# CIA Decl.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATELYN SACK,

        Plaintiff,

    v.

CENTRAL INTELLIGENCE AGENCY,
  et al.,

        Defendants.

Case No. 1:12-CIV-00244 (EGS)

## DECLARATION OF MARTHA M. LUTZ
### CHIEF OF THE LITIGATION SUPPORT UNIT
### CENTRAL INTELLIGENCE AGENCY

I, MARTHA M. LUTZ, hereby declare and state:

    1.  I am the Chief of the Litigation Support Unit of the Central Intelligence Agency ("CIA" or "Agency").  I have held this position since October 2012.  Prior to assuming this position, I served as the Information Review Officer ("IRO") for the Director's Area of the CIA for over thirteen years.  In that capacity, I was responsible for making classification and release determinations for information originating within the Director's Area, which includes the Office of the Director of the CIA and the Office of General Counsel, among others.  I have held other administrative and professional positions within the CIA since 1989.

    2.  As the Chief of the Litigation Support Unit, I am authorized to assess the current, proper classification of CIA

information, based on the classification criteria of Executive

Order 13526 and applicable CIA regulations.[1]  I am also

responsible for the classification review of documents and

information, including documents which may be the subject of

court proceedings or public requests for information under the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  As part of

my official duties, it is my responsibility to ensure that any

determinations as to the public release or withholding of any

such documents or information are proper and do not jeopardize

the national security.

    3.  As a senior CIA official under a written delegation of

authority pursuant to section 1.3(c) of Executive Order 13526,

as amended, I hold original classification authority at the TOP

SECRET level.  I am authorized, therefore, to conduct

classification reviews and to make original classification and

declassification decisions.

    4.  Pursuant to authority delegated by the Associate Deputy

Director of the CIA, I also have been appointed Records

Validation Officer ("RVO").  As RVO, I am authorized to sign

declarations on behalf of the CIA regarding searches for

records, and the contents of any located records, including

---

[1] Executive Order 13526 was issued by President Barack Obama on 29 December 2009.  *See* 75 Fed. Reg. 707 (Jan. 5, 2010). Executive Order 13526 superseded Executive Order 12958, as amended.

2

those located in or containing information from all CIA directorates.

5.   Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA requests.  I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

I.   RELEVANT PROCEDURAL HISTORY OF PLAINTIFF'S FOIA REQUESTS

   A.   FOIA Request F-2011-00389

6.   By letter received by the Agency on 30 November 2010, plaintiff submitted to CIA a FOIA request for copies of all "CIA documents pertaining in whole or in part (all years, all classifications) to a list of closed Inspector General investigations and reports."  Plaintiff also asked for a fee waiver in her capacity of "an independent film-maker" with a desire to create a "documentary on polygraphs," "an independent writer," and as a doctoral student of Politics.  A copy of the 30 November 2010 letter is attached as Exhibit A.

7.   By letter dated 7 February 2011, the CIA responded to plaintiff's correspondence and informed her that the CIA "cannot accept [her] FOIA request in its current form because it would require the Agency to perform an unreasonably burdensome search."  The letter also noted that "[t]he FOIA requires

3

requesters to 'reasonably describe' the information they seek
so that professional employees familiar with the subject matter
can locate responsive information with a reasonable amount of
effort."  The letter further explained that because of "breadth
of [the] request, and the way in which our records systems are
configured, the Agency cannot conduct a reasonable search for
information responsive to [plaintiff's] request."  Lastly, the
letter recommended that plaintiff refine the scope of her
request to allow for a search to be conducted.  A copy of the
7 February 2011 letter is attached as Exhibit B.

    8.   Plaintiff did not administratively appeal the Agency's
determination, resubmit her request, or contact the Agency to
reformulate or clarify her request.

    B.   FOIA Request F-2011-01757

    9.   In a letter dated 5 July 2011, plaintiff, via her
counsel, submitted a request for "copies of all [CIA] records
referencing FOIA, Privacy Act [PA], or Mandatory
Declassification Review [MDR] requests submitted by her
including [four specific requests] that contain remarks,
comments, notes, explanations, etc. made by CIA personnel or
contractors about the processing of these requests (and appeals,
if appropriate), the invocation of exemptions, or related
matters."  The request further stated that plaintiff did not

seek correspondence exchanged between her and the agency in the course of the processing of those requests or the underlying records responsive to those requests. The request noted that due to "the low number of responsive records" that plaintiff believed to be at issue, she did not request a public interest fee waiver at this time. However, plaintiff asked to be contacted in the event that the Agency released more than 100 pages of responsive records so that she could submit a fee waiver. A copy of the 5 July 2011 letter is attached as Exhibit C.

10. By letter dated 11 August 2011, the CIA's Information and Privacy Coordinator confirmed the receipt of plaintiff's 5 July 2011 letter and noted that, as a matter of administrative discretion, the Agency waived any fees associated with the request. A copy of the 11 August 2011 letter is attached as Exhibit D.

11. By letter dated 6 June 2012, the CIA advised plaintiff that it located a total of 43 responsive records. The Agency further informed plaintiff that 15 records were being released in part with redactions made pursuant to Exemptions (b)(1), (b)(3), and (b)(5) of the FOIA, and that 28 documents were withheld in full under Exemptions (b)(3) and (b)(5). In the course of litigation, it was determined that Exemption (b)(1) is

not applicable to the one record for which that Exemption was claimed.  However, the information initially withheld pursuant to Exemption (b)(1) remains covered by Exemptions (b)(3) and (b)(5); the propriety of these withholdings is discussed below. A copy of the 6 June 2012 letter is attached as Exhibit E.

C.  FOIA Request F-2011-01778

12.  By letter dated 5 July 2011, plaintiff, through counsel, requested a copy of "[a]ll records pertaining to changes made since 1994 in 'the policies applicable to the training, supervision, and performance appraisal of polygraph examiners to ensure that polygraph examinations are conducted in a professional manner and produce optimum results,' in keeping with Recommendation 17 of the [Senate Select Committee on Intelligence (SSCI)] Report."[2]  Plaintiff also requested "all current 'policies'" related to those standards and "any other records pertaining to Recommendation No. 17 of the SSCI Report." The request also asked that plaintiff be considered a representative of an educational institution in connection with her status as student and that she be granted a public interest fee waiver on the basis that her research on "bias in

_____

[2] The Senate Select Committee on Intelligence published a staff report entitled "An Assessment of the Aldrich Ames Espionage Case and its Implications for U.S. Intelligence," in which it presented various recommendations based its analysis of the Ames case.  See U.S. Senate, 103d Cong. 2d Sess. (Nov. 1, 1994).  Recommendation Number 17 concerned the tightening of "polygraph procedures in order to make the polygraph more useful."  Id.

polygraphs" is "of interest to the public at large,
because . . . [it] potentially affects millions of Americans."
A copy of the 5 July 2011 letter is attached as Exhibit F.

13.   By letter dated 26 July 2012, the CIA advised
plaintiff that it had located a total of nine responsive
documents, seven of which it was releasing in part with
redactions made pursuant to Exemptions (b)(1), (b)(3) and (b)(6)
of the FOIA.  Additionally, the Agency informed plaintiff that
it was also withholding two documents in full in accordance with
Exemptions (b)(3) and (b)(5).  A true and correct copy of the
26 July 2012 letter is attached as Exhibit G.

D.   FOIA Request F-2011-01779

14.   By letter dated 5 July 2011, plaintiff, through
counsel, submitted a FOIA request for "all records pertaining to
'[evaluations] of the polygraph as a part of the CIA's security
program' since[ ]1994 in keeping with Recommendation 18 of the
SSCI Report."[3]  Additionally, plaintiff's request asked for all
records pertaining to "polygraph reliability and validity with
respect to deception detection," "polygraph's relation to other
aspects of the security process," "inconclusive test results,
especially *(but not limited to)* situations in which there are

---

[3] Recommendation 18 of the SSCI Report recommended that the Director of
Central Intelligence institute a fundamental revaluation of the polygraph as
part of the CIA's security program.  <u>See</u> U.S. Senate, 103d Cong. 2d Sess.
(Nov. 1, 1994).

not damaging admissions," "use of deceptive polygraph results in
the absence of damaging admissions," and "any other records
pertaining to Recommendation No. 18 of the SSCI Report."  As
with request F-2011-01778, plaintiff asked that she be
considered a representative of an educational institution for
fee purposes and sought a public interest fee waiver on the
basis that her research "would significantly contribute to the
public's understanding of the government's use of polygraphy."
A true and correct copy of the 5 July 2011 letter is attached as
Exhibit H.

15.  By letter dated 6 June 2012, the CIA informed
plaintiff that it located five documents, four of which it was
releasing in part with deletions made on the basis of
Exemptions (b)(1), (b)(3) and (b)(6).  The CIA further advised
plaintiff that it was withholding the remaining document in full
pursuant to Exemptions (b)(1) and (b)(3).  A true and correct
copy of the 6 June 2012 letter is attached as Exhibit I.

II.  SEARCH FOR RECORDS RESPONSIVE TO
     REQUESTS F-2011-01757, F-2011-01778 and F-2011-01779

16.  The Information Management Services ("IMS") component
of the CIA is the initial reception point for all requests for
information under the FOIA.  IMS information management
professionals assess each request, determine which CIA
directorate(s) might reasonably be expected to possess

8

responsive records, and transmit a copy of the request to the IRO in IMS for the appropriate directorate(s) for action. All searches in this matter were initiated after litigation commenced. Consistent with the CIA's current practice, the date of the searches, rather than the dates that the requests were received, were used as the cut-off dates.

A.   Request F-2011-01757

17.   In this case, IMS determined that plaintiff's request for records related to her past FOIA, PA, and MDR requests would be maintained in the CIA's Automated Declassification and Release Environment (CADRE). CADRE is a case management system maintained by IMS which acts as a repository for documents related to various release programs, including FOIA, PA and MDR. CADRE holds correspondence between the Agency and the requester and often contains electronic versions of the documents that are the subject of the request. Additionally, CADRE also contains all of the background associated with the request including search details, processing notes, and discussions related to release determinations.

18.   CADRE is the only Agency system of records that is reasonably likely to maintain records responsive to plaintiff's request F-2011-01757, seeking "remarks, comments, notes, explanations, etc. made by CIA personnel or contractors about

9

the processing" of her previous FOIA, PA and MDR requests.
Accordingly, IMS searched CADRE using the requester's name.[4]
Excluding any correspondence and the documents responsive to the
earlier requests, which plaintiff specified were not requested
here, IMS located 43 responsive records.  The disposition of
these records is further discussed below and in the Agency's
Vaughn Index as Exhibit J.

   B.  F-2011-01778 and F-2011-01779

   19.  With respect to requests F-2011-01778 and F-2011-
01779, which sought various polygraph-related records, IMS
determined that the Office of Security (OS) within the
Directorate of Support was the only office that is reasonably
likely to maintain responsive records.  OS oversees security
programs that are designed to protect Agency personnel,
intelligence, operations and facilities.  OS is responsible for
the oversight, administration and execution of the Agency's
polygraph program.  No other offices or Directorates were deemed
reasonably likely to maintain records responsive to plaintiff's
requests for these polygraph documents.

   20.  A senior OS employee within the Agency's polygraph
program who is knowledgeable about its record holdings conducted
a hand search of OS's hard copy files and electronic database.

---

[4] Because the requester has made requests under the names "Kathryn Sack" and
"Katelyn Sack," IMS searched using both variations.

10

The paper files and the database were the only systems that are reasonably likely to contain records responsive to plaintiff's various requests for polygraph-related information.  For the manual search, the OS employee reviewed by hand all the paper polygraph files, including soft file personnel folders to identify the different items requested by plaintiff.  With respect to the database searches, OS conducted keyword searches using search terms posed by plaintiff's requests, such as "validity," "quality," "reliability," "incentives," and "training" modified by the term "polygraph."  For request F-2011-01778, OS searched for any records pertaining to changes in polygraph policies since 1994, including all records related to training, supervision and performance appraisal of polygraph examiners, and Recommendation No. 17 of the SSCI Report.  OS's search yielded a total of nine responsive records.  Similarly, for request F-2011-01779, OS searched for evaluations of the polygraph program since 1994, including all records related to the evaluation of the security program, the reliability and validity of the polygraph, deception as it relates to the polygraph, and Recommendation No. 18 of the SSCI Report.  As a result of this search, OS located a total of five documents. CIA's redactions to the documents identified as responsive to

plaintiff's requests are explained below as well as the in attached Vaughn Index at Exhibit J.

III.  FOIA REQUEST F-2011-00389 - NOT REASONABLY DESCRIBED

21.  With respect to F-2011-00389, IMS determined that plaintiff's correspondence does not constitute a reasonably described request and, to the extent that plaintiff's request sought any and all records pertaining to closed OIG investigations and reports, the request would be unduly burdensome.  Specifically, plaintiff's correspondence asked for all "CIA documents pertaining in whole or in part (all years, all classifications) to a list of closed Inspector General investigations and reports."  (Ex. A.)

22.  As written, plaintiff's request does not describe a record or records that could be identified with a reasonable amount of effort.  The Agency's records systems do not allow it to search for and identify records that somehow pertain "to a list" of closed investigations.  To the extent that the plaintiff seeks "any" record that "pertains" to closed OIG investigations and reports, such a search would be unduly burdensome to conduct because the lack of a clear subject would mean that any document referencing an OIG investigation or report would be potentially responsive.  Moreover, to the extent that plaintiff instead intended to request a comprehensive list

12

of closed OIG investigations, the OIG has determined that no such listing exists.

23.  The Agency advised plaintiff that the request as currently worded is not reasonably described or that, if a search were conducted based on the limited information available in the request, it would constitute an unduly burdensome search. The CIA then invited plaintiff to reformulate or clarify her request.  Plaintiff declined to do so - she did not contact the Agency to explain or narrow the scope of her request, nor did she submit an administrative appeal on this request. Accordingly, the Agency administratively closed request F-2011-00389.

IV.  APPLICABLE FOIA EXEMPTIONS

A.  Exemption (b)(1)

24. Exemption (b)(1) provides that the FOIA does not require the production of records that are:  "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  As explained below, the Exemption (b)(1) withholdings present in the responsive documents satisfy the procedural and the substantive requirements of the relevant Executive Order 13526.

13

25.   Section 1.1(a) of Executive Order 13526 provides that information may be originally classified under the terms of this order if the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of Executive Order 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.   The Executive Order also mandates that records be properly marked and that the records have not been classified for an improper purpose.

i.   <u>Procedural Requirements</u>

26.   <u>Original classification authority.</u> Pursuant to a written delegation of authority in accordance with Executive Order 13526, I hold original classification authority at the TOP SECRET level.   Therefore, I am authorized to conduct classification reviews and to make original classification decisions.   I have determined that certain records or portions

of records responsive to plaintiff's requests are currently and properly classified SECRET and CONFIDENTIAL.

27.  U.S. Government information.  The information at issue is owned by the U.S. Government, was produced by or for the U.S. Government, and is under the control of the U.S. Government.

28.  Classification categories in Section 1.4 of the Executive Order.  Exemption (b)(1) is asserted in this case to protect information that concerns "intelligence activities (including covert action),[or] intelligence sources or methods," pursuant to § 1.4(c) of the Executive Order.

29.  Damage to the national security.  I have determined that certain information contained in the responsive records is classified SECRET, because it constitutes information the unauthorized disclosure of which could reasonably be expected to result in serious damage to the national security.  Some information is classified CONFIDENTIAL because it constitutes information the unauthorized disclosure of which could reasonably be expected to result in damage to the national security.

30.  Proper purpose.  With respect to the information relating to CIA sources, methods, and activities described in this declaration for which Exemption (b)(1) is asserted in this case, I have determined that this information has not been

15

classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security.

31. Marking. The documents are properly marked in accordance with section 1.6 of the Executive Order.

ii. Substantive Requirements

32. In processing the documents for this litigation, IMS professionals have reviewed the records identified as exempt under Exemption (b)(1) in the attached Vaughn Index, which I incorporate by reference, and determined that they contain information that is currently and properly classified.

33. Specifically, IMS determined that certain information was properly withheld because its disclosure could be expected to lead to the identification of intelligence sources and methods of the CIA within the meaning of § 1.4(c) of Executive Order 13526. Additionally, IMS found that disclosure of this information could reasonably be expected to result in damage or, in some instances, serious damage to national security and therefore that information is currently and properly classified at the CONFIDENTIAL and SECRET levels.

16

34.   Here, the information withheld pursuant to Exemption (b)(1) consists of information regarding covert employees, field installations, and the utility of the polygraph.

35.   The CIA considers the identities of its undercover employees to constitute information pertaining to intelligence methods.   In order to carry out its mission of gathering and disseminating intelligence, the CIA places certain CIA employees undercover to protect the fact, nature, and details of the CIA's interest in foreign activities and the intelligence sources and methods employed to assist those activities.   Disclosing the identity of an undercover employee could expose the intelligence activities with which the employee has been involved, the sources with whom the employee has had contact, and other intelligence methods used by the CIA.   Compromise of an officer's cover not only reveals his or her intelligence officer status, but also permits individuals to ascertain the precise location where that person works.   Disclosing the identity of an undercover employee could jeopardize the safety of the employee, his or her family, his or her sources, and even other persons with whom he or she has had contact.

36.   Additionally, Exemption (b)(1) was asserted to protect the location of a covert field installation.   Official

acknowledgment that the CIA maintains an installation in a particular location abroad may cause the government of the country in which the installation is located to take countermeasures to eliminate the CIA presence within its borders or otherwise to retaliate against the United States Government, its employees, or agents.  Revealing this information also could result in terrorists and foreign intelligence services targeting that installation and persons associated with it.  Additionally, in some cases, the disclosure of information concerning a covert CIA installation would, in and of itself, reveal specific intelligence activities for which the CIA uses the installation.

37.  Lastly, the CIA asserted Exemption (b)(1) to protect portions of a report detailing the utility of the polygraph.[5] The polygraph is an important tool used by the Agency in assessing the suitability of applicants and current employees. In the course of their work, CIA employees have access to sensitive compartmented information.  The applicant and employee screening process is one of the methods used to determine whether an individual can be entrusted with such access.  If the aspects of the Agency's polygraph program were to be disclosed, unscrupulous individuals could circumvent security screening procedures in order to attain a position of trust.  Such

---

[5] As further discussed below, the CIA also asserts Exemption 3 to withhold this report in full.

individuals could then make unauthorized disclosures of classified information or otherwise subvert the Agency's functions, which would in turn cause serious harm to national security.

38.   For the foregoing reasons, the CIA has determined that information pertaining to covert employees, covert CIA installations abroad, and the utility of polygraph examinations, reasonably could be expected to cause harm to the national security of the United States and that therefore this information is currently and properly classified pursuant to Executive Order 13526.   As such, this information has been withheld from release pursuant to Exemption (b)(1).

B.   <u>Exemption (b)(3)</u>

39.   Exemption (b)(3) protects information that is specifically exempted from disclosure by statute.   A withholding statute under Exemption (b)(3) must (A) require that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establish particular criteria for withholding or refer to particular types of matters to be withheld.   5 U.S.C. § 552(b)(3).

40.   For these requests, the CIA invoked Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 403g (the "CIA Act"), in conjunction with Exemption (b)(3).

19

Section 6 of the CIA Act protects from disclosure information that would reveal the CIA's organization, functions, including the function of protecting intelligence sources and methods, names, official titles, salaries, or numbers of personnel employed by the CIA.  The CIA Act has been widely recognized by courts to be a federal statute that "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  The statute does not require a showing of harm in order to withhold any applicable material.

41.  Here, pursuant to Section 6 of the CIA Act, the CIA withheld the names of CIA employees; information disclosing their organizational functions, including functions related to the protection of intelligence sources and methods; official titles; contact information for CIA personnel; and internal CIA organizational data, including file paths.  The CIA also withheld information about internal taskings which would reveal internal document processing methods, as well as the organization of and capabilities related to the CIA's decentralized information management systems.[6]  The CIA also withheld three reports in full on the basis that they would reveal internal CIA organizational and functional information.

---

[6] As discussed below, the CIA also invoked Exemption 5 for tasking information that contained pre-decisional deliberations regarding record searches and the applicability of exemptions for specific information.

This information pertains to the protection of intelligence sources and methods including specific polygraph techniques and procedures, and functions of CIA polygraph examiners, analysis of polygraph testing data, and evaluations of the role of polygraphs within the Agency's personnel security program. Although no harm rationale is required by Exemption (b)(3), the Agency notes that disclosure of this information would provide a roadmap for persons attempting to circumvent the Agency's testing and personnel screening procedures.  The CIA Act covers all of the information at issue in this case that was withheld under Exemption (b)(3).

42.  Additionally, the CIA has determined that Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1(i)(1) (the "National Security Act"), which provides that the Director of National Intelligence "shall protect intelligence sources and methods from unauthorized disclosure" also applies to the three reports that were withheld in full.  As an initial matter, the National Security Act is likewise a well-recognized Exemption (b)(3) withholding statute that both refers to particular types of matters to be withheld, and "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue."  5 U.S.C. § 552(b)(3).

21

43.   In this case, the National Security Act covers the withheld information insofar as it would reveal covert employees and facilities as well as the limitations, capabilities, successes, weaknesses or other issues pertaining to polygraph examinations.   Again, this information would expose sources and methods of the agency, not simply in the personnel screening settings, but also the capabilities and limitations of the polygraph in all applications.   As indicated above, although no harm rationale is required, the release of this information would provide dishonest individuals with a means to circumvent the Agency's screening procedures and gain access to classified information and facilities.   Additionally, disclosure of the reports would allow persons to develop countermeasures to mask deception during the screening process.

C.   Exemption (b)(5)

44.   FOIA exemption (b)(5) provides that FOIA does not apply to inter-agency or intra-agency memoranda or letters that would not be available by law to a private party in litigation with the agency.   5 U.S.C. § 552(b)(5).   As described in the attached Vaughn Index, the CIA determined that the information for which Exemption (b)(5) was asserted is protected by the deliberative process and attorney work product privileges.

45.  The CIA invoked the deliberative process privilege with respect to communications between Agency personnel that discuss the nature of information retrieved in response to plaintiff's FOIA, PA and MDR requests, the scope of legal exemptions and the application of exemptions to particular material, or recommendations.  All of these discussions pre-date the Agency's final determinations with the respect to plaintiff's earlier requests.  Disclosure of this information would inhibit the frank communications and the free exchange of ideas that the privilege is designed to protect.

46.  The CIA also asserted the deliberative process privilege to withhold a draft inter-agency inspection report, which originated with the U.S. Department of Defense (DOD), but contains substantial CIA equities.  The draft report contains preliminary evaluations and recommendations with respect to the Agency's polygraph program.  Additionally, the deliberative process privilege also applies to second DOD report which provides specific recommendations about the polygraph program.  The report was provided to the Agency as part of a DOD assessment and required the CIA's response to specific recommendations.  Disclosure of this information would significantly hamper the candid discussions between federal agencies.  These documents do not contain any reasonably

23

segregable factual information that would not betray the
deliberative process.[7]

47.   Additionally, the attorney-client privilege applies to
emails that contain legal advice provided by the CIA's Office of
General Counsel to IMS in connection with the instant
litigation.  The confidentiality of these communications was
maintained and the contents of these emails were not shared
beyond the parties.  If this type of confidential, candid
information were to be disclosed, it would inhibit open
communication between client-agencies and their attorneys,
thereby depriving the agencies of the full and frank counsel of
their attorneys.

48.   Additionally, insofar as any of the documents for
which Exemption (b)(5) was claimed contain internal
organizational and functional information such as names of CIA
personnel, official titles or deliberative functions within the
organization, routing or administrative data, the information is
protected pursuant to Exemption (b)(3) as further detailed in
the Vaughn Index at Exhibit J.

D.   Exemption (b)(6)

49.   Exemption (b)(6) provides FOIA's information-release
requirements do not apply to "personnel and medical files and

_____
[7] As addressed above, these two reports were also withheld in full on the
basis of Exemption 3.

24

similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Courts have broadly construed the term "similar files" to cover any personally identifying information. Here, the CIA invoked FOIA exemption (b)(6) to withhold exempt information regarding individual employees.

50. Specifically, the Agency withheld evaluative information related to specific employees as well as the identifying information of the officials involved in the review. These persons maintain a strong privacy interest in this information because its release could subject them to harassment, embarrassment or unwanted contact.

51. Conversely, plaintiff has not set forth and, I am unable to identify in each of these instances, any qualifying public interest that would be served by such a disclosure. The release of the identities of these individuals would not serve the core purpose of the FOIA -- informing the public as to the operations or activities of the government. Accordingly, because there is no qualifying public interest in disclosure, I have determined that the release of this information would constitute a clearly unwarranted invasion of these individuals' personal privacy. Additionally, to the extent that the identifying information is that of Agency personnel, the

protections of Exemption (b)(3) in conjunction with the CIA Act jointly apply.

V.   CONSULTATION WITH DEPARTMENT OF DEFENSE

52.   The Department of Defense (DOD), a co-defendant in this action, requested that the Agency review several documents involved in this litigation for CIA equities.  The Agency determined that only one document entitled "Review of the Actions Taken to Deter, Detect and Investigate the Espionage Activities of Ana Belen Montes" contained CIA equities and applied Exemptions (b)(1), (b)(3), (b)(5) and (b)(6) to protect that material.  DOD advised the Agency that plaintiff is not challenging any of the redactions made pursuant to Exemption (b)(1).  In this case, Exemption (b)(1) covers all the information for which Exemptions (b)(5) and (b)(6) are also claimed and, in some instances, information for which Exemption (b)(3) is asserted.  Accordingly, I will only address the information for which Exemption (b)(3) alone is claimed.  The material protected by Exemption (b)(3) consists of information pertaining to internal CIA programs, subject matter groups, an internal publication, and Agency employees.  This information is withheld pursuant to the Section 6 of the CIA Act because it would reveal the Agency's organizational functions, including functions related to the protection of intelligence sources and

26

methods, and the identities of CIA personnel.  Additionally, insofar as this information relates to Agency programs, subject matter groups and the internal publication, Section 102A(i)(1) of the National Security Act of 1947 also applies because disclosure of the information would reveal specific intelligence sources and methods.

VI.   SEGREGABILITY

53.  In evaluating responsive documents, the CIA conducted a document-by-document and line-by-line review and segregated all nonexempt from exempt information.  In instances where no segregable, non-exempt portions of documents could be released without potentially compromising classified information, information concerning intelligence sources and methods, or other information protected by FOIA, then such documents were withheld from plaintiff in full.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of April 2013.

Martha M. Lutz
Chief, Litigation Support Unit
Central Intelligence Agency

27