# COUNT 3 VAUGHN INDEX (CIA)

## Katelyn Sack v. CIA et al

| | |
|---|---|
| **FOIA/PA Request No.:** | F-2011-01778 |
| **Document Number:** | 1 |
| **Date of Document:** | UNDATED |
| **Document Type:** | Form |
| **Classification:** | Unclassified |
| **From/To:** | N/A |
| **Subject:** | Non-Competitive Promotion to GS-09, GS-10, and GS-11 Requirements |
| **Document Pages:** | 3 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☐ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ○ Denied in Full
- ● Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is a 3-page undated document contains non-competitive promotion requirements. CIA internal dissemination control markings, internal rating and organizational information have been withheld.  This document is currently and properly UNCLASSIFIED.

This document is withheld in part on the basis of FOIA exemption (b)(3).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3).  This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3).

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

Name: _____  _____ _____     graduation date: _____

(b)(3)

## NON COMPETITIVE PROMOTION TO GS-09 REQUIREMENTS

— 1. **ASSIGNED CASE TYPES**- First session, full scope [_____] cases          _____

2. **LEVEL OF GUIDANCE**- Close supervision by TL          _____

3. **GATHERING DATA / INFORMATION**                    PRIOR [_____] EXPERIENCE  _____

**Case Planning:**  Conducts a proper file review, has all applicable forms and alternative sensors ready          _____

**Pre Test**- Picks up subject on time, develops rapport, runs an acceptable [_____] properly scopes questions  _____

**In Test**- Produces charts of acceptable quality, employs valid formats with acceptable questions          _____

**Post Test**- [_____] gathers information with TL guidance _____

**Specialized Test**- Uses a proper [_____] format with relevant questions that completely cover the issue  _____

**Summary**- Conducts a complete and accurate interview summary at the end of the session          _____

4. **ANALYSIS**                                   PRIOR [_____] EXPERIENCE  _____

**Phase Test**- Conducts a proper [_____] evaluation following [___] guidelines, QC in person with TL  _____

**Specialized Test**- Conducts a proper numeric evaluation [_____] with TL guidance  _____

**Case Facts**- Evaluates case facts, briefs TL, determines the need for any immediate action by the TL  _____

5. **WRITING**                                    PRIOR [_____] EXPERIENCE  _____

**Past Perm**- Properly enters all required information at the end of the session          _____

**Tech Reports**- Produces a complete and concise technical review of the case in [_____]  _____

**Exam Reports**- Produces an accurate and timely [_____] report for [___] requiring only routine editing  _____

6. **ACCEPTABLE COMPREHENSIVE REVIEWS**          _____

7. [_____]          _____

8. **TL RECOMMENDATION FOR PROFESSIONAL DEVELOPMENT**- _____

9. **BC CONCURRENCE** - _____

APPROVED FOR RELEASE DATE: 25-Jul-2012

②

C05836394

_____   _____   _____   graduation date:_____

## NON COMPETITIVE PROMOTION TO GS-10 REQUIREMENTS
### (meets all prerequisite GS-09 requirements)

1. **ASSIGNED CASES**- First and second session, [_____] cases                     _____

2. **LEVEL OF GUIDANCE**- Routine supervision by TL, learning to operate more independently      _____

3. **GATHERING DATA / INFORMATION**                     PRIOR [____] EXPERIENCE      _____

   **Case Planning**- Reviews first session information, develops sound strategy for second session with TL      _____

   **Pre Test**- Develops good rapport, [_____] (30 minutes)      _____

   **In Test**- Gets into operation quickly and produces good chart quality, makes effective adjustments      _____

   **Post Test**- [_____] gets admissions      _____

   **Specialized Test**- Develops and uses appropriate [_____] question material, uses a fourth chart as needed      _____

   **Summary**- Gathers any amplifying data and builds subject up before releasing them      _____

4. **ANALYSIS**                     PRIOR [____] EXPERIENCE

   **Phase Test**- Identifies problem areas with confidence, confers electronically with TL      _____

   **Specialized Test**- Effectively uses [____] review and numeric scoring to make valid decisions in real time      _____

   **Case Facts**- Evaluates case facts, briefs TL, determines the need for any immediate TL or [____] action      _____

5. **WRITING**                     PRIOR [____] EXPERIENCE      _____

   **Past Perm**-Properly records session information and notifies [____] of any unique situations      _____

   **Tech Report**- Includes recommendations for the second session examiner      _____

   **Exam Report**- Submits accurate reports, requiring only minor editing, within five days      _____

6. **ACCEPTABLE COMPREHENSIVE REVIEWS**      _____

7. [_____]      _____

8. **TL RECOMMENDATION FOR PROFESSIONAL DEVELOPMENT:** _____

9. **BC CONCURRENCE**- _____

graduation date:_____

## NON COMPETITIVE PROMOTION TO GS-11 REQUIREMENTS
### (meets all prerequisite GS-10 requirements)

1. **ASSIGNED CASES**- First and second session [                                    ]

2. **LEVEL OF GUIDANCE**- Minimal supervision by TL, comfortable and successful in independent operation _____

3. **GATHERING DATA / INFORMATION**                PRIOR [        ] EXPERIENCE _____

   **Case Planning**- Independently develops case strategies, plans for contingencies _____

   **Pre Test**- Establishes an environment conducive to successful testing, overcomes past exam problems _____

   **In Test**- Adapts quickly to problematic charts, runs clear and uncluttered charts with minimal chart minutes _____

   **Post Test**- [                                        ] gets hard admissions _____

   **Specialized Test**- Develops new and valid relevant [            ] questions to meet unique admissions _____

   **Summary**- Emphasizes proper "context" on complex issues _____

4. **ANALYSIS**                                    PRIOR [        ] EXPERIENCE _____

   **Phase Test**- Identifies problem areas quickly and independently _____

   **Specialized Test**- Stays in the exam room and uses all available data to make independent decisions _____

   **Case Facts**- Evaluates case facts, briefs TL, determines the need for any immediate [          ] action _____

5. **WRITING**                                    PRIOR [        ] EXPERIENCE _____

   **Past Perm**- Properly records session information and notifies [            ] of any unique situations _____

   **Tech Report**- Documents unique technical issues and makes recommendations for future testing _____

   **Exam Report**- Accurately answers all the standard interrogatories, makes complex issues easily understood _____

6. **ACCEPTABLE COMPREHENSIVE REVIEWS** _____

7. [                                                ] _____

8. **TL RECOMMENDATION FOR PROFESSIONAL DEVLOPMENT:** _____

9. **BC CONCURRENCE-** _____

# Katelyn Sack v. CIA et al

| | |
|---|---|
| **FOIA/PA Request No.:** | F-2011-01778 |
| **Document Number:** | 2 |
| **Date of Document:** | UNDATED |
| **Document Type:** | Form |
| **Classification:** | Unclassified |
| **From/To:** | Office of Security/All Security Officers and Polygraphers |
| **Subject:** | Code of Ethics |
| **Document Pages:** | 1 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☐ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ○ Denied in Full
- ● Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**

This is a 1-page undated document used by the Office of Security to as a Code of Ethics distributed to all future security officers and polygraph examiners. Personal identifying information (e.g. name) and CIA internal dissemination control markings have been properly withheld. The substantive portion of the document has been released. This document is currently and properly UNCLASSIFIED.

This document is withheld in part on the basis of FOIA exemption (b)(3).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational functions, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3).

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 2 -



# CODE OF ETHICS



### AS SECURITY OFFICERS OF THE CIA, POLYGRAPH EXAMINERS UNDERSTAND AND AGREE TO ADHERE TO THE FOLLOWING PRINCIPLES:

1. TO UPHOLD THE HIGHEST STANDARDS OF MORAL, ETHICAL, AND PROFESSIONAL CONDUCT AS SET FORTH IN THE CIA CREDO.

2. TO TEST EACH EXAMINEE IN A MANNER THAT IS IMPARTIAL AND FAIR, WITHOUT REGARD TO THE EXAMINER'S PERSONAL FEELINGS TOWARD THE SUBJECT'S SOCIAL, RACIAL, ECONOMIC STATUS, OR PHYSICAL CHARACTERISTICS.

3. TO TREAT ALL SUBJECTS WITH RESPECT AND CONSIDERATION.

4. TO REPORT POLYGRAPH DERIVED INFORMATION ACCURATELY, IMPARTIALLY AND WITHOUT REGARD TO ANY OUTSIDE INFLUENCES BROUGHT TO BEAR ON THE CASE OR THE EXAMINER. A CIA EXAMINER SHALL NOT KNOWINGLY ALLOW ANY REPORT TO BE SUBMITTED THAT IS FALSE OR MISLEADING.

5. TO UPHOLD AND PROTECT THE PRIVACY OF EACH SUBJECT AFFORDED A CIA POLYGRAPH EXAMINATION AS PRESCRIBED BY AGENCY POLICY.

6. TO CONDUCT EXAMINATIONS USING STANDARD POLYGRAPH METHODS AND TECHNIQUE AS PRESCRIBED BY THE

7. TO CONDUCT EACH EXAMINATION IN A MANNER THAT UPHOLDS THE NATIONAL SECURITY INTERESTS OF THE UNITED STATES INTELLIGENCE COMMUNITY.

8. CIA EXAMINERS SHALL AT ALL TIMES REALIZE THAT THEY OCCUPY A POSITION OF EXTRAORDINARY TRUST, RESPONSIBILITY, AND SENSITIVITY; AND EVERY EFFORT SHALL BE MADE TO ADHERE TO THE HIGHEST ETHICAL AND PROFESSIONAL STANDARDS WHILE ADMINISTERING POLYGRAPH EXAMINATIONS.

APPROVED FOR RELEASE DATE: 25-Jul-2012

⑤

# Katelyn Sack v. CIA et al

| | |
|---|---|
| **FOIA/PA Request No.:** | F-2011-01778 |
| **Document Number:** | 3 |
| **Date of Document:** | 02/11/2011 |
| **Document Type:** | Memo/Report |
| **Classification:** | Unclassified |
| **From/To:** | N/A |
| **Subject:** | Polygraph Procedures Manual |
| **Document Pages:** | 91 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☐ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ○ Denied in Full
- ● Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is a 91-page document dated 02/11/2011 titled "Polygraph Procedures Manual" and discusses authorities, code of ethics, examiner standards, and other topics with regard to polygraph examinations. The CIA redacted information relates to the polygraph techniques, internal procedures and analysis. This document is currently and properly UNCLASSIFIED.

This document is withheld in part on the basis of FOIA exemption (b)(3).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 3 -

U//FOUO



# Polygraph Procedures Manual

**Last Updated:**

**11 February 2011**

APPROVED FOR RELEASE DATE: 25-Jul-2012





U//FOUO

## INTRODUCTION: Philosophy, Standards, and Utility

The philosophy [                    ] is that we must provide quality polygraph services to our customers. We are accountable for using valid, reliable and effective polygraph testing methods. Our examiners must be able to demonstrate to the satisfaction of others that their polygraph decisions are based on procedures generally accepted by the polygraph profession.

The Agency's polygraph program, therefore, will use procedures that are accepted within the polygraph community. These procedures must meet the highest professional standards. While there is room for personal preferences and modifications within certain boundaries, it is imperative that we follow universally accepted procedures as closely as practical. Quickly identifying and correcting procedural and technical errors will continue to have a high priority [                    ]

When administered competently, polygraph tests are an accurate, and sometimes the only means available for determining the truth. Therefore, the purpose of this manual is to provide guidance and establish controls regarding polygraph procedures. Continuing efforts will be made to ensure we meet the needs of our customers, while ensuring fair, valid, and reliable polygraph examinations.

No manual can anticipate or cover every circumstance or question about policy. As we continue to accomplish our mission [        ] there will be a need to revise, supplement, or rescind policies or portions of policies. Every effort will be made to keep [        ] personnel informed of such changes as they occur. If a question about polygraph policy or procedure arises and cannot be found in the manual, feel free to bring your questions to the next level of supervision or to the [                    ]. If the solution is not immediately available, one will be forthcoming.

U//FOUO

# Table of Contents

Introduction .................................................. ii

I    Polygraph Program Basic Authorities ................. 7

    A.   National Security Act, 1947 ...................... 7
    B.   Central Intelligence Act, 1947 ................... 7
    C.   Executive Orders ................................. 7
    D.   National Security Directive 63 ................... 7
    E.   EPPA, 1988 ....................................... 7
    F.   Office of Security – Authority ................... 8
    G.   Regulations and Directives ....................... 8
    H.   Polygraph Memorandum of Agreement ........... 9

II    Polygraph Division Mission Statement ................ 13

III   Polygraph Division Code of Ethics ...................... 14

IV   Quality Control & Assurance .......................... 15

    A.   Examination Quality ............................. 15
    B.   Quality Control ................................. 15
    C.   Quality Assurance ............................... 15

V    Examination Facilities ............................... 16

    A.   Examination Room Décor/Appearance ............. 16
           ... 16

VI   Examiner Standards .................................. 17

    A.   Examiner Appearance ............................ 17
    B.   Examiner Conduct ............................... 17

U//FOUO

C05836404

U//FOUO

VII   Health Aspects of Examinees .........................… 18

    A.  Suitability for Testing ......................... 18
    B.  Physically Challenged Examinees ............... 19
    C.  Medical Emergency ......................... 19

VIII  Pretest Procedures ......................... 20

    A.  Pretest Purpose ......................... 20
    B.  General Procedures ......................... 20
    C.  Military Detailees ......................... 20
    D.  Non-Agency Third Party Participation in Polygraph Examinations ......................... 20

IX   [REDACTED] ......................... 21

    A.  [REDACTED] ......................... 21
    B.  ......................... 25
    C.  ......................... 26
    D.  ......................... 30
    E.  ......................... 32
    F.  ......................... 34
    G.  [REDACTED] ......................... 34
    H.  [REDACTED] ......................... 34
    I.  [REDACTED] ......................... 35
    J.  [REDACTED] ......................... 35
    K.  ......................... 36

X   [REDACTED] ......................... 38

    A.  [REDACTED] ......................... 38
    B.  ......................... 38
    C.  [REDACTED] ... 42
    D.  [REDACTED] ......................... 42
    E.  ......................... 43
    F.  [REDACTED] ... 44
    G.  [REDACTED] ......................... 44

U//FOUO

U//FOUO

XI   [redacted] .......... 47
     A. [redacted] ................................. 47
     B. [redacted] ................................. 47

XII  [redacted] ................................. 48
     A. [redacted] ................................. 48
     B. [redacted] ................................. 48
     C. [redacted] ................................. 49
     D. [redacted] ................................. 50
     E. [redacted] ................................. 50
     F. [redacted] ... 50

XIII [redacted] ... 51
     A. [redacted] .......... 51
     B. [redacted] ............. 51
     C. [redacted] ................................. 52
     D. [redacted] ................................. 52
     E. [redacted] ................................. 53
     F. [redacted] ...................... 54

XIV  Posttest ................................. 56
     A. Skills ................................. 56
     B. Conduct ................................. 56
     C. [redacted] ................................. 56
     D. [redacted] ................................. 56

XV   Examination Reports and Administrative Records ... 57
     A. Objectives of Report ................................. 57
     B. Responsibilities ................................. 57
     C. [redacted] ......... 57
     D. [redacted] ................................. 59
     E. [redacted] ...................... 59
     F. [redacted] ...................... 60

U//FOUO

U//FOUO

   G.  Format and Style    ....................................... 62

XVI                                 .................... 64

    A.                   ................... 64
    B.                   ................... 69
    C.                   ................... 69

XVII                            .......... 71

    A.                   .................... 71
    B.                   .................... 71
    C.                   .................... 71

XVIII                       .................... 72

    A              ................................... 72
    B.             ................................... 72
    C.             ................................... 72

                            .................. 76

                            .................. 79

Appendix C – Complaints and Inquiries    ...................... 83

Appendix D – Uniform Code of Military Justice    ................. 87

                                 .............. 88

                                 .............. 89

                                 .............. 91

U//FOUO

U//FOUO

## I   POLYGRAPH PROGRAM BASIC AUTHORITIES

A. National Security Act, 1947

B. Central Intelligence Act, 1949

Central Intelligence Act of 1949:  Established and provided for the administration of the Agency and the basic legislative authorities under which it exists and operates.  Provides DCI broad authority to protect CIA's personnel and installations, as well as sources and methods.

C. Executive Orders

1. Executive Order 10450:  Provides that there shall be a "loyalty investigation" of every person entering the civilian employment of any Executive Branch agency or department, and spells out how such investigations shall be conducted, the establishment of loyalty boards at each agency/department, and standards for determining if there are "reasonable grounds" that a particular person is disloyal to the U.S. Government.

2. Executive Order 12333:  Provides for the protection/security of the Agency's installations, activities, information, property, and employees by appropriate means, including investigations of applicants, employees, contractors, and other persons with similar associations with the CIA. Outlines responsibilities of the DCI to include security and access standards, and the development of programs designed to protect intelligence sources, methods, and analytical procedures.

3. Executive Order 12356:  Provides the Agency's investigative authorities.

D. National Security Directive 63

National Security Directive (NSD) 63, Subject: Single Scope Background Investigations provides for the use of polygraph during subject interviews. Specifically, it states that in those departments or agencies with policies sanctioning the use of the polygraph for personnel security purposes, the personal interview may include a polygraph examination, conducted by a qualified polygraph examiner.

E. EPPA, 1988

1. Essentially, the Employee Polygraph Protection Act (EPPA) of 1988, states that the Department of Labor is the Federal agency responsible for administering and enforcing the Act through the Wage and Hour Division of the Employment Standards Administration. The Act generally prevents

U//FOUO

U//FOUO

employers engaged in interstate commerce from using the polygraph, with certain exemptions, either for pre-employment screening or during the course of employment. The Act, signed by the President on 27 June 1988, went into effect on 27 December 1988.

2. Federal, State and local governments are exempt from the EPPA prohibitions of polygraph use. In addition, polygraph examinations by Federal Government of federal contractors engaged in national security intelligence or counterintelligence functions are exempt.

F. Office of Security – Authority

The authority to authorize _____ to conduct a polygraph examination rests with the Director, Office of Security, who receives technical advice and guidance from appropriately qualified _____ personnel, usually Chief _____ a representative of the Chief Examiner Cadre, and/or Chief, _____ See _____ _____ and related regulations and directives, Section I, Paragraph G.

G. Regulations and Directives

1. 

2. 

3. 

4. 

5. 

6. 

U//FOUO

U//FOUO

7.  Intelligence Community Directive (ICD) – 704.

8.  NSD 63: Utilization of polygraph as part of the investigative process. While entities within [          ] may publish guidelines pertaining to unique administrative processes, this manual is the sole technical authority for polygraph examinations conducted for this Agency's polygraph program.

H.  Polygraph Memorandum Agreement

## US SECURITY POLICY BOARD STAFF
Arlington, VA. 22202

MEMORANDUM FOR:    Mary McCarthy
Acting Special Asst. to the President and
Senior Director for Intelligence Programs,
National Security Council

SUBJECT:                        Polygraph Memorandum of Agreement (MOA)


1. The Polygraph MOA is intended to provide standardization of polygraph program procedures. Its content is consistent with the recommendations cited by the original Joint Security Commission, and was developed with input from the entire Forum.

2. Of the 13 members overseeing polygraph programs, all but one, FBI, have signed the MOA. The FBI cites unique, on-going operational and policy issues that prevent their signing the document at this time. The FBI does, however, indicate a firm intent to comply with the spirit of the MOA.

3. In the attached package is a copy of the polygraph MOA plus signatures of representatives from agencies that employ the polygraph.

4. If you have any questions, or are interested in receiving a personal briefing on this issue, please notify Dan Jocobson, Director of the Security Policy Board Staff, at (703) 602-1030.


Jennifer A. Curran
Cochair
Security Policy Forum

Attachment

U//FOUO

## MEMORANDUM OF AGREEMENT ON POLYGRAPH EXAMINATIONS IN PERSONNEL SECURITY EVALUATION PROGRAMS

For those agencies sanctioned to use polygraph, the Memorandum of Agreement (MOA) Signatories endorse polygraph as an investigative aid in personnel security evaluation programs.

In the interest of maximizing efficiency and fostering professionalism, the Signatories endorse reciprocity among agencies in the conduct of their polygraph programs.

To ensure uniformity of application, standardization and reciprocity the Signatories endorse the following policy and procedural guidelines:

That agency heads establish procedures for the supervision of polygraph programs to insure the highest ethical, professional and technical standards, and standardize polygraph practices and techniques as much as is practicable.

That a polygraph examination is a process of determining if a person is attempting to be a deceptive to issue(s) in question through the use of a polygraph instrument. The examination typically consists of the pretest interview, the data collection phase wherein the polygraph instrument is used to collect physiological data from the examinee, the diagnostic phase, which includes the analysis of physiological data in correlation with the stimuli (questions) posed during each test to support a diagnostic decision and the post examination phase wherein the examinee and, when discussion may occur, to ascertain additional information as necessary.

That [          ] Polygraph examinations [                    ] [          ] relating to personnel security evaluation programs, be used as an investigative aid in personnel security evaluation programs and counterintelligence investigations.

That a [                    ] Polygraph examination be conducted to ascertain or validate information of adjudicative significance regarding an individual's eligibility for initial or continued access to classified information.

That the [              ] security screening polygraph examinations are the [                    ] and the [          ]

That the [                              ] examination shall include

[                                                                          ]



U//FOUO

10

C05836404

U//FO̶U̶O

That [          ] coverage should be limited to [                    ]
plus [                                                        ]
[                              ]

That a [                    ] Polygraph may be conducted subsequent to the
[                    ] examination and administered [                    ]

That [          ] Polygraph Examinations may be conducted outside the specific
interval of the [          ] examination cycle as part of and agency's continuing personnel
security program.

That DOD/PI, through its quality assurance program will provide guidance and
assistance to government polygraph managers to ensure consistent and equitable
administration of appropriate oversight mechanisms to resolve polygraph complaints.
That individual agencies shall participate in the quality assurance review process, as
detailed in the Federal Psychophysiological Detention of Deception Examiner's
Handbook.

That polygraph examinations for personnel [                    ] evaluation
programs be limited to [                    ] topics except for agencies authorized
to conduct [                    ] examinations: a) for initial applicants seeking staff positions
and contractors seeking staff-like access and b) as a requisite for attaining staff status or
continued detailee assignment.

That Staff-Like Access is defined as continued unescorted access to installations,
information, systems or classified information as designated by the agency head or their
authorized representative.

That a cleared individual's lack of polygraph screening shall not serve as a bar to
clearance reciprocity or to the exchange of information within like classification levels.
However, a polygraph examination may be applied as an option for access to particular,
controlled access activities, or as a condition for staff and staff-like employment to some
agencies. Where [                    ] polygraph examinations are standardized (as to
scope) among federal agencies, there shall be reciprocity with respect to favorable
polygraph examination results.

C05836404

U//FOUO

That standards be maintained to insure consistency in the administration, application and quality control of [          ] polygraph [          ] programs.


MOA Signatories:


The undersigned, on behalf of the listed agency, endorses the Memorandum of Agreement on Polygraph Examinations in Personnel Security Evaluation Programs and the tenets therein.

Associate Deputy Director for
Administration for Security
Central Intelligence Agency


U//FOUO

U//FOUO

## II     [ ]     MISSION STATEMENT



[ ] is a diverse cadre of dedicated professionals within the Office of Personnel Security who objectively assess and report the veracity of information elicited during polygraph interviews. This information is provided to both internal and external customers as an aid in the determination of an individual's security suitability, in order to protect the integrity of Agency interests.

Through creative management, innovative research, and training, we strive to continuously improve the polygraph process, to maximize the full potential of [ ] employees, and to promote their well-being.

C05836404

U//FOUO

III                                           **CODE OF ETHICS**

As security officers of the CIA, polygraph examiners understand and agree
to adhere to the following principles:

To uphold the highest standards of moral, ethical, and professional conduct
as set forth in the CIA credo.  To test each examinee in a manner that is
impartial and fair, without regard to the examiner's personal feelings toward
the subject's social, racial, economic status, or physical characteristics.

To treat all examinees with respect and consideration.

To report polygraph-derived information accurately, impartially, and
without regard to any outside influences brought to bear on the case or the
examiner.  A CIA examiner shall not knowingly allow any report to be
submitted that is false or misleading.

To uphold and protect the privacy of each examinee afforded a CIA
polygraph examination as prescribed by Agency policy.

To conduct polygraph examinations using standard polygraph methods and
techniques as prescribed by

To conduct each examination in a manner that upholds the national security
interests of the United States Intelligence Community.

CIA examiners shall at all times realize that they occupy a position within the
Office of Security of extraordinary trust, responsibility, and sensitivity; and
every effort shall be made to adhere to the highest ethical and professional
standards while administering polygraph examinations.



U//FOUO



U//FOUO

## IV    QUALITY CONTROL AND ASSURANCE

### A. Examination Quality

The quality of examinations is determined by adherence to the policies of [                    ] and whether the final product meets the needs and expectations of the customer.

### B. Quality Control

1. Quality control is performed by the first level management.

2. Quality control entails the inspection of test data, test format, and question construction.

3. Quality control entails confirmation or adjustment of the examiner's test results.

4. Quality control entails review of administrative records and the examination report.

### C. Quality Assurance

1. The Chief/Quality Assurance is responsible for implementation of the quality assurance program.

2. The Quality Assurance Program is a comprehensive effort to ensure thorough understanding of the [        ] policies and the motivation to implement the approach methods.

3. The primary components of Quality Assurance are systematic inspections of examinations on both a random and specific case basis.

4. The Quality Assurance Program is responsible for providing management assessments of examiners' performance in administering examinations.





U//FOUO

## V   EXAMINATION FACILITIES

A. Examination Room Décor/Appearance

1. [          ] examination rooms serve the additional function of personal office.  The examination room purpose takes precedence over the office function.

2. Following are the guidelines for examination room furnishings.

   a. Wall hangings should be in accord with a professional office setting. Nothing should be hung on the wall facing the examinee's chair.

   b. Furniture should consist of a desk, chairs for the examinee and the examiner.  Cabinets, shelves, or similar items may be used.

   c. Personal photographs must be out of the examinee's sight.

   d. Items such as figurines and plants should be kept to a minimum and out of the examinee's sight.

   e. Items bearing the name of the examiner (e.g. awards, certificates) must be kept out of the examinee's sight.

   f. The room should appear clean and orderly.

U//FOUO

**U//FOUO**

## VI   EXAMINER STANDARDS

A. Examiner Appearance

 1. Examiners will dress in professional business attire.  (There will be exceptions to this requirement

 2. Examiners will adhere to good personal hygiene practices.

B. Examiner Conduct

 1. Examiners will maintain a professional, clinical demeanor.

 2. Examiners will endeavor to develop an atmosphere of open communication.

 3. Examiners will not administer an examination to anyone with whom the examiner has a pre-existing personal relationship.

 4. Examiners will not permit prior personal knowledge of or contact with the examinee to influence conduct of the examination.

 5. Examiners will not direct demeaning or abusive language at the examinee.

U//FOUO

## VII   HEALTH ASPECTS OF EXAMINEES

A. Suitability for Testing

1. The pretest interview should be used to assess the examinee's physical and mental suitability for polygraph testing.

2. It may be appropriate to consult with the Office of Medical Services (OMS) in assessing an examinee's suitability for testing.

3. Heart Disease: An individual with diagnosed heart disease should provide written confirmation from a physician that it is acceptable for that person to undergo polygraph testing. When circumstances preclude acquiring a physician's written confirmation, the examinee's assurance that he/she desires to undergo testing absent a physician's assurance should be obtained.

4. Anticoagulant Medication: An individual using anticoagulant medication (blood thinner) should provide written confirmation from a physician that it is acceptable for the individual to undergo polygraph testing. (Caliparine, Coumadin, Dicumarol, Heparin, Hepin, Lipo, Liquaemin, Warfarin, and Panwarfin are some anticoagulant medications.)

5. Pregnancy: Pregnant females should provide written confirmation from a physician that it is acceptable for the woman to undergo polygraph testing. When circumstances preclude acquiring a physician's written confirmation, the examinee's assurance that she desires to undergo testing absent a physician's assurance should be obtained.

6. Seizures: If an individual reports experiencing seizures, information should be gathered to assess whether the testing environment might contribute to the occurrence of a seizure. It may be appropriate to obtain a physician's written confirmation of the individual's suitability for testing. The examinee's assurance that he/she desires to undergo testing absent a physician's assurance should be obtained absent a physician's written approval of testing.

7. Obtaining Assurance – Absent a Doctor's Authorization:

   The examiner [                    ] use the following statement to elicit the examinee's response:

   "Polygraph Division prefers that a doctor's written authorization be provided prior to proceeding with polygraph testing."

U//FOUO

C05836404



U//FOUO

> "Do you request of your own volition that polygraph testing proceed without a physician's written authorization?"

B. Physically Challenged Examinees

1. Every appropriate effort will be made to accommodate the testing environment for physically handicapped individuals.

C. Medical Emergency

1. On occasion, an examinee will require medical assistance during an examination. Within Agency facilities, the Security Protective Officers (SPO) take the lead in addressing medical emergencies.

2. When an examinee requires emergency assistance, the examiner should immediately inform a supervisor, activate the room panic button (if available) and request that a SPO be summoned to the examinee's location.

3. 

U//FOUO

U//FOUO

## VIII  PRETEST PROCEDURES

A. Pretest Purpose

The purpose of the pretest interview is to prepare the examinee for polygraph testing.

B. General Procedures

1. The pretest interview begins with the execution of the examination consent form.  A separate consent form will be executed for each exam session.

2. The examiner should not confront or accuse the examinee.

3.

4.

5. The examinee should be informed that any attempts to manipulate the test data or deliberately alter the test results will have a negative effect on the entire security clearance process.

C. Military Detailees

1. At the beginning of the pretest interview, active duty military personnel must be informed that derogatory information developed during the examination may be shared with their respective military service.

D. Non-Agency Third Party Participation in Polygraph Examinations

1. Representatives, colleagues, friends, or similar individuals may not accompany the examinee in the examination room.

2.



U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

22

U//FOUO

U//FOUO

U//FOUO

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO



C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

U//FOUO

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

U//FOUO

U//FOUO



U//FOUO

C05836404

U//FOUO

C05836404

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO



U//FOUO

## XIV  POSTTEST

### A. Skills

The elicitation of information is a critical skill, necessary for the accomplishment of the ___mission. The exercise of these skills must be done deliberately and professionally. Examiners must keep in mind that in order to provide customers with a quality product, information that explains reactions on the charts must be elicited. Each person undergoing a polygraph examination must be given a reasonable opportunity, and be encouraged to explain meaningful physiological responses to relevant questions.

### B. Conduct

The policy of CIA's ___ is to conduct interrogations in a manner consistent with a professional interview. The objective is not only to obtain information that is useful to the adjudication process, but to do so while respecting the dignity of the examinee. Therefore, examiners must avoid the use of inflammatory and degrading comments meant to personally demean an individual. No examinee will be called a liar, or be made to feel demeaned by virtue of his/her station in life. However, results indicating deception must be clearly and professionally stated to the examinee.



C05836404

U//FOUO

## XV  EXAMINATION REPORTS AND ADMINISTRATIVE RECORDS

A. Objectives of Report

    1. Present the result of polygraph testing for each relevant issue.

    2. Present an accurate, detailed account of the subject's pertinent statements with regard to each relevant examination issue.

    3. When appropriate, accurately provide noteworthy information not directly related to a relevant issue in the correct context.

    4. Present all information utilizing a consistent format and process.

B. Responsibilities

    1. The examiner is responsible for generating a professional product that is well written and edited.

    2. The examiner is responsible for ensuring accuracy by reviewing each item of information with the subject prior to termination of the exam session. Accuracy is paramount in reporting the statements of the subject.

    3. The examiner who conducts a second or subsequent session is responsible for alerting management of discrepancies entered in a report by a prior session examiner.

    4. All questions regarding whether to include an item of information in the report or how to present certain information should be addressed with a team leader or another manager.

    5. Team leaders and other reviewers are responsible for ensuring that reports are comprehensive and clear before releasing the report to the consumer.



C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

7.  <u>Religious/Political Beliefs and Race/Gender Issues</u>: Reports should not
    reference religious, and/or political affiliations/beliefs, race, or gender
    unless there is a direct bearing on the relevant issue.

C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

G. Format and Style:

1. Format: In general
   a. The font in all reports is Default Sans Serif 10
   b. Each paragraph should be indented
   c. Each paragraph should be single spaced
   d. Within a paragraph there should be two spaces between the end of one sentence and the beginning of the next
   e. Double space between paragraphs
   f. Double space between the section header (i.e., Criminal Activity, Drug Use, etc.)

2. Style:
   a. When used in place of the examinee's name, the term "Subject" is a proper noun. The first letter should be capitalized.
   b. When referring to an individual for the first time, the first letter of an individual's first and middle names should be capitalized, and the entire last name should be capitalized. Thereafter, only the individual's last name, in all capital letters, will be used to reference the person.
   c. If two individuals cited in the report have the same last name, use the first and last names to establish the distinction.
   d. Ensure that each pronoun has a clearly identified antecedent.
   e. A person's age should be expressed in figures, except at the beginning of a sentence.
   f. If a person's age is not available it should be approximated in decades (e.g., "forties", "fifties").
   g. Numbers less than 10 should be spelled unless it is a decimal, the age of a person, a percentage, an amount of money, or measurement.
   h. Except for the first word of a sentence, present numbers of 10 or more in figures.
   i. Dates should be written in the order of day, month, year (e.g. 17 March 2003).
   j. Dates should be used to establish when an event occurred. If a subject states that an event occurred *"six months ago"* or *"when I was 21"*, an *approximate month and year should also be obtained from the subject and reported.*
   k. Time should be written in the 24 hour format (e.g. 0730 or 1715).
   l. Contractions should not be used (e.g., cannot versus can't).

C05836404

U//FOUO

m. Abbreviations or acronyms should only be used after the term is spelled completely in the first reference with the abbreviation or acronym immediately following in parenthesis.

n. An exception in the use of acronyms is allowed for the use of commonly used abbreviations

o. The use of adjectives should be limited.

p. Do not use polygraph specific terminology or jargon (e.g., electro dermal activity, phase testing).

q. Avoid the use of vague terms such as "a few minutes" or "sometimes".

r. If a subject did not provide details when requested, or the examiner failed to request specific information that fact should be noted in the report.

s.

t.

u. When breakdown testing is administered, it should be reported as "specialized testing".

v. Breakdown relevant test questions should not be included in the report.

C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

**U//FOUO**

U//FOUO

C05836404

U//FOUO

U//FOUO

72

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

U//FOUO

C05836404

C05836404

U//FOUO



U//FOUO

## APPENDIX C – Complaints and Inquiries

**Initial Notification:**

C[____] is responsible for investigation of complaints and inquiries related to CIA polygraph examinations.  C/[____] should be notified immediately of all complaints and inquiries regarding CIA polygraph examinations.

**Coordination:**

C/[____] will endeavor to obtain a written statement, which details issue from the complainant or inquiry requestor.  When it is not possible to obtain a written statement, C/[____] may interview the complainant or requestor and prepare a memorandum detailing the complaint or inquiry.

If neither statement can be obtained, C/[____] will prepare a memorandum stating the nature of the complaint or inquiry.

C/[____] will inform DC[____] and appropriate [____] Chief of complaints and inquiries.

C[____] will designate a QA Officer(s) to investigate a complaint or inquiry.

C[____] will provide DC[____] and the appropriate [____] Chief with the findings of the investigation.

U//FOUO



U//FOUO



U//FOUO

C05836404

## APPENDIX D – Uniform Code of Military Justice (UCMJ)
## Article 31

1.      No person subject to this chapter may compel any person to incriminate himself or to answer any questions which may tend to incriminate him.

2.      No person subject to this chapter may interrogate or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

3.      No person subject to this chapter may compel any person to make a statement or produce evidence before any military tribunal if the statement or evidence is not material to the issue and may tend to degrade him.

C05836404

U//FOUO

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

C05836404

U//FOUO

# Katelyn Sack v. CIA et al

| | |
|---|---|
| FOIA/PA Request No.: | F-2011-01778 |
| Document Number: | 4 |
| Date of Document: | UNDATED |
| Document Type: | Memo |
| Classification: | Unclassified |
| From/To: | Office of Security/Deputy Director for Administration |
| Subject: | Team ABC Study Results and Polygraph Reform Goals |
| Document Pages: | 11 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☐ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ○ Denied in Full
- ● Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is an 11-page undated memo written by an employee in the Office of Security to the Deputy Director for Administration regarding a study team and polygraph reform goals. The CIA redacted internal organizational information and information regarding CIA employees. This document is currently and properly UNCLASSIFIED.

This document is withheld in part on the basis of FOIA exemption (b)(3).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 4 -

ADMINISTRATIVE // INTERNAL USE ONLY

MEMORANDUM FOR:  Deputy Director for Administration

VIA:             Director of Personnel Security

FROM:            _____

                 Chief, _____

SUBJECT:         Team ABC Study Results and
                 Polygraph Reform Goals

## SUMMARY

1. Earlier in the year, the surfacing of the Ames case prompted many questions from inside and outside our organization regarding the polygraph program's policies and procedures. One question dealt with whether CIA polygraphers looked at polygraph charts differently than examiners from other agencies. In other words, was there any institutional bias on the part of CIA polygraphers? In August 1994 a study with CIA, ____ and ____ participants was conducted to answer the question. It became known as the Team ABC Study.

2. This paper, presented in two parts, first offers a short report on the methodology and results of the Team ABC Study. The three primary conclusions of the study are: 1) there was no evidence to suggest CIA examiners were biased in their chart interpretations; 2) examiners from the three agencies obtained a significant level of agreement in their analysis of the CIA charts used in the study; and 3) examiners from the three agencies had statistically significant levels of agreement with the original CIA chart interpretations, but there was room for much improvement.

3. The second part of this paper offers _____ reform goals for effecting change in a number of areas. Those areas having the greatest corrective effects on examiner agreement include: the implementation of numerical scoring systems for chart analysis; the establishment of sampling inspections to ensure quality; upgrading the in-service training program; and employing an examiner certification program. Other areas of change in

APPROVED FOR
RELEASE DATE:
25-Jul-2012

C05836392

SUBJECT:  Team ABC Study Results and Polygraph Reform Goals

the polygraph program include:  modifications to polygraph test questions; integration of adjudicators in☐ and close interaction with the new Personnel Assessment Center.

4.  The Office of Personnel Security (OPS) is in the process of redefining the polygraph research program.  In the past, research emphasized the development of computerized instrumentation and alternate technologies. Now OPS will focus on polygraph validity, reliability, methodology, and countermeasures.  This long-term plan will be coordinated among all research participants within OPS, DoD, and the Intelligence Community.

## "Team ABC Study"
### A Short Report of the Interagency
### Analysis of CIA Periodic Polygraph Examinations

5.  Internal and external organizations asked ☐. ☐whether CIA polygraph outcomes are biased.  The study presented here was designed to cover only one possible source of bias:  examiners interpretation of polygraph exams.  This study compares CIA with☐ ☐and ☐examiners' interpretations.

## STUDY DESIGN

6.  Four examiners from the CIA, four from ☐ and four from ☐were placed into four teams.  Three☐ examiners were placed in one team, three CIA examiners in another, and three☐examiners in a third team.  A fourth team of examiners was composed of one examiner from each agency.

7.  Each examiner was asked to review independently of any other examiners participating in the study 100 CIA polygraph examinations randomly selected from all periodic examinations conducted between 1988 and 1992.  After reviewing the polygraph charts and pertinent information from the polygraph subject's file, they were required to decide whether their interpretation was No Deception Indicated (NDI), Deception Indicated (DI), or Inconclusive (INCL).  Team members reviewed together the same polygraph

2

C05836392

ADMINISTRATIVE / INTERNAL USE ONLY

SUBJECT:  Team ABC Study Results and Polygraph Reform Goals

cases they had already reviewed separately.  They were
asked, as a team, to come to a consensus on an
interpretation.  The team consensus is the focus in the
results section.

## RESULTS

8.  Overall, there appears to be no statistically
significant difference (p<.78)[1] between the proportion of
NDI, Inconclusive, and DI calls made by the CIA, ⬚
and Mixed teams (Table 1).  Operating under the constraints
of a blind chart analysis study, CIA polygraph examiners are
just as likely as examiners from other agencies to conclude
a polygraph subject is Nondeceptive, Deceptive, or
Inconclusive.  For all 100 cases, agreement between any
possible pairing of teams varied by only one percentage
point.



Table 1
Distribution of polygraph interpretations
by study team

---

[1] "p" denotes statistical probability that the result can be attributed
to chance.  Convention sets a value of .05 or less as being considered
statistically significant, and any value greater than this threshold is
not statistically significant.  The present statistic (p<.78) indicates
that the differences in proportions of the various polygraph decisions
among the agencies are not larger than chance expectancies.

3

C05836392

ADMINISTRATIVE - INTERNAL USE ONLY

SUBJECT:  Team ABC Study Results and Polygraph Reform Goals

9.  The team interpretations agreed in 67% of the 100 cases used in the study (Table 2).  For cases originally determined by the CIA [        ] [        ] to be DI, the level of agreement increased to 82% but dropped to 55% for NDI cases. Regardless of the type of case, however, a test of interrater agreement using the Kappa coefficient found that there is a significant level of agreement (p<.00) among examiners from the three participating agencies. In other words, they agreed at a level significantly beyond what would be expected by chance alone.



Table 2
Percent agreement between teams
by type of case

10.  Each team also agreed with the original CIA calls significantly more than expected by chance (p<.00). The Mixed team had the highest level of agreement, 64%, with the original interpretations (Table 3). The CIA team's agreement with original calls was slightly lower at 62%.

## CONCLUSIONS

11.  Using blind chart analysis, CIA polygraph examiners make polygraph interpretations consistent with those of [    ] and [    ] examiners.  Thus, no institutional bias--or trend characterizing one Agency's interpretation as distinct



Table 3
Percent agreement between teams
and original CIA interpretation

4

ADMINISTRATIVE - INTERNAL USE ONLY

ADMINISTRATIVE / INTERNAL USE ONLY

SUBJECT: Team ABC Study Results and Polygraph Reform Goals

from other agencies'--was evident in this study.

12. Although agreement in this study is statistically significant, it may seem modest as a practical matter. There is no "true" or absolutely correct level of interrater agreement. Reference to scientific professionals' agreement in other domains (see Table 4) reveals levels of interrater agreement comparable to those in this study. Reliability of CIA's polygraph interpretation is consistent with judgment reliability in some medicine and psychology studies.

| Table 4 Other Studies of Interrater Agreement | | |
|---|---|---|
| Classification Topic | Percent Agreement | Author |
| Severity of Retinopathy | 61% | Woolson (1987) |
| Psychological Disorders | 56% | Fleiss (1971) |
| Psychological Disorders | 70% | Cohen (1968) |
| Multiple Sclerosis | 43% | Landis & Koch (1977) |
| Carcinoma | 64% | Agresti (1990) |
| Child Aptitude Scoring | 59-86%* | Mason (1992) |
| CIA Study | | |
| Team Agreement | 67% | |
| CIA Examiner Agreement | 62% | |
| NSA Examiner Agreement | 60% | |
| FBI Examiner Agreement | 54% | |
| *range based on several different assessment criteria | | |

C05836392

ADMINISTRATIVE / INTERNAL USE ONLY

SUBJECT:   Team ABC Study Results and Polygraph Reform Goals

## POLYGRAPH REFORM GOALS

13.   The same improvements, say in medical diagnosis, that could increase reliability also could increase consistency in practice among polygraphers. [_____] [_____] has undertaken a series of initiatives to increase reliability in CIA's polygraph interpretation.

14.   A program plan to re-evaluate and modify a number of current practices and methods of operation in [____] has resulted from the Ames case, the subsequent Team ABC Study, and the creation of the Office of Personnel Security in October 1994.   In order to strengthen, improve, and further professionalize the polygraph program, [____] is effecting changes in eight areas.   The first four have the greatest impact on "reliability":

- NUMERICAL SCORING SYSTEMS

[____] formerly employed a more subjective, visual method of polygraph chart interpretation [_____] [_____].   Objective numerical scoring is known to sharply reduce the decision variances evidenced in the Team ABC Study.   Numerical chart evaluations have a number of inherent benefits.   While they are not purely objective, they reduce subjectivity to acceptable levels that are more easily understood. Numerical evaluations improve the reliability of the polygraph examination because one examiner's independent evaluation should not vary significantly from another examiner's independent evaluation, no matter when they are applied.   Numbers help define and explain what an examiner sees, and an examiner can clearly demonstrate how decisions were made.   The final number score represents the polygraph examiner's professional opinion as to truth or deception, based solely on the polygraph tracings.   In December 1994 and January 1995, all CIA polygraph examiners were instructed in recognized objective scoring techniques, and the use of these methods became standard and required practice for all cases on 10 January 1995.

- ESTABLISHMENT OF A QUALITY ASSURANCE TEAM

6



ADMINISTRATIVE - INTERNAL USE ONLY

SUBJECT:   Team ABC Study Results and Polygraph Reform Goals

[ ] has established a Quality Assurance Team (QAT) whose goal on a cross-divisional basis is to eliminate errors, constantly improve the polygraph process, and improve the product we provide to our customers.   Its first order of business has been to complete a Polygraph Examiner's Manual to serve as a basic reference for testing procedures in line with the rest of the professional polygraph community.   This was distributed electronically to all examiners on 20 December 1994.   QAT conducts sampling inspections on examinations conducted in each testing branch.   If errors or non-compliance with technical and professional standards are surfaced, immediate feedback is provided, and a determination is made as to whether corrective instruction is required of examiners or management.   QAT's sampling inspections began in early-December 1994.   Data must be gathered for a six-month period to obtain sufficient information to analyze trends.   June 1995 is the target date for its first analytical report.   On 23 December 1994, the Quality Coordinator for the Agency reviewed the activities of QAT and advised that QAT was on track, taking all the right measurements, and had a good feedback system in place.

- <u>TRAINING</u>

[ ] established its own American Polygraph Association accredited training school in 1983 to prepare students for the conduct of screening examinations for CIA applicants.   Although the basic training for examiners is excellent, and advanced, in-service and specialized training courses have been conducted, more needs to be done. [ ] has re-evaluated, and is now upgrading, its entire in-service training program.   By 1 April 1995, [ ] will implement a formal examiner certification program and a program of in-house training in alternate testing techniques.   The certification program will establish benchmarks for initial and periodic polygraph examiner qualifications and will better allow the professional progression and competency levels of the examiner cadre to be tracked and recorded throughout their careers.   To produce a cadre of examiners with a measurably high level of competence, training will be provided in techniques

7

ADMINISTRATIVE / INTERNAL USE ONLY

SUBJECT:  Team ABC Study Results and Polygraph Reform Goals

involving different test formats (different question
types and different order of questions), as utilized by
the professional polygraph community.  Examiners will
be required to be certified in the use of these test
techniques following the training.  Refresher,
advanced, and specialized training courses will be
provided to examiners on a more regular basis in order
to continually enhance their interpersonal skills,
subject matter expertise, and CI knowledge.

- IMPLEMENT ONGOING RESEARCH PROJECTS

Standardization, reliability, and consistency are key
issues in the polygraph process.  There has always been
a need to limit variation in the process. [____] has been
involved for years in both the development and
procurement of computerized polygraph instruments. [____]

A study is underway to validate a computerized scoring
algorithm developed by [____]  Once validated, the
algorithm will be applied to polygraph cases to assist
examiners in their interpretation of charts and to
establish a consistent baseline for chart analysis.

15.  Changes in the following four areas will further
strengthen the program by streamlining the process, boosting
examiner productivity and reducing errors:

- POLYGRAPH TEST QUESTIONS

[____] has long felt that too many issues/questions
are covered during test sessions.  This directly
contributes to lower productivity, higher "bring back"
rates (examinees requiring more than one session to
complete their polygraph examination) and higher than
desired Inconclusive results.  To satisfy its different
customers over the years, [____] has complied with requests
to cover more topics and ask more test questions.
Narrowing the scope of testing and focusing on
prioritized issues will increase the accuracy and
reliability of the process.  It is essential to
determine whether the adjudicator/customer can apply
risk management to establish different thresholds for
the issues. [____] has initiated a formal review of both

8

ADMINISTRATIVE INTERNAL USE ONLY

SUBJECT:   Team ABC Study Results and Polygraph Reform Goals

    the issues covered and the specific test questions
utilized on all test types. [    ] review is first
addressing changes that can be made internally, such as
combining issues or clarifying the focus or scope of
the issues.

- INTEGRATION OF [              ]
  [   PERSONNEL ]

    [  ] needs to better understand [        
[                 ] needs and
problems. [      ] need to better understand what [  ]
can and cannot do. In the past, they have both placed
representatives [    ] for consultation with examiners
during the conduct of their cases. The representa-
tives' guidance has prevented the continuation of
unnecessary or unwarranted testing. The representa-
tives, having a better understanding of thresholds [  ]
[               ] were able to
prevent elicitation of information that is not used in
adjudications. Better communication between examiners
and adjudicators will lead to a streamlined polygraph
process that is speedier and more efficient for the
examiner and the polygraph subject and will provide the
adjudicator with the information needed. This process
is currently being reimplemented.

- INTERACTION WITH THE PERSONNEL ASSESSMENT CENTER

    [  ] has established a close working relationship
with the newly created [                ]
to ensure that polygraph examiners are provided with
guidance and integrated background information prior to
each polygraph examination in order to achieve the
highest level of effectiveness possible.

- RECRUITMENT

    The quality of the CIA's polygraph program is
certainly no stronger than the quality of the examiners
interacting with polygraph subjects on a daily basis.
It is just as important today as it has been in the

9

ADMINISTRATIVE - INTERNAL USE ONLY

SUBJECT:  Team ABC Study Results and Polygraph Reform Goals

past to select the absolute best polygraph examiner
candidates the Agency has to offer.  We need to
continually analyze our existing skills mix against
what we need to most effectively meet customer needs.
We need to look closely at candidates with [          ]
training and experience.  We test a diverse population.
It is in our best interests to have a more diverse
examiner corps.  In trying to recruit for the future,
we will seek examiner candidates with diverse
occupational and personal backgrounds to better
represent this Agency.  A class of [    ] students is
projected for the next Basic Polygraph Examiner Course
in early-1995.

16. [      ] Quality Assurance Team and [              ]
[                    ] will be the leading players in the reform
process for the polygraph program.  The eight areas
identified above are ones that [    ] has recognized as
deserving attention.  Our task is to have a completed plan
by 1 April 1995 and to systematically work that plan.  We
may make adjustments along the way, but we are working
toward an objective.  That objective, in simplistic form, is
a quality product that we can justify against standards,
delivered by knowledgeable, skilled professional examiners.

[                    ]

ADMINISTRATIVE – INTERNAL USE ONLY

SUBJECT:   Team ABC Study Results and Polygraph Reform Goals

DA/OPS [                    ]     (7 February 1995)

11

# Katelyn Sack v. CIA et al

| | |
|---|---|
| FOIA/PA Request No.: | F-2011-01778 |
| Document Number: | 5 |
| Date of Document: | 11/30/2010 |
| Document Type: | Regulation |
| Classification: | Unclassified |
| From/To: | Office of Security/CIA Employees |
| Subject: | Administration of Polygraph Examinations |
| Document Pages: | 3 |

| FOIA Exemptions: | Privacy Act Exemptions: | Disposition: |
|---|---|---|
| ☐ (b) (1) | ☐ (d) (5) | ○ Denied in Full |
| ☐ (b) (2) | ☐ (j) (1) | ● Partial Release |
| ☒ (b) (3) | ☐ (j) (2) | ○ Released in Full |
| ☐ (b) (4) | ☐ (k) (1) | ○ Referred to Third Agency |
| ☐ (b) (5) | ☐ (k) (2) | |
| ☐ (b) (6) | ☐ (k) (5) | |
| ☐ (b) (7) (a) | | |
| ☐ (b) (7) (c) | | |
| ☐ (b) (7) (d) | | |
| ☐ (b) (7) (e) | | |
| ☐ (b) (7) (f) | | |

**Document Description:**
This document is a 3-page CIA regulation written by the Office of Security dated 11/30/2010 which establishes the policy for the administration of polygraph examinations. The CIA redacted information related to the functions and organization of the agency as well as information that would reveal intelligence sources and methods. This document is currently and properly UNCLASSIFIED.

This document is withheld in part on the basis of FOIA exemption (b)(3).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

(b)(3)

UNCLASSIFIED/AIUO

# OFFICIAL FILE COPY

**Date:** 11/30/2010

**Category:** ☐ Security                    **OPR:** OS

**Title:** ☐ (U) POLYGRAPH

(U) *This revision was written by the Office of Security*

3. (U) POLYGRAPH

   (U//AIUO)  SYNOPSIS.  **This regulation prescribes the policy and responsibilities governing the Agency's polygraph program.**

a. (U)  AUTHORITY.  The authority for this regulation is derived from the National Security Act of 1947, as amended; the CIA Act of 1949, as amended; Executive Orders 12333 as amended and Executive Order **13526**; ICPM No. 2006-700-5, DCID 6/4 or successor documents; and other applicable law.

b. (U)  POLICY

   (1) (U//AIUO)  In view of the sensitive intelligence and counterintelligence mission of the Agency and in support of the statutory responsibility of the Director of the Central Intelligence Agency (D/CIA) to protect intelligence sources and methods from unauthorized disclosure, the use of the polygraph is authorized as an aid to investigations associated with determining if individuals are acceptable security risks or otherwise suitable for Agency employment or affiliation.

   (2) (U//AIUO)  All persons employed by, assigned to, or detailed to the Agency or whose Agency affiliation gives them access to Agency facilities, operations, or information, as well as applicants or candidates for such positions or affiliation, are subject to being polygraphed.

   (3) (U//AIUO)  Individuals covered by paragraph b(2) above, unless otherwise

UNCLASSIFIED//AIUO

APPROVED FOR
RELEASE DATE:
25-Jul-2012

C05843011

excepted by the Director of Security (D/OS) will be required as a condition of employment or affiliation, or of continued employment or affiliation, to take polygraph examinations administered or otherwise approved by the D/OS. Polygraph examinations will occur:

(a) (U//FOUO) Before or upon entrance-on-duty or the beginning of the affiliation;

(b) (U//FOUO) Periodically during the tenure of Agency employment or affiliation as part of the Agency's reinvestigation program; and

(c) (U//FOUO) At such other times determined by the D/OS in order to assist in resolving specific questions associated with determining if individuals are acceptable security risks for Agency employment or affiliation.

(4) 

(5) (U//AIUO)  Requests by other government agencies for OS personnel to administer polygraph examinations to U.S. persons not employed by or affiliated with the Agency must be approved in advance by the Associate Deputy Director of the Central Intelligence Agency (ADD/CIA).

(6) (U//AIUO) Before U.S. persons submit to polygraph testing, their consent to the procedure will be obtained in writing.

(7) (U//AIUO) Applicants or candidates required to take polygraph examinations will be informed of the polygraph requirement as early in their personnel processing as possible. Individuals scheduled for polygraph examinations as part of the reinvestigation program or required by the D/OS to take special polygraph examinations also will receive advance notification.

(8) (U//AIUO) Notwithstanding any other provisions of this regulation, no U.S. person under 18 years of age will be given a polygraph examination.

c.  (U). RESPONSIBILITIES

(1) (U//AIUO). The D/OS  is responsible for the operation of the Agency polygraph program.  Only officers designated by the D/OS will apply polygraph techniques and conduct polygraph examinations.

(2) (U//AIUO). The D/OS, in appropriate coordination with the General Counsel, will establish and maintain standards and procedures for the Agency polygraph program. Upon request by a U.S. person required to submit to polygraph testing, the rights and responsibilities of examinees will be explained.

(3) (U//AIUO)  In managing the Agency's polygraph program, the D/OS will implement and monitor safeguards to ensure against Agency use of polygraph

C05843011

UNCLASSIFIED//AIUO

testing that would constitute an unwarranted invasion of privacy.

(4) (U//AIUO)   The D/OS will conduct, task, and coordinate all research and development regarding polygraph testing and all other advanced techniques and methodologies concerning the detection of deception as an aid to investigations as described in paragraph b(1) above.

(5) (U//AIUO)   The D/OS will release to the General Counsel polygraph-derived information concerning the commission of crimes or otherwise relating to an authorized criminal investigation, as appropriate, in accordance with the provisions of 28 U.S.C. 535 and other applicable law, so that the General Counsel may make required reports to the Attorney General.

# Katelyn Sack v. CIA et al

| | |
|---|---|
| **FOIA/PA Request No.:** | F-2011-01778 |
| **Document Number:** | 6 |
| **Date of Document:** | UNDATED |
| **Document Type:** | Memo |
| **Classification:** | Unclassified |
| **From/To:** | N/A |
| **Subject:** | Certification Requirements and Standards of Procedure for Polygraph Examination |
| **Document Pages:** | 2 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☐ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ○ Denied in Full
- ● Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is a 2-page undated document which describes the certification requirements and standards of procedure for the administration of polygraph examinations. Personal identifying information (e.g. name) and CIA internal dissemination control markings have been withheld. The substantive portion of the document has been released. This document is currently and properly UNCLASSIFIED.

This document is withheld in part on the basis of FOIA exemption (b)(3).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3).

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

C05836400

# CERTIFICATION REQUIREMENTS AND SOPS

*CERTIFIED STATUS:* Certification indicates the examiner demonstrates the following:

1. a. The independent ability to properly construct and use accepted test formats and test questions.

   b. The independent ability to obtain technically acceptable chart tracings that allow chart data to be appropriately analyzed.

   c. The use of proper and effective interview and interrogation techniques.

   d. The independent ability to properly analyze and interpret polygraph chart data, and to apply proper chart markings.

   e. The ability to prepare polygraph reports properly, accurately and comprehensively

   f. Administers a minimum of☐examinations each calendar year.  (Amended 3/31/2006 ☐)

2. <u>Requirements for Certification:</u>

   a. The intern examiner must conduct at least☐polygraph examination sessions directly supervised by an Agency certified polygraph examiner, preferably a Team Leader,☐ Chief, Quality Assurance Officer, or Senior/Chief Examiner.

   b. A Quality Assurance Officer must subject at least☐of the intern's examinations, to a full Quality Assurance Review.

   c. The intern must complete pre-certification training course conducted by☐ ☐

   d. If, after fulfilling the above requirements, the intern's immediate supervisor and☐ Chief are satisfied that the intern can competently administer polygraph examinations for CIA, the☐chief must submit a request for certification of that intern to the Chairperson,☐Subsequently, the majority of the☐ ☐members must be independently satisfied that the intern is prepared to competently administer polygraph examinations before recommending technical certification.

## Preparation for Certification:
- Arrange a conference room at least one month in advance.

- Print tests☐and☐Keep all tests in☐office.



APPROVED FOR
RELEASE DATE:
25-Jul-2012



C05836400

- **Prepare schedule (see certification training folder for sample schedule). Schedule should include[         ]and[  ]review and tests;[         ]protocol for official finding; QAR exercise; TDA exercise; and advanced training courses.**

- **Arrange half hour at end of day for Chief[   ]to speak.**

- **Send LN to[   ]requesting session off.**

- **Send LN to[     ]examiners,[   ]members, notifying them of certification training. Send separate LN to examiners and[   ]with schedule and conference room location.**

- **Ensure that[  ]QARs have been conducted on each student and are recorded appropriately in QAR database.**

# Katelyn Sack v. CIA et al

| | |
|---|---|
| FOIA/PA Request No.: | F-2011-01778 |
| Document Number: | 7 |
| Date of Document: | UNDATED |
| Document Type: | Form |
| Classification: | Confidential |
| From/To: | Office of Security |
| Subject: | Performance Appraisal Review |
| Document Pages: | 2 |

| FOIA Exemptions: | Privacy Act Exemptions: | Disposition: |
|---|---|---|
| ☒ (b) (1) | ☐ (d) (5) | ○ Denied in Full |
| ☐ (b) (2) | ☐ (j) (1) | ◉ Partial Release |
| ☒ (b) (3) | ☐ (j) (2) | ○ Released in Full |
| ☐ (b) (4) | ☐ (k) (1) | ○ Referred to Third Agency |
| ☐ (b) (5) | ☐ (k) (2) | |
| ☒ (b) (6) | ☒ (k) (5) | |
| ☐ (b) (7) (a) | | |
| ☐ (b) (7) (c) | | |
| ☐ (b) (7) (d) | | |
| ☐ (b) (7) (e) | | |
| ☐ (b) (7) (f) | | |

**Document Description:**
This is a 2-page undated performance appraisal.  Personal identifying information (e.g. names) and CIA internal dissemination control markings and internal information about the operations and functions of the agency and information pertaining to intelligence sources and methods have been withheld.  This document is currently and properly classified CONFIDENTIAL.

This document is withheld in part on the basis of FOIA exemptions (b)(1), (b)(3), and (b)(6).

Exemption (b)(1): This document is withheld in part on the basis of FOIA exemption (b)(1).  This document contains information relating to intelligence activities, intelligence sources and methods, 1.4(c) of Executive Order 13526.  Disclosure of the information withheld pursuant to exemption (b)(1) reasonably could be expected to cause damage to the national security.

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3).  This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

This document is also withheld in part on the basis of FOIA exemption (b)(6) because it contains information derived from the personnel files of a CIA officer the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.  The public interest in disclosure of this information does

not outweigh the harm to the individual whose privacy would be violated, and thus the information is protected from disclosure by Exemption b(6).

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 7 -

C05836396

(b)(1)
(b)(3)
(b)(6)

SECRET

| PAR General Information for | |
|---|---|
| Name: | |
| Career Service: | CIA/DS/OS |
| Affiliation: | STAFF |
| Assignment Organization: | CIA/DS/OS |
| Employee Title - Level: | POLY EXAMINER |
| Position Title - Level: | POLY EXAMINER |
| Schedule/Grade: | GS - 13 |
| Rating Official: | |
| Reviewing Official: | |
| Rating Period: | 08/01/2010 - 07/31/2011 |
| Mid-Cycle Feedback: | 01/19/2011 |

**PAR Job Summary for**

### Standard Job Summary:

This is entry-level work within the [        ] career track consisting of Collector, Analyst, or Elective tours. [                    ] have a basic level of knowledge needed to do their job and typically require close supervision from their supervisor and more experienced coworkers when handling routine tasks. [            ] participate as a junior member of work groups and teams and demonstrate basic communication skills.  In addition, at this level [        ] are required to learn to elicit and/or analyze basic information using established guidelines, provide basic guidance and advice based on DCID standards, conduct routine security surveys of Agency and contractor facilities or provide other security services.  Entry performance level is defined as new OS careerists with no relevant security experience or other applicable experience/education.

### Additional Job Summary:

None

**PAR Objectives for**

| Objective | Start Date | End Date |
|---|---|---|
| In accordance with established guidelines, apply technical expertise and appropriate time-management practices to resolve polygraph cases in a timely manner. | 08/01/2010 | 07/31/2011 |
| Utilize approved [        ] standards to elicit reportable information that will afford [            ] the opportunity to make objective adjudicative decisions. | 08/01/2010 | 07/31/2011 |

SECRET



APPROVED FOR
RELEASE DATE:
25-Jul-2012

③

C05836396

SECRET

| PAR Objectives for | | |
| --- | --- | --- |
| Objective | Start Date | End Date |
| In accordance with established reporting standards and timelines, prepare and submit accurate, thorough, and grammatically correct polygraph reports.  These reports will be objective, factual, and will represent all basic interrogatories. | 08/01/2010 | 07/31/2011 |

SECRET

# Katelyn Sack v. CIA et al

| | |
|---|---|
| FOIA/PA Request No.: | F-2011-01778 |
| Document Number: | 8 |
| Date of Document: | 02/09/2009 |
| Document Type: | Letter |
| Classification: | Unclassified |
| From/To: | DOD/Office of Security |
| Subject: | Preliminary Report of Inspection |
| Document Pages: | 8 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☒ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ● Denied in Full
- ○ Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is an 8-page document that originated from the Department of Defense but contains substantial CIA equities. It is dated 02/09/2009 and consists of a 1-page cover letter addressing certain recommendations and a 7-page preliminary report. It is currently and properly marked as UNCLASSIFIED.

This document is withheld in full on the basis of FOIA exemptions (b)(3) and (b)(5).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

Exemption (b)(5): This document contains information relating to intra-agency predecisional deliberations, including preliminary evaluations, opinions, and recommendations of CIA officers, and thus is protected from disclosure by Exemption (b)(5).

*The CIA conducted a line-by-line review of this document to determine whether meaningful, reasonably segregable, non-exempt portions of the document could be released. This document is withheld in full because there is no meaningful non-exempt information that can reasonably be segregated from any exempt information.

- 8 -

# Katelyn Sack v. CIA et al

|  |  |
|---|---|
| **FOIA/PA Request No.:** | F-2011-01778 |
| **Document Number:** | 9 |
| **Date of Document:** | 02/14/2011 |
| **Document Type:** | Memo/Report |
| **Classification:** | Unclassified |
| **From/To:** | DOD/Office of Security |
| **Subject:** | Inspection Report - Draft |
| **Document Pages:** | 9 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☒ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ● Denied in Full
- ○ Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is a 9-page draft report that originated from the Department of Defense but contains substantial CIA equities. It is dated 02/14/2011 and contains information about an inspection conducted on polygraph-related programs. It is currently and properly marked as UNCLASSIFIED.

This document is withheld in full on the basis of FOIA exemptions (b)(3) and (b)(5).

Exemption (b)(3): This document is withheld in full on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

Exemption (b)(5): This document contains information relating to intra-agency predecisional deliberations, including preliminary evaluations, opinions, and recommendations of CIA officers, and thus is protected from disclosure by Exemption (b)(5).

*The CIA conducted a line-by-line review of this document to determine whether meaningful, reasonably segregable, non-exempt portions of the document could be released. This document is withheld in full because there is no meaningful non-exempt information that can reasonably be segregated from any exempt information.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 9 -