# COUNT 4 VAUGHN INDEX (CIA)

## Katelyn Sack v. CIA et al

| | |
|---|---|
| FOIA/PA Request No.: | F-2011-01779 |
| Document Number: | 1 |
| Date of Document: | 06/01/2003 |
| Document Type: | Memo/Report |
| Classification: | Secret |
| From/To: | |
| Subject: | Re: Use of polygraph in security screening |
| Document Pages: | 61 |

**FOIA Exemptions:**
- ☒ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☒ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ◉ Denied in Full
- ○ Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is a 61-page report dated June 2003 regarding the role of the polygraph in security screening process. It is currently and properly classified SECRET.

This document is withheld in full on the basis of FOIA exemptions (b)(1), (b)(3) and (b)(5).

Exemption (b)(1): This document is withheld in part on the basis of FOIA exemption (b)(1). This document contains information relating to intelligence activities, intelligence sources and methods, 1.4(c) of Executive Order 13526. Disclosure of the information withheld pursuant to exemption (b)(1) reasonably could be expected to cause serious damage to the national security.

Exemption (b)(3): This document is withheld in full on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

Exemption (b)(5): This document contains information relating to intra-agency predecisional deliberations, including preliminary evaluations, opinions, and recommendations of CIA officers, and thus is protected from disclosure by Exemption (b)(5).

*The CIA conducted a line-by-line review of this document to determine whether meaningful, reasonably

segregable, non-exempt portions of the document could be released.  This document is withheld in full because there is no meaningful non-exempt information that can reasonably be segregated from any exempt information.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 1 -

# Katelyn Sack v. CIA et al

| | |
|---|---|
| FOIA/PA Request No.: | F-2011-01779 |
| Document Number: | 2 |
| | C05836401 |
| Date of Document: | 09/01/1993 |
| Document Type: | Memo/Report |
| Classification: | Secret |
| From/To: | Office of Security/NA |
| Subject: | The Value of the Polygraph in CIA's Personnel Security Program |
| Document Pages: | 17 |

**FOIA Exemptions:**
- ☒ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☐ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ○ Denied in Full
- ◉ Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is a 17-page document dated September 1993 generated by the Office of Security titled "The Value of the Polygraph in CIA's Personnel Security Program." The CIA redacted internal dissemination control markings and information that would reveal intelligence sources and methods as they are relate to polygraph screening procedures.   This document is currently and properly classified SECRET.

This document is withheld in part on the basis of FOIA exemptions (b)(1) and (b)(3).

Exemption (b)(1): This document is withheld on the basis of FOIA exemption (b)(1). This document contains information relating to intelligence activities, intelligence sources and methods, 1.4(c) of Executive Order 13526.   Disclosure of the information withheld pursuant to exemption (b)(1) reasonably could be expected to cause serious damage to the national security.

Exemption (b)(3): This document is withheld on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.  All redactions in the document are covered by these two statutes, including any classified information for which exemption (b)(1) was invoked.

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 2 -

Secret

(b)(1)
(b)(3)

Office of Security

# The Value of the Polygraph in CIA's Personnel Security Program (C)

APPROVED FOR RELEASE
DATE:  29-May-2012





Secret

# The Value of the Polygraph in CIA's Personnel Security Program (C)

This paper was produced by the Office of Security.  Comments and questions are welcome and should be directed [          ] (U)



Secret

*September 1993*

## The Value of the Polygraph in CIA's Personnel Security Program (Ø)

**Summary**

The polygraph examination is a central feature of the Agency's personnel security system.[1] _____ it plays a vital role in decisions about prospective or current employees. Any information that is obtained in testing is strictly protected and limited to what is essential for the clearance process. (S)

Personnel security in CIA directly benefits from use of the polygraph through the:

- Acquisition by the admissions of individuals of security-pertinent information not
- _____
- Support to special investigations.
- Encouragement of adherence to proper security practices. (Ø)

Other not so apparent benefits are nonetheless significant. _____ It also has helped ease physical and procedural controls _____ thereby facilitating a number of activities and cutting costs. (Ø)

Given the essential role of the polygraph in the Agency, working to gauge and enhance the validity of the testing has been a longstanding objective. _____ Adjudication— _____ is a key crosscheck on the process. (Ø)

The polygraph's ability to elicit admissions _____ that could threaten national security is likely to remain an invaluable feature. _____ Consequently, the risk of compromise of these undertakings—particularly by employees who have access to the information—remains a core concern for personnel security. (Ø)

[1] This analysis addresses use of the polygraph in processing clearances _____

C05836401

Secret

**The Value of the Polygraph in CIA's Personnel Security Program** (C)

The Agency's personnel security program seeks to ensure that all staff employees or people affiliated with the organization ☐ ☐ meet the security criteria set forth in ☐ ☐ (Director of Central Intelligence Directive (DCID) 1/14 applies for determining access to sensitive compartmented information.)[2] Although CIA uses several sources of information for evaluating a person's security dependability, ☐ ☐ This stems from the organization's extensive assessments of and experiences with this investigative tool in the past four decades. (S)

The polygraph has been used in the Agency for three main functions:

• Initial Screening. It is one of several screening mechanisms used to evaluate the large pool of applicants for employment with the Agency. ☐ ☐ Prospective employees answer questions ☐ ☐

• Reinvestigations. The test also is used in association with ☐ periodic security reviews. ☐ ☐ Reinvestigation Program (RIP), which responds to the CIA requirement to reinvestigate personnel ☐

[2] *Personnel Security Standards and Procedures Governing Eligibility for Access to Sensitive Compartmented Information (SCI)*, 22 January 1992. (U)

*What is a Polygraph Test?*

*The polygraph instrument records physiological changes with three sensors attached to an individual being tested:*

• *A blood pressure cuff—the same device physicians use to measure systolic and diastolic blood pressure—is usually wrapped around the upper arm, where the brachial artery is located. This sensor is responsive to artery movements.*

• *A tube placed around the individual's chest to measure rib cage and diaphragm movements during breathing.*

• *Small pads attached to the fingers to measure galvanic skin response. (U)*

*These sensors record the physiological changes in ink as tracings on a continuously running paper chart. For subsequent review, the examiner indexes the reactions on the chart to specific questions asked. (U)*

*The analysis of the monitoring and a summary of the key points of discussions about the test —particularly admissions made—constitute the test results. (U)*

(DCID 1/14 also requires recertification of SCI-cleared personnel every five years.) It features a limited counterintelligence (CI) polygraph examination plus a mandatory background investigation (BI). ☐ ☐

• Special Investigations. ☐

Secret

C05836401

Secret

## Primary Benefits

The polygraph has proved to be a crucial asset for the Agency in eliciting important leads related to personnel security.

*Unique Source of Security Information*

Probably the most useful aspect of polygraph-acquired information is that it frequently is unique and may be something known only to an individual or a very small circle of associates.

One measure of the acquisition of such otherwise unobtainable information was provided in a 1992 study by _____ OS. _____ randomly selected and then examined ____ cases of _____ in 1991. To determine what type of and how much additional information had been supplied during polygraph tests, ____ compared it to information provided by applicants on their personal history statements (PHS). This study showed that ____ percent of the applicants in the sample admitted during the polygraph that they had intentionally withheld or falsified information on their PHS. It also indicated that such individuals were ____ more likely than applicants who made no omissions on their PHS to have excluded anything about their involvement ____ and nearly twice as likely to have concealed _____

Another indicator of the unique contribution of polygraph information for personnel screening was described in a separate 1991 analysis ____ This evaluation involved ____ applicants (from the period 1 January 1986-31 December 1989) whose urinalyses detected the presence of at least one illegal drug. The results of the assessment showed noteworthy differences in candor on the issue of drug use before and after the polygraph.

- During the polygraph pretest interview, ____ denied ____ But after the test, when asked to explain their reactions on the polygraph to the question ____ of the ____ admitted lying.

- Also before the polygraph test, ____ of the ____ answered no to a question about _____

- 

A review of cases in which other government employees designated to serve temporarily in the Agency were turned down as a result of polygraph-acquired information further demonstrates the singular value of this source.

C05836401

}(The issues brought to the fore by the test had been present before or at the time of the most recent BI.)

*Secret*

---

### *Productivity of Sources*

*CIA's decision to grant or deny a security clearance or an approval for access to CIA classified data or facilities depends on information about a person's loyalty, trustworthiness, stability, reliability, judgment, and character. This information is drawn mainly from three types of sources:*

- *Subject. Through the personal history statement or discussions with the individual, including during polygraph testing.*
- *Interviews. Through conversations with coworkers, supervisors, social acquaintances, neighbors and, if appropriate, physicians, psychiatrists, ex-spouses, and relatives.*
- *Records. Through checks of law enforcement, credit, medical/psychiatric, employment, residence, and education files. (U)*

The Agency's reinvestigations [ ] have been bolstered by polygraph-acquired information.

cases "to demonstrate . . . that major damage to national security has been averted through polygraph testing."

The value-added feature of the polygraph for exposing important security-relevant information not picked up by routine BIs is further illustrated in a 1984 DCI study. Covering the period January 1980-September 1983, it cited various Community

C05836401



**Deterrence**

Difficult to quantify, but still a factor in calculating the value to personnel security, is the deterrence to espionage that the polygraph offers.

**Aid to Special Investigations**

Tipoffs from the polygraph about theretofore unknown actions of individuals have been important contributions to Agency special investigations.

**Supplementary Benefits**

Indirect, but nonetheless important, benefits from using the polygraph have included:

- *Forgoing*

Polygraph testing, together with background

C05836401

Secret

investigations, has been instrumental in avoiding hiring applicants with a pattern of

• *Facilitating the flow of classified information within the organization.*

• *Using minimal information security checks.*

## Polygraph Test Types

*The multiissue test is used in nonspecific situations, such as preemployment screening. The Agency uses this type of test to cover counterintelligence and other security issues, generally including one question per issue. A multiissue test requires considerable discussion before the test, as the examiner goes over each question that will be asked. This allows the individual being tested to talk about any pertinent information that he or she feels might affect responses. Posttest discussions are centered on the individual's reactions to specific questions. (U)*

*The specific-issue test focuses on a single issue, and consists of several sharply defined questions about that issue. The Agency uses this type of test in conjunction with a multiissue test in which one or more issues were unresolved, or as part of an investigation or inquiry into a security-related incident in which an Agency employee allegedly is involved. (U)*

## Dealing With Concerns

Because of the importance of the polygraph to the Agency's personnel security system, OS and other components have long sought to examine and find solutions to controversial aspects of the testing. This process—particularly long-term research on polygraph issues and specialized joint projects—received a boost following inspections of OS by the Office of the Inspector General in 1986 and 1988. (U)

C05836401

*Validity*

The validity of the polygraph has been a core concern for the Agency and the subject of many debates within the government and scientific community. If the polygraph examination is insufficiently accurate, applicants or employees who seek to harm the organization and US national security might be able to succeed in their objectives. At the same time, inadequate validity of a polygraph examination without any countervailing data might result in an unjustified conclusion that someone is not trustworthy. (U)

The Agency has undertaken numerous inquiries into the validity (accuracy) and reliability (consistency of results) of the polygraph. For instance, the Moss Committee hearings in the mid-1960s on the use of the polygraph spurred an in-depth review of the Agency's procedures by OS and the _____ . (U)

OS, OMS, and _____ formed the Polygraph Validity Working Group in 1987 for the specific purpose of proposing research studies on the validity of the process as used in CIA. The group identified five major studies in August 1989 that have not yet been done, owing to funding and resource limitations. The recommended studies include the:

- Analysis of the impact of modified questions on test results.

- Evaluation of the answers to a question about _____ and the results of _____

- Comparison of posttest admissions with examiners' interpretations and personal history data supplied by the subjects.

- Blind reassessments of charts from previous cases.

*Adjudicative Issues According to Agency and Community Standards*

*Loyalty and/or foreign affiliation*
*Cohabitant, close relatives, and associates*
*Sexual considerations*
*Undesirable character traits*
*Financial considerations*
*Alcohol use*
*Drug activities*
*Emotional, mental, and personality disorders*
*Law violations and criminal conduct*
*Security violations*
*Outside activities*
*Failure to cooperate (U)*

- Comparison of the information obtained by the BI and polygraph on three issues. (U)

At the same time, OS has redoubled efforts to identify and at least minimize factors in the tests that could adversely affect their accuracy. The possibility of misinterpreting their reactions has been lessened by:

- *Test preparation.* Applicants or employees preparing to take a test are carefully informed about all aspects of the process. The objective of this pretest briefing is to reduce anxiety about test procedures. This portion of the process has particular importance, given that the instruments will register physiological signs of emotional responses.

- *Discussion about the questions.* Polygraph examiners talk with individuals about all questions to be asked in a test. No surprise or trick questions are introduced while monitoring is under way, and anything asked must be related to Intelligence Community-defined issues. To avoid undue negative reactions, the wording of these questions may be modified as a result of the discussions.

C05836401

Secret

- *Instrumentation.*  For the past several years, OS has worked with other Agency offices to develop more precise instrumentation to

- *Checks on chart interpretations.*  All polygraph charts are reviewed by at least one other more senior examiner to enhance prospects for more accurate interpretations of results.

- *Examiner quality.*  Recognition that examiner skill has an important effect on improving accuracy rates has promoted rigorous selection procedures followed by in-house and external training for Agency polygraphers.  (C)

Probably the most significant check on the validity of the polygraph in CIA is the adjudication process.

**Intrusiveness**
Responses to the issue of the intrusiveness of the polygraph process generally have concentrated—in the Agency and elsewhere—on limiting the information obtained to what is essential for the clearance process and on maintaining its privacy. (U)

## Other Considerations

The polygraph's ability to uncover information about security-relevant issues that people aim to conceal may be particularly useful, given changing societal factors. A recent analysis by a security consultant suggests some of these developments have implications for personnel security:

- Lowering of ethical standards.

- Changing employer-employee relations. Shrinking workforces are one factor —according to the consultant—that is eroding employees' sense of job security and loyalty to employers. Employees, in response, may be focusing more on their self interest and less on commitment to a job or organization.

- Higher incidence of arrests for embezzlement and fraud.

How directly these developments—or other shifts in values or behavior in society—bear on current or prospective Agency applicants is unknown, but any increased potential for a betrayal of trust should be carefully assessed. Insiders, after all, continue to pose the greatest threat to national security

Secret

C05836401

Secret

Secret

11

Secret

Secret

C05836401

Secret

Secret

12

C05836401

Secret

Secret

# Katelyn Sack v. CIA et al

| | |
|---|---|
| **FOIA/PA Request No.:** | F-2011-01779 |
| **Document Number:** | 3 |
| **Date of Document:** | 04/01/1994 |
| **Document Type:** | Memo/Report |
| **Classification:** | Unclassified |
| **From/To:** | Office of Security/NA |
| **Subject:** | Validity and Reliability of the Polygraph as a Tool for Identifying Deception and Nondeception |
| **Document Pages:** | 29 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☐ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ○ Denied in Full
- ● Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is a 29-page document dated April 1994 that was written by the Polygraph Group to measure the validity and technical reliability of polygraph examinations. Personal identifying information (e.g. name), CIA internal dissemination control markings, organizational information and intelligence sources and methods related to the polygraph have been redacted. This document is currently and properly UNCLASSIFIED.

This document is withheld in part on the basis of FOIA exemption (b)(3).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 3 -

C05836395

(b)(3)

# RELIABILITY AND VALIDITY

# OF THE

# POLYGRAPH

**Polygraph Group**

APPROVED FOR RELEASE
DATE:  29-May-2012

(2)

C05836395

*Prepared by*

*April, 1994*

# EXECUTIVE SUMMARY

The purpose of this inquiry is to determine the validity and reliability of the polygraph as a tool for the identification of deception and nondeception. Reliability of the polygraph is estimated from the results of a blind chart analysis study of 20 NDI and 20 DI subjects. The reliability of examiner classification of reaction criteria is very low, while the reliability of the overall identification of the polygraph charts as DI, NDI or Inconclusive is relatively high. This presents us with the contradictory conclusion that examiners consistently classify final calls even though these calls are based on inconsistent reaction classifications.

The validity of the polygraph procedure, as measured by the results of positive urinalysis screening, is 81% for DI cases. The validity of chart interpretation, as measured by the blind chart analysis study, is 93% for DI cases and 96% for NDI cases with an overall accuracy of 94%. While this indicates a high degree of accuracy, the results are based on one test issue and excludes Inconclusive cases. In practice, the standard applicant screening test includes nine test issues. This reduces the overall accuracy of the polygraph to 68%. It is also clear that when we evaluate the accuracy of DI and NDI calls separately and consider the incidence of actual deception in the applicant population, the validity of DI calls is dramatically less than 93% while the validity of NDI calls is enhanced (above 96%) for most test issues.

2

C05836395

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................. 2

INTRODUCTION ........................................................................................... 4

RELIABILITY................................................................................................ 7

    Method.................................................................................................... 7

    Technical Reliability ............................................................................... 9

    Interpretive Reliability........................................................................... 12

VALIDITY .................................................................................................... 15

    Method.................................................................................................... 16

    Urinalysis Study..................................................................................... 17

    Blind Chart Analysis Study.................................................................... 19

APPLYING THE RESULTS .......................................................................... 23

    Predictive Value..................................................................................... 26

CONCLUSIONS............................................................................................ 32

RECOMMENDATIONS ................................................................................ 34

REFERENCES .............................................................................................. 36

C05836395

# INTRODUCTION

There have been many attempts to measure the validity and reliability of the polygraph (Abrams, 1989; Capps, 1991). They have involved both laboratory experiments (Barland, Honts, and Barger, 1990; Raskin and Kircher, 1990) and analysis of polygraph examinations conducted in the field (Horvath and Reid, 1971; Ansley, 1990; Mason, 1991; Patrick and Iacono, 1991). Almost all of these studies, along with many others not cited, were based on the specific issue polygraph examination.[1] The results of these studies suggest that polygraph testing can be a valid and reliable indicator of deception and nondeception, although none have specifically focused on employee screening.

There are many critics of both the polygraph technique and past attempts at assessing validity (Sax, 1985; Brett, Phillips, and Beary, 1986; Furedy, 1987; Lykken, 1987; Steinbrook, 1992). The foci of these criticisms have primarily been concerned with the excessively optimistic evidence presented by those in the polygraph field and the moral implications of falsely accusing an examinee of lying. All doubt the accuracy of the polygraph and one in particular (Furedy, 1987) has accused the polygraph detection of deception technique as spiritualistic, not scientific.

In response to this continuing debate, the purpose of this inquiry is to provide a realistic assessment of the reliability and validity of the polygraph screening technique as it is used at the Agency. This analysis is based on applicant polygraph data gained through two previous Agency studies. One study compared positive urinalysis tests for drugs with polygraph outcomes. The other investigated the consistency of six examiners blindly examining the same sets of polygraph charts. Unfortunately, as in any social science research, neither these studies nor the subsequent analyses are flawless. However, we

---

[1] One study, conducted by Barland, Honts, and Barger (1990), looked at a multiple issue polygraph test that involved simulated crime scenarios.

C05836395

have attempted to make these flaws as self evident as possible so the reader can form their own conclusion on the reliability and validity of the polygraph.

Before proceeding with our analysis we need to briefly discuss the issue of error. The polygraph technique is commonly considered a process designed for the prescribed purpose of detecting deception. What is often forgotten is that the concept of deception or nondeception is an abstract phenomenon. In other words, we cannot directly observe or measure deceit. As a result, we must search for indicators of deception that can be observed and measured. In the case of the polygraph these indicators involve psychophysiological responses initiated by the autonomic nervous system during a period of psychological stress. The indicators are imprinted on a polygraph chart in the form of galvanic skin response (GSR), cardiovascular activity, and respiration[          ] In essence, the polygraph does not measure deception; it is measuring physiological activity. Any measurement of this sort, which in turn must be interpreted, is prone to error.

Measurement error involves both theoretical and empirical issues. As an example, validity concerns itself with the theoretical issues imposed in any effort to measure an abstract phenomenon. Simply put, validity is the degree to which an indicator measures a phenomenon: in this case deception. As an example, if one found that the polygraph technique was measuring psychological stress one could not confidently argue that it is therefore a valid measure of deception. In fact, it could be measuring numerous other causal factors associated with anxiety such as embarrassment, fear, and anger (Saxe, 1985; Steinbrook, 1992).

In contrast to validity, reliability is concerned with the extent the instrumentation or procedures employed provide consistent results during repeated trials. Whether it does or does not measure the concept being explored goes unanswered in a test of reliability in that you may have a measure that produces consistent results over repeated applications but be measuring a totally different phenomenon than that intended. Obviously validity

C05836395

and reliability go hand-in-hand. Discussing one without the other could be very misleading.

In the following sections, the issue of reliability will be discussed first. This will be followed by an investigation of validity and an application of the results to the screening polygraph examination. The reader is cautioned that this analysis is not the final word on the reliability and validity of the polygraph as it is employed at the Agency. However, based on Agency data presently available and the results of other research efforts in and out of the polygraph community, the conclusions drawn from this investigation are not unreasonable and hopefully will contribute to a better understanding of the strengths and weaknesses of the polygraph.

C05836395

# RELIABILITY

The premise behind the use of polygraph is that deception or nondeception is more than simply a chance occurrence determined solely by a polygraph examiner's innate ability to evaluate a subject's veracity. Another way of viewing this premise is that the polygraph procedure is often presented as an objective assessment technique, not solely based on subjective examiner impressions. The most common method used to support the objectivity of the polygraph procedure has been to have multiple examiners review the same polygraph charts. In this approach, examiners are asked to evaluate physiological activity occurring concurrently with a question and response routine without the benefit of direct contact with the examinee (i.e. blind analysis). If the polygraph technique is capable of providing objective results, the conclusions based on the charts alone should be consistent when reviewed by examiners other than the one conducting the polygraph examination.

Consistency in this sense is simply another way of referring to the concept of reliability. For reliability testing, this leads us to two questions. First, do examiners consistently, not to be confused with correctly, identify the existence or absence of physiological reactions. Second, are their interpretations of these reactions as deceptive or non deceptive consistent with one another. One could view these two questions as one of "technical ability" in the form of reaction classification and the other of "analytic ability;" a combination of observation, training, and experience.

## Method

The results of a blind chart analysis study conducted in 1991 will be used in the assessments of reliability and validity. The polygraph charts from 40 Agency applicant polygraph examinations were used in this study. For each examination two charts were

7

C05836395

gathered on a series of lifestyle questions. Each chart contained the same questions asked in the same order. This resulted in a total of 40 examinations and 80 charts: two per subject. Six examiners reviewed these charts with the task of evaluating only the relevant question pertaining to nonmedicinal drug use. They were asked to identify any reactions to this question along with their determination of Deception Indicated (DI), No Deception Indicated (NDI), or Inconclusive.

Twenty of the cases were known to be deceptive to the drug issue. Urinalysis testing conducted prior to the polygraph examination or examinee admissions determined that these subjects had used an illegal drug and through review of the polygraph report had withheld this information during the pre-test portion of the polygraph examination. The other twenty subjects were assumed to be non deceptive to the drug question. The selection of known NDI subjects was much more difficult. Outside of a laboratory experiment one can never know with certainty that an applicant is being truthful: especially concerning a lifestyle issue. In the case of this study, older subjects who lacked drug admissions or positive urinalysis, had polygraph charts and examiner notes that supported a NDI call, and nothing could be suspected from their personal history or the results of a thorough background investigation were used as the sample of truthful subjects. The examiners were given the polygraph charts in random order with the knowledge that there was a mixture of NDI and DI cases included in the sample. All of the examiners included in this study were experienced polygraphers who were either trained by the Agency, a private polygraph school, or both. One should be cautioned that the participating examiners were not randomly selected. As a result, we cannot infer with total confidence that the results obtained from these examiners are representative of all examiners involved in applicant polygraph processing.

A Cronbach's Alpha reliability test was used in this analysis. Cronbach's Alpha is a method of assessing the reliability of multiple indicators. In this analysis the indicators are examiners. We are interested in determining the correlations between examiner analyses

C05836395

of the same set of polygraph charts.  For the following analysis, mean correlations between all possible pairings of the participating examiners are used to determine the consistency of examiner identified reactions and their conclusions about the examinee's truthfulness.

### Technical Reliability

Each examiner in the blind chart analysis study was provided with a form that had a list of reactions commonly found in polygraph charts.  The list of reactions was grouped according to whether it was associated with respiration (pneumo section), galvanic skin response (GSR section), or cardiovascular activity (cardio section).  The examiners were instructed to indicate which, if any, of the reactions were exhibited on the drug question and to do this individually for each chart.  As a result, each examiner had to assess reaction criteria for 80 charts.

Mean correlations were determined for each reaction criterion.  Some of the reaction criteria listed on the form were used infrequently or not at all and therefore are not included in this analysis. For the remaining reactions, mean correlations were determined for each reaction by all cases and then controlled for the type of case by correlating the DI and NDI cases independently.  In addition, mean correlations were developed for each of the three polygraph sections to provide an indication of examiner consistency not limited to a specific reaction type.  In other words, did the examiners consistently find evidence of any Pneumo, GSR, or Cardio reaction no matter what its specific identification might be.

Mean correlations between examiner identified reactions are provided for all six examiners involved in the study and for a subset of four examiners.  The reason that two

C05836395

examiners were removed from part of the analysis is that Cronbach's Alpha indicated that two examiners were, in almost half the comparisons, reducing the scale coefficient. Coincidentally these same examiners were the most likely to use the Inconclusive call. Since these examiners appeared to be grossly inconsistent with the other four participants, they were excluded for a comparative view in Table 1. One should remember, however, that all the participants in this study were seasoned examiners with between 4 to 12 years polygraph experience. As a result, more weight should be given to the correlations for all examiners participating in the study.

The mean correlations between examiner identified reactions are presented in Table 1. Although there is no set standard for determining what is and is not a strong correlation, the guideline imposed in this analysis is that any correlation less that .40 is assumed to be a weak association, correlations between .40 and .60 are considered moderately associated, and correlations greater than .60 are strongly associated.

As previously noted, there are two sets of correlations: those based on all examiners and a second set for the most consistent examiners. As expected, the correlations increased when the two examiners with inconsistent interpretations were removed. Simply put, these two examiners were less likely to agree with the remaining four on the type of reactions they found. Whether this is a result of poor chart interpretation (one examiner was responsible for two out of the three false positives[2]) or some external factor(s) not controlled for in the study is difficult to assess. There could,

---

[2] Both of the terms "False Positive" and "False Negative" are used through out this paper. A false positive indicates that a nondeceptive subject was found deceptive by the examiner. In turn, a false negative indicates that a deceptive subject was found not deceptive by the examiner.

C05836395

## TABLE 1

### MEAN CORRELATIONS BETWEEN EXAMINER IDENTIFIED REACTIONS

| | ALL EXAMINERS | | | FOUR EXAMINERS | | |
|---|---|---|---|---|---|---|
| | Total | NDI | DI | Total | NDI | DI |
| **Pneumo Reactions** | .39 | .09 | .23 | .51 | .18 | .36* |
| Suppression | .48 | .16 | .51 | .54 | .06 | .57 |
| Apnea | .42 | * | .40 | .72 | * | .71 |
| I&E Ratio | .21* | * | .18* | .37* | * | .32* |
| Temporary Baseline | .23 | .12* | .21 | .16 | -.03* | .13 |
| Permanent Baseline | .11 | -.01* | .25* | .05 | -.05* | .19* |
| Amplitude Increase | .08* | .02* | .17* | .16* | .10* | .31* |
| Rhythm Change | .28 | .04* | .23 | .39 | -.04* | .37 |
| **GSR Reactions** | .57 | .48 | .53 | .65 | .52 | .64 |
| Degree of Reaction | .56 | .50 | .52 | .62 | .52 | .61 |
| Reaction Duration | .18* | * | .14* | .29* | * | .29* |
| Multiple Reactions | .15 | .09* | .17* | .22 | .70* | .22 |
| Plunging Tracing | .29* | * | .26* | .40* | * | .37* |
| **Cardio Reactions** | .53 | .34* | .49 | .57 | .37 | .49 |
| Increased BP | .34 | .28 | .32 | .34 | .31 | .27 |
| Decreased BP | .29 | .41* | .26 | .27 | .33* | .30 |
| Pressure Rise/Fall | .23 | .34* | .15 | .13 | .31* | .05 |
| Decrease Amplitude | .28 | * | .23 | .26 | * | .21 |
| n = | 80 | 40 | 40 | 80 | 40 | 40 |

\* At least one examiner never used this reaction criterion. Mean correlations are not included if 3 or more examiners failed to use a reaction criterion (2 or more for the inquiry limited to 4 examiners).

C05836395

as an example, have been time limitations or disinterest in the project. What is interesting is that both of the examiners had high Inconclusive rates.

For the correlations that include all examiners only suppression, apnea, and degree of GSR response were moderately associated. The remaining correlations were either weak or nonexistent. If we consider whether any reaction was found in the breathing, GSR, or cardiovascular activity sections, there was only a moderate association in the GSR and cardio sections. Using the GSR section as an example, what this suggests is that the examiners' identification of any reaction in the GSR section were only moderately associated with one another. Simply put, the reliability of examiner reaction identification is, with the exception of a few criteria in the reduced sample of four examiners, moderate to weak. What the exclusion of the two examiners does add to this picture, however, is that it is possible to reach higher levels of consistency especially, in this case, [          ] *EASIEST TO OBSERVE* [          ] As a final note, the correlations for NDI cases are generally less than DI cases. What we can ascertain from this is that examiners were more likely in NDI cases to find reactions not shared by their peers. This inconsistency in reaction identification probably explains why there were more Inconclusive calls on NDI cases.

## Interpretive Reliability

The previous section on technical reliability does not provide much evidence to support the premise that examiners can or will consistently identify the same type of reactions. However, probably what is more important is how they interpret what they see. Whether an examiner sees apnea, a GSR reaction, or blood pressure change, it is still necessary for him or her to weight this reaction with the examinee's overall response pattern to determine if the reaction is indicative of deception. In this section we will use correlations again to ascertain the consistency of examiner results.

C05836395

The examiners participating in the study used both charts in determining a final call on a subject. Their final call, as in practical applications, could be NDI, DI, or Inconclusive. Since there are three choices possible, a scale had to be created that provides a meaningful indication of the differences in the type of call. Although it would be ideal to only test the relationship between NDI and DI calls, removing the number of Inconclusive calls would significantly lower an already small sample size. In addition, in the real world of polygraph, there are Inconclusive charts. As a result, a scale was developed that coded an NDI call as 1, Inconclusive as 2, and DI as 3. Although the DI and NDI placements are reversible without any change in the correlation outcomes, the location of Inconclusive between these two extremes was based on two rationales. First, Inconclusive charts are assumed to have reaction patterns conducive to both NDI and DI calls and, as such, provides a balancing point between the attenuation or absence of reactions found in NDI cases and the existence of reactions indicative of deception. Second, the scale polarizes DI and NDI calls. Using a DI case as an example, an Inconclusive call by examiner A is perceived to be more consistent with examiner B's determination of DI than if examiner A had made an NDI call.

**TABLE 2**

**CORRELATION MATRIX OF EXAMINER FINAL CALLS**

|  | Examiner A | Examiner B | Examiner C | Examiner D | Examiner E | Examiner F |
|---|---|---|---|---|---|---|
| Examiner A | 1.0000 | | | | | |
| Examiner B | .6536 | 1.0000 | | | | |
| Examiner C | .6256 | .8236 | 1.0000 | | | |
| Examiner D | .6417 | .8286 | .7296 | 1.0000 | | |
| Examiner E | .7074 | .7717 | .7645 | .7722 | 1.0000 | |
| Examiner F | .6604 | .8428 | .8138 | .7356 | .7292 | 1.0000 |

Mean Inter-Examiner Correlation  .7400

13

C05836395

Table 2 has the correlations between all possible pairings of examiners and the mean correlation for all six examiners. The correlations are much higher than those generally observed for the reaction criteria. They ranged from a low of .62 to a high of .84 with a mean correlation of .74. This suggests that, although the examiners in the study may not be consistent in their ability to identify types of reactions, their conclusions were much more consistent with one another.[3]

---

[3] The removal of the two least consistent examiners increases the mean correlation to .80.

C05836395

# VALIDITY

There are three basic forms of validity that are used in social science research. These are criterion-related validity, content validity, and construct validity. Criterion-related validity involves an estimation of some form of behavior that is external to the measuring process. This form of validity can either be predictive or concurrent. Predictive validity involves a correlation between the indicators measured and a future event or criterion. As an example, we would be dealing with predictive validity if we wished to assess whether the results of the polygraph help predict the future behavior of an applicant. Concurrent validity, on the other hand, is the correlation between a measure and behavior in the same time frame. In the case of this investigation, we are explicitly using concurrent validity to assess the correlation between the detection of deception and nondeception through the polygraph technique and the actual practice of deception by an examinee.

Content validity is related to the question of whether empirical measures reflect the domain under study. As an example, nonrandom sampling or only measuring deception without considering nondeception, are both examples of failed content validity. The studies used for this paper violate content validity in the nonrandom selection of cases and examiners participating in a blind chart analysis study. Generally, the violation of content validity is not necessarily unusual in the social sciences and even if we were to claim to have content valid studies there is a lack of any rigorous means to independently determine the accuracy of such a claim (Carmines and Zeller, 1979). This is not to suggest, however, that future studies shouldn't strive for a more random selection of examiners.

And finally, construct validity is concerned with the connection between the measured indicators and the theory that psychophysiological reactions can be used to

detect deception and nondeception.   Generally an indicator is believed to be valid if another independent measure shows similar results.   In the case of the polygraph technique, we are interested in whether determinations of deception or nondeception through the use of the polygraph are consistent with deception and nondeception established from evidence external to the polygraph procedure; e.g. urinalysis testing.   To simplify the discussion in the remainder of this paper, the use of the term validity will be used interchangeably with the concepts of criterion-related validity (in the form of concurrent validity) and construct validity.

### Method

The validity of the polygraph technique is presented in two forms.   First, the validity will be assessed for the entire polygraph process.   This process includes the production of polygraph charts, analysis of any reactions, interpretation of the subject's pre- and post-test statements, As you can see, validity in this form is heavily based on the examiner's ability to detect deception not limited solely to chart interpretation.   In addition, validity will be assessed in a more limited, but hopefully more objective fashion, by looking at the interpretation of charts alone.

Assessing the validity of the polygraph process will, similar to the reliability assessment, rely on data from urinalysis drug screening.   To assess the validity of discovering deception through the polygraph process, a review of the polygraph results from the original positive drug cases will be used to evaluated examiner determinations based both on chart analysis and personal contact with the polygraph subject.   To assess the validity of discovering deception and nondeception solely from polygraph charts, the blind chart analysis study will be used to assess the accuracy of examiner evaluations of the polygraph charts independent of any contact with or knowledge of the examinee.

C05836395

**Urinalysis Study**

Between 1986 and 1991 there were 60 applicants with positive urinalysis results for either cocaine or marijuana.[4] The average age of the applicants was 27.5 and most (68%) were male. Twenty-seven (45%) were between the ages of 19 and 25, 30 (50%) were between the ages of 26 and 35, and only three (5%) were over the age of 35. In comparison with the entire applicant population for this same time period, this subgroup was biased toward males and applicants between the ages of 26 and 35.[5]

**TABLE 3**

**ADMISSIONS AND FINAL CALLS ON CASES WITH KNOWN DRUG USE**

**WITHIN 30 DAYS OF THE POLYGRAPH EXAMINATION.**

|                      | NDI | DI | No Decision* | Total | |
|----------------------|-----|----|--------------|-------|------|
|                      | n   | n  | n            | n     | %    |
| Admitted Pre-test    | 1   | 1  | 8            | 10    | 16.7 |
| Admitted Post-test   | 1   | 7  | 12           | 20    | 33.3 |
| Never Admitted       | 6   | 6  | 18           | 30    | 50.0 |
| Total                | 8   | 14 | 38           | 60    | 100  |

\* Cases resulting in final calls of Inconclusive, Incomplete, or the final call was not available (1 case) were aggregated as no conclusive decision. Shaded portion used to determine success and failure rate.

As indicated in Table 3, ten (16.7%) admitted during the pre-test interview of the polygraph procedure to using an illegal drug within 30 days of the polygraph interview. In

---

[4] Urinalysis screening is routinely conducted by OMS for all applicants.
[5] The comparison is based on a random sample from 1986 to 1990 of 2500 applicants. In this sample, 48% were between the ages of 18-25, 33% between the ages of 26 and 35, 18% over 35; 56% were male, and 44% female. (margin of error plus or minus 2%)

C05836395

addition, 20 subjects (33.3%) admitted to recent drug use only after polygraph testing. The remaining 30 subjects never explained their positive urinalysis results although most (90%) admitted some sort of illegal drug use during the polygraph examination.

To assess the validity of the polygraph in identifying deception, those subjects admitting recent drug use during the pre-test portion of the polygraph interview must be excluded. As a result, assessing the validity of the polygraph process is based on those subjects who either admitted after polygraph testing to drug use or never accounted for their positive urinalysis results. In this instance we are assuming that, for the 30 cases without supporting admissions, there were no errors in the urinalysis tests. In other words, they all had used an illegal drug within approximately 30 days of the test.

For those cases where an applicant admitted in the post-test interview to recent drug use, it is assumed that the applicant deliberately withheld information about their drug use from the examiner during the pre-test interview. The obvious implication of this assumption is that the applicant consciously withheld information about their drug use. Although one might argue that it is possible an applicant could have forgotten their drug use and therefore respond to questions about drug use without practicing deception, the recency of the use suggests this is highly improbable. Therefore, the polygraph process will be considered a valid indicator of deception if the examiner was capable of either eliciting post-test admissions about recent drug use or concluded deception without any admissions that would account for the positive urinalysis. The obvious assumption here is that for an examiner to elicit admissions during post-test questioning, they must have recognized a deceptive response to the drug question. One should be aware, however, that an examiner could also decide to question the veracity of an applicant's statements without clear deceptive reactions on a polygraph chart.

Obviously

18

C05836395

this analysis is assessing much more than simply the validity of the technical ability of the polygraph to detect deception. It is assessing examiner characteristics, quality control of polygraph charts, and procedural limitations in making a final call.[6]

The previously discussed constraints reduced the number of cases to 32 (shaded portion of Table 3). Using this as our sample for assessing validity, 81% (26) of the cases were correctly identified in the polygraph process as being deceptive to the use of nonmedicinal drugs. In other words, the polygraph procedure was able to identify known deception at a rate much higher than what would be expected by random chance. As an example, if the polygraph process was not measuring deception, one would not normally expect results better than 50% NDI and 50% DI.[7] Using a single sample test of proportions to test the hypothesis that the 81% success rate was a chance occurrence, indicates that the probability of this occurring is only about two one-hundredths of one percent (.023%).[8]

### Blind Chart Analysis Study

The preceding section suggests that the polygraph technique is a valid measure of deception. This, however, is inadequate in determining the validity of the polygraph since polygraph examinations are also employed to determine nondeception. As a result, in this section we will expand this assessment by not only looking at the validity of the detection of deception, but also at the validity of determining nondeception.

As discussed in the section on reliability, six examiners reviewed polygraph charts from 20 known deceptive subjects and 20 known nondeceptive subjects focusing solely on the issue of nonmedicinal drug use. To assess the validity of using polygraph charts alone as an indicator of deception or nondeception, DI and NDI calls were evaluated with and

---

[6] There may be a reluctance of the polygraph unit to report a DI call without supporting admissions.
[7] Assuming, for the moment, the probability of success and failure was no different that the flip of a coin.
[8] See Social Statistics by Hubert M. Blalock JR., McGraw Hill (1979).

C05836395

without including Inconclusive calls (Figure 1). For 176 cases where a decision was made as to whether the applicant was NDI or DI (no Inconclusive calls), only 4% of the NDI cases and 7% of the DI cases were called incorrectly. This resulted in an overall



**FIGURE 1**

**Combined Accuracy for All Examiners Participating in Blind Chart Analysis**

accuracy rate of 94%. In other words, taken as a whole the examiners participating in this study correctly identified NDI and DI applicants 94% of the time. However, if Inconclusive calls are included as failures in determining deception and nondeception, only 69% of the 240 chart interpretations were correctly identified. This is still better than chance (p < .001%)[9] but not nearly as impressive as the success rate without Inconclusives.

---

[9] Based on a 50/50 chance of success/failure.

C05836395

Table 4 provides the interpretations of deception and nondeception made by each examiner participating in the study. Using examiner A as an example, 7 out of the 20 known NDI cases were correctly identified, 2 were false positives, and the remaining 11 were Inconclusive. For the 20 known DI cases, examiner A correctly identified 16 cases, made no false negatives and concluded 4 cases were Inconclusive. Overall, the Inconclusive rate for all examiners was 33% for NDI cases and 21% for DI cases. When we look at each examiner, it is readily apparent that some relied more on an Inconclusive call than others. In particular, Inconclusive calls ranged from a high of 43% to a low of 10%.

**TABLE 4**

**EACH EXAMINER'S FINAL CALL BY THE TYPE OF CASE EVALUATED**

| Case Type ⇨ | Examiner A | | Examiner B | | Examiner C | | Examiner D | | Examiner E | | Examiner F | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NDI | DI | NDI | DI | NDI | DI | NDI | DI | NDI | DI | NDI | DI |
| NDI Call | 7 | 0 | 10 | 0 | 18 | 4 | 14 | 0 | 13 | 0 | 16 | 3 |
| DI Call | 2 | 16 | 0 | 16 | 0 | 14 | 0 | 16 | 0 | 10 | 1 | 16 |
| Inconclusive | 11 | 4 | 10 | 4 | 2 | 2 | 6 | 4 | 7 | 10 | 3 | 1 |

Based on 20 NDI cases and 20 DI cases

The combined Inconclusive rate of 27% for the examiners participating in this study is much higher than the 14% normally found in applicant examinations.[10] One possible explanation for such a high Inconclusive rate may be attributable to the

---

[10] Based on a random sample of 2500 applicants for the years 1986 to 1991 (margin of error plus or minus 2%).

C05836395

constraints imposed by the study.  As an example, the examiners were only allowed to evaluate the first two polygraph charts conducted on the lifestyle issues.  This is contrary to actual practice where, in those cases where a subject inconsistently reacts to a relevant question, a third test is conducted to help determine if the single reaction was an anomaly. Without this third chart, some examiners may have been reluctant to make a final determination.

We are faced with the problem of deciding which measure of validity to use: with or without Inconclusives included.   Ultimately, the decision will be based on the population to which we want to apply these results.  If the validity of the polygraph is to based on its ability to identify deception and nondeception for all applicants involved in the polygraph process, Inconclusives must be included in our assessment.  If the validity of the polygraph is to be based on its ability to identify deception and nondeception only for applicants who produce technically interpretable charts, Inconclusives should be removed from our assessment.

C05836395

# APPLYING THE RESULTS

This analysis has only looked at one test issue when, in fact, there are between seven and nine relevant issues addressed in each polygraph examination. Although we know that when Inconclusive cases are removed from our sample the combined accuracy on the drug issue for the six participating examiners is 96% for NDI cases and 93% for DI cases, we have no determination of the probability of accurately interpreting a polygraph examination for all testable issues. Since we know that there is a 4% error rate in correctly calling NDI cases and a 7% error rate for DI cases, it is inevitable that this error will increase as the number of calls is expanded beyond the drug issue. In other words, the probability of making an error will increase as the number of polygraph issues increases.

To answer the question of what the probability of correctly identifying deception and nondeception on a complete set of polygraph issues would be, the probabilities from the drug issue will be used as estimates of the likelihood of correctly determining each of the other test issues. We should keep in mind that this assumes the probabilities would not vary by the issue covered. Ideally one should determine the probabilities of error for each issue but this data is not available and for many of the test issues it would be extraordinarily difficult to gather.

The overall accuracy rate of 94% is based on a sample of conclusive cases where 46% (81) of the cases were NDI and 54% (95) were DI. This distribution is unlikely to occur in the applicant population and can be expected to vary depending on the test issue. Although the base rate for deception is difficult to accurately assess, we do know from prior data collection efforts that the proportion of applicants who withhold information in the pre-test portion of the polygraph procedure depends on the type of issue. In other words, there is a greater likelihood that an applicant will provide post-test admissions on

23

drugs than on financial problems or foreign national contacts. Although there are undoubtedly others who are deceptive on polygraph issues, but never admit it, the estimate of the incidence of deception based solely on admission patterns is the best we can currently do and is undoubtedly underestimating base deception rates. As a result, post-test admissions from a random sample of 500 applicants in 1991 were used to estimate base deception rates in the applicant population. These base rates were then weighted by the accuracy of NDI and DI calls to determine the combined accuracy for each issue. The formula used for weighting the incidence of deception is the following:

$$P = b_{\times.93}g[b_{-d}g_{96}]$$

where

$d = proportion\ withholding\ information\ in\ pre\text{-}test\ interview$

The multiplication rule for determining the probability of statistically independent trials was then used to determine the accuracy of the polygraph technique when all issues are considered. This rule assumes that a final call on one test issue cannot be predicted from nor is it dependent on a final call for another test issue.

$$Pb_{\&B\&C\&\cdots\&K}g\ Pbgbgbg._{P}bg$$

The results are presented in Table 5. Based on the pattern of NDI and DI calls found in 1991, the probabilities of successfully calling a case as either NDI or DI varies only slightly according to the polygraph issue. Overall, if an applicant is tested on all nine polygraph issues, an examiner has a 68% chance of correctly identifying all the issues as either NDI or DI. If an applicant has not had access to classified information, the removal of the two questions related to this issue increases the probability of correct identification

C05836395

to 71%.  As previously discussed, the error changes with the number of decisions an examiner is required to make.  Any limitation therefore of the number of test issues is bound to increase the validity of the polygraph outcome.  Using the three CI issues in Table 5 as an example suggests that, if we were to limit testing to these three questions, the probability of correct identification increases from 68% to 88%.  This, however, may

**TABLE 5**

**ESTIMATED PROBABILITIES OF IDENTIFYING NDI AND DI CASES***



| Polygraph Issue | Probabilities | |
|---|---|---|
| | .9595 | Accuracy for Phase I Issues    .8112 |
| | .9598 | |
| | .9596 | ⇐ |
| | .9564 | ⇐    Three CI Issues    .8808 |
| | .9598 | ⇐ |
| | .9575 | Accuracy For Phase II Issues    .8356 |
| | .9530 | |
| | .9560 | |
| | .9579 | |

Accuracy For All Issues  ⇨    .6778

⇨    .7360

* The probability for NDI and DI calls were weighted by known outcomes established for all issues from a 1991 random sample of 500 applicants.

C05836395

be an overly optimistic estimate of polygraph accuracy in the field since only experienced examiners were used in this study, and the assumption that the accuracy found on the drug issue is transferable to other test issues cannot be verified. One should note that although there is evidence that experienced examiners in contrast to newly trained examiners have more skill in diagnosing charts (Suzuki, 1974), we have no evidence that this is a linear relationship where diagnosis ability increases steadily with experience. In fact, there was no discernible pattern between accuracy and the level of experience of the examiners participating in the blind chart analysis study.


### Predictive Value

The previous discussion has focused solely on the combined accuracy rate for correctly identifying both deceptive and nondeceptive subjects. We know, however, that the accuracy of an NDI or DI call will vary depending on the estimated prevalence of deception and nondeception in the general applicant population (Murphy, 1987). In particular, Brett, Phillips, and Beary (1986) have shown that the accuracy of the polygraph is dependent on the prevalence of deceptive subjects in the population. They based this conclusion on Vecchio's (1966) method, used primarily by the medical community, for determining the predictive value of a diagnostic test. Applying predictive values to the polygraph can help us determine the probability, given a base rate in the population, that a DI or NDI call will be correct. This probability is based on the sensitivity and specificity of the test. In the case of polygraph, sensitivity is the probability of detecting a deceptive subject and specificity is the probability of identifying a nondeceptive subject.

C05836395

The following formula is used to determine the positive (DI Calls) and negative (NDI Calls) predictive values:

$$PV(Pos) = \frac{pa}{pa + (1-p)(1-b)}$$

$$PV(Neg) = \frac{(1-p)b}{(1-p)b + p(1-a)}$$

*where*

$p$ = *% actually DI*

$a$ = *accuracy of a DI call (sensitivity)*

$b$ = *accuracy of a NDI call (specificity)*

In addition to using the base rates established in the previous section, when applying this formula we also have to incorporate the probability of accurately making a DI and NDI call. In the blind chart analysis, we found that 93% of the DI calls were correct and 96% of the NDI calls were correct. These rates will be used initially to determine predictive values and then lowered to provide two alternative levels of accuracy.

The positive and negative predictive values for each polygraph issue are presented in Table 6 by levels of accuracy. The high accuracy category is based on the results of the blind chart analysis study. The moderate level of accuracy is based on the assumption that the actual accuracy rate is 10% lower than that found in the study. In turn, the minimum level of accuracy is based on an accuracy rate 20% lower than that found in the blind chart analysis study. As an example of how one should interpret Table 6, we know that 23% of the applicant population is expected to be deceptive on the ☐ issue. If we assume a high level of accuracy, 88% of the DI calls and 99% of the NDI calls will be correct.

Another way of viewing this is that 12% of those found to be deceptive by the polygraph will actually be truthful and 1% of those found to be truthful will be actually be deceptive. If we assume a moderate level of polygraph accuracy, the predictive values are reduced to 64% for the DI calls and 95% for the NDI calls.

As you can see in Table 6, the level of accuracy for DI calls on the other issues will be substantially reduced if the incidence of deception in the population is much lower than that found on the drug issue.  Using involvement with a ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ as an example, there is less than a 1% chance that an applicant will withhold information about contact with a ⬚⬚⬚⬚⬚⬚⬚⬚ This results in only 16% of the DI calls being correct at a high level of accuracy, 5% correct at a moderate level of accuracy, and only 2% if we assume minimum accuracy.

Although the predictive value of DI calls in a screening test will be much less than what we could ex

29

# Katelyn Sack v. CIA et al

| | |
|---|---|
| FOIA/PA Request No.: | F-2011-01779 |
| Document Number: | 4 |
| Date of Document: | UNDATED |
| Document Type: | Memo/Report |
| Classification: | Confidential |
| From/To: | Agency Panel/Director of CIA |
| Subject: | CIA's Use of Polygraphy in Personnel Screening |
| Document Pages: | 46 |

**FOIA Exemptions:**
☒ (b) (1)
☐ (b) (2)
☒ (b) (3)
☐ (b) (4)
☐ (b) (5)
☒ (b) (6)
☐ (b) (7) (a)
☐ (b) (7) (c)
☐ (b) (7) (d)
☐ (b) (7) (e)
☐ (b) (7) (f)

**Privacy Act Exemptions:**
☐ (d) (5)
☐ (j) (1)
☐ (j) (2)
☐ (k) (1)
☐ (k) (2)
☐ (k) (5)

**Disposition:**
○ Denied in Full
◉ Partial Release
○ Released in Full
○ Referred to Third Agency

**Document Description:**
This is a 46-page undated document written by an Agency panel called the "Blue Ribbon Polygraph Panel" for the Director of the CIA. The report goes into specific detail about reliance on polygraph examinations, the polygraph process, reinvestigation, training, and recommendations. Personal identifying information (e.g. name),CIA internal dissemination control markings, information related to CIA functions and operations, and intelligence sources and methods related to the polygraph have been withheld. This document is currently and properly classified CONFIDENTIAL.

This document is withheld in part on the basis of FOIA exemptions (b)(1), (b)(3), and (b)(6).

Exemption (b)(1): This document is withheld on the basis of FOIA exemption (b)(1). This document contains information relating to intelligence activities, intelligence sources and methods, 1.4(c) of Executive Order 13526, as amended. Disclosure of the information withheld pursuant to exemption (b)(1) reasonably could be expected to cause damage to the national security.

Exemption (b)(3): This document is withheld on the basis of FOIA exemption (b)(3). This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended. All redactions in the document (excepting the information protected by exemption (b)(6)) are covered by these two statutes, including any classified information for which exemption (b)(1) was invoked.

This document is also withheld in part on the basis of FOIA exemption (b)(6) because it contains information pertaining to third parties who participated with the Blue Ribbon Panel.  Release of the identities of these individuals would constitute a clearly unwarranted invasion of personal privacy.  The public interest in disclosure of this information does not outweigh the harm to the individual whose privacy would be violated, and thus the information is protected from disclosure by exemption b(6).  The identifying information associated with the individuals appears on pages ii and 2 of the report.

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

- 4 -

CONFIDENTIAL

# CIA's Use of Polygraphy in Personnel Screening

**Report to the Director of Central Intelligence**
**The DCI's Blue Ribbon Panel**
**on the Polygraph**

APPROVED FOR RELEASE
DATE: 29-May-2012



C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

## EXECUTIVE SUMMARY

(Ø) The DCI's Blue Ribbon Polygraph Panel was commissioned to review the Agency's use of the polygraph in employee selection and staff reinvestigation. In his charge to the Panel, the DCI asked us to meet with representatives from across the Agency and from other Intelligence Community agencies. We spent a great deal of time comparing CIA's use of polygraphy to that of [   ] and [   ] because those agencies' employee pools are most similar to CIA's, and they also use screening polygraphs. We traveled to the [                                    ] to see first-hand the basic training all US Government examiners receive. We listened to the stories of some Agency employees, and their counsel from the ACLU, who have had problems clearing the reinvestigation process. We heard from senior Agency officials responsible for security and counterintelligence. We also met with representatives of [        ]

(Ø) We agree that CIA has a continuing need for the polygraph, and that CIA's polygraph program is, overall, headed in the right direction. We were favorably impressed by the corps of examiners, and especially by their perseverance [            ] [                        ] In general, we believe the Agency owes its counterintelligence and security officers a large debt for their willingness to soldier on, often without thanks. We believe Agency-wide recognition of their critical contributions is both in order and overdue. And we believe the Agency should seek to make their career tracks as desirable and as influential as other careers in the Agency.

(Ø) We have reached one overarching conclusion: **the Agency relies far too heavily on the polygraph.** Experts tell us the polygraph is at best only about 86 percent accurate. CIA espouses the "whole person" concept, under which all sources of information about an employee or applicant are considered and weighed, but reality is that the polygraph results carry disproportionate weight. Such over-reliance on a single test frequently has a deleterious impact on individual careers and on the organization's morale. We propose a number of specific changes designed to address over-reliance. Other changes we discussed range from increasing the focus on management accountability as it pertains to security and CI issues to improving the physical environment in which Agency polygraphers work.

(Ø) We understand why Agency managers have come to rely so extensively on the polygraph [                                    ] [                        ] but we also believe that the cost of the current program is too high.

C05836390

(Ø) We strongly recommend that the Agency's senior managers undertake an ongoing and detailed outreach process for all employees to educate them in the polygraph process and procedures. We believe that ⬚ practice of training "security coordinators" in each business area is worth emulating. Humans hate that which they do not understand; therefore, with understanding comes acceptance. Demystifying the polygraph and bringing security to the desk of each employee, we believe, will increase the population's acceptance of its necessity and its value. In addition, we recommend that all levels of Agency managers be educated in the process and appeal/complaint possibilities.

⬚ chairman

C05836390

CONFIDENTIAL

## PURPOSE

(Ø) In July 1999, DCI George Tenet commissioned a Blue Ribbon Panel of distinguished representatives from government and the private sector to review the Agency's use of the polygraph in employee selection and staff reinvestigation. Addressing the group's inaugural meeting, the DCI noted that the Agency is committed to recruiting and retaining "the best and brightest" workforce, and does not want anything to unfairly hamper achievement of this goal. The Panel was asked to address these questions:

- Whether CIA's use of the polygraph is in accord with federal standards and best practices?
- Is CIA placing undue reliance on polygraph results?
- Does CIA's use of polygraphy maintain the correct balance between the demands of national security and the appropriate treatment of individuals?
- Are there preferable options to the polygraph?

(Ø) The panel is supported by a staff director and detailees from the

## Scope of Work

(Ø) The panel met biweekly from August 1999 through January 2000, with subcommittee and individual panel members conducting far-reaching research and investigation. Highlights of these activities include:

- Panel members were briefed by senior          managers and polygraph professionals.
- Members met with senior Agency executives (DDO, DDA, C/NE, C/CIC, as well as retired senior DO officers).
- 
- The DS&T's primary research specialist                    briefed the Panel.
- 

  Members also witnessed the quality control process between examiner and team leader.
- One Panel member requested and was administered an EOD polygraph examination.
- Members traveled to the

  for briefings and interviews.
- Panel members met with representatives of employee affinity groups to obtain their views on how such issues as race, culture and ethnicity relate to the polygraph process.
- We heard briefings on how polygraph results are used in the          personnel security adjudication process

C05836390

CONFIDENTIAL

- Members met with senior managers☐ ☐
  to discuss the referral process and Section 811 of the Foreign Intelligence
  Authorization Act of 1995.
- ☐ employees, accompanied by ACLU attorney☐, met
  with the Panel to discuss process issues based on their personal experiences.
- The Staff Director attended an international conference on interviewing and
  interrogation hosted by Dr.☐(renowned academician and author of☐
  ☐).
- Panel members reviewed scores of significant cases, research and background
  material; they also reviewed☐
  ☐ some problematic cases.

*Panel Members*

Chairman: ☐

☐

C05836390

CONFIDENTIAL

## INTRODUCTION

(Ø) The success of the US Intelligence Community rests on three pillars: collection and operations, analysis, and security. While the three pillars are of equal importance, security is perhaps the most difficult to get right. Because of its nature, and because of the lack of discernible results, security is frequently relegated to a back burner. Moreover, in a democracy, security necessarily involves balancing the rights of the individual against the security needs of the nation.

(Ø) The Intelligence Community must recruit and retain the best and brightest the nation has to offer. It must take risks—sometimes very large risks—to protect our nation. Sometimes those risks are physical, but they can also be intellectual or policy risks. It follows, therefore, that the Community's security pillar must also consist of the best and the brightest if it is to face successfully its particularly difficult challenges. The security services are in a constant tug of war between individual liberty and national security. But in addition, they must cope with a collective work force that may acknowledge the need for security but does not always honor that need with respect for the process and those who administer it.

(Ø) We wish to note that some Panel members were inclined to believe, at the outset of our deliberations, that serious consideration should be given to the complete elimination of the polygraph requirement. At the end of our deliberations, no member of the Panel held that view. The evidence is overwhelming that the polygraph, in the hands of a skilled examiner, is a very useful tool to elicit information from an applicant or an employee that might otherwise be obtained only after lengthy and costly investigation—or not at all. At the same time, the Panel is very concerned that the cost of acquiring this information is quite high. This report attempts to identify key problem areas and provide reasonable recommendations and options that will reduce the negative impact of the polygraph, while allowing continued use of the polygraph as a meaningful safeguard for Agency and national security interests.

(Ø) Although the Panel was not asked to address the broader issues of security and counterintelligence, it is clear to us that management must continue to work to improve CI and security. Polygraphers—the focus of our study—must be included in the IC's effort to improve working conditions for CI and security officers, but they are only a part. Senior management of the Intelligence Community must ensure that all security and CI officers have a career path that assures them adequate promotion and education opportunities. CI and security professionals must have choice assignments and be competitive with officers from the more glamorous parts of the Community. And they must know that they enjoy the full confidence of management.

(Ø) The Panel believes the DCI was prudent in asking for a review of the polygraph. In the course of our work, we discovered several areas that need correction, but we reached

3
CONFIDENTIAL

C05836390

one overarching conclusion: **the Agency places far too much reliance on the polygraph.**

(C) Most of our observations and recommendations are polygraph-specific and address issues such as examiner selection and training. But the Panel believes that the security structure—composed of various disciplines, such as physical, information, and personnel security—must develop a synergy to support these individual specialties. [ ] security officers, for instance, need to be well-versed in personnel security issues and serve as honest brokers for personnel security concerns within the components in which they serve. Even more broadly, the concept that security and CI matters are responsibilities shared by all Agency employees and contractors should be second nature for everyone at the Agency. We believe that the recommendations contained in this report should be widely discussed and adopted.

(C) The Panel reached the following major conclusions:

1.

2. Far too many employees have had difficulty passing a reinvestigation polygraph, when there was little or no corroborating evidence of wrongdoing

3.

**Section 811**
(C) Section 811 of the Foreign Intelligence Act of 1995 (codified as Counterintelligence and Security Enhancements Act of 1994, 50 U.S.C. 402a) requires, in part:

C05836390

. . . [T]hat each department or Agency within the Executive immediately report to the FBI . . . receipt of any information, regardless of its origin, which indicates that classified information is being or may have been disclosed in an unauthorized manner to a foreign power or an agent thereof.

4. We believe that the aggressive use of the polygraph has precluded able Americans from working at CIA, and perhaps at other Community agencies. Although the Panel found no specific evidence that the polygraph disadvantaged any particular group of Americans, we remain concerned that the security process—including the polygraph— may in some cases prematurely reject candidates who, upon further investigation, would qualify for employment and be granted a clearance. In still other instances we are concerned that the process may become so distasteful that highly qualified applicants just give up and return to their universities or places of employment with negative feelings about the Agency. This obviously hampers the Agency's ability to recruit from the best academic institutions, research labs and private industry.

5. The Panel met with many polygraphers and was deeply impressed by their dedication, pride and commitment to their mission. However, much can be done to make CIA's polygraph corps even better. We make specific training recommendations, including special efforts to educate them in the different cultures and duties found in the Agency. While we reject the notion that a polygrapher must be a scientist, computer expert or case officer to effectively test one, we recognize that lack of knowledge, [                    ] [                    ] could cause a polygrapher to regard routine behavior as suspicious. This, in turn, leads CIA officers to disparage the process—and the examiners.

C05836390

6. CIA polygraph techniques are more aggressive than those of other agencies. CIA polygraphers take understandable pride in the number of admissions of misconduct they elicit, but the Panel is not persuaded that other methods, more in tune with management objectives, could not produce equally satisfactory results without the associated negative costs.

7. The Panel believes that the polygraph examination should not be a hostile interrogation. _____ Panel members also heard complaints that employees felt they were being interrogated and humiliated. We believe CI objectives can be pursued without such an approach. We believe an examiner should never mislead an examinee or engage in conduct that could be seen as aggressive or badgering.

8. Finally, we believe that Agency management must be involved throughout the reinvestigation process, including in issues raised by the polygraph. Too often, management abdicates its responsibility to value the "whole person" concept by over-reliance on the polygraph and by not encouraging further investigative efforts.

This often confronts managers with tough decisions, and when they make these decisions, they should do so confident that they will be supported by senior leaders of the Agency.

(Ø) The Panel's overall assessment of the Agency's polygraph program is positive. The observations and recommendations contained in this report are not intended as criticism of the entire program. **Indeed, many of our comments address systemic problems with management's perception of the polygraph and the resulting over-reliance.** While the panel heard of abuses, excesses, or other failures directly attributable to polygraph, we believe that these are the exceptions rather than the norm. Nonetheless, these failures create great controversy and do great harm—to the recruitment effort, employee careers and morale. As such they cannot be ignored. The system will never be perfect, but that must be our goal.

(Ø) A word must also be said about the resource issue. If the Agency is committed to establishing the Government's premier personnel security program, resources must be devoted to _____ of those officers who fulfill that mission. Although this commitment in resources may be large, it pales in comparison to the costs associated with failures in determining who is suitable to be granted and retain access to extremely sensitive information. Also, the Agency needs to take a leadership role by investing in research of alternate means of detecting deception.

(Ø) As noted above, the Panel reviewed a large number of cases in recent years in which the polygraph played a key—and sometimes the only—role in discovering very significant information about applicants, contractors and employees. The Panel believes

C05836390

CONFIDENTIAL

strongly that the information elicited by the polygraph process in these cases is of very great value to the Agency and the nation. These cases highlight the invaluable contribution the polygraph makes to the clearance adjudication process. Our recognition of the value of the polygraph as a tool to continue to help produce this information is a theme that permeates the report.

C05836390

CONFIDENTIAL

## THE POLYGRAPH PROCESS

(Ø) The polygraph continues to be a controversial investigative technique, both within and outside of CIA. Proponents of the polygraph argue that it is the most effective information-gathering procedure available, while detractors point to its lack of scientifically established validity and say the process is intrusive and violates personal privacy. CIA and other entities in the Intelligence Community use the polygraph for ⎿_____⏌ personnel screening (applicants and employees)⎿_____⏌The Panel reviewed use of the polygraph in personnel security screening only.

### Background

(Ø) The polygraph is a multi-channel instrument that measures and records certain physiological characteristics of an individual. Specifically, the polygraph instrument records physiological reactions. These include the respiratory patterns of the upper and lower chest; the galvanic skin response (GSR—changes in skin resistance); and the relative blood volume pressure (changes in the average volume of the systolic/diastolic blood pressure). All of these reactions are traced on a continuously running chart

The examiner is a critical element in the successful completion of a polygraph examination.

8

CONFIDENTIAL

C05836390

CONFIDENTIAL

In reaching an opinion, the dynamics of the examiner/examinee relationship play a critical role in the process.

C05836390

(Ø) The arguments in favor of screening polygraphs are based on, its utility (most important), its deterrent effect, and the cost effectiveness of the process. officials throughout the Intelligence Community agree that the polygraph process elicits important information that is often not obtained by other investigative methods

In February 1994, the Joint Security Commission reported:

> *The utility of the polygraph in eliciting important adjudicative information is not in doubt . . .*

(Ø) We believe, however, that many, if not most of the Agency population is unaware of the polygraph's efficacy.

**(Ø) The Panel strongly urges that, consistent with privacy safeguards, the Agency population should receive education regarding the value of the polygraph as it relates to the integrity of the work force and ultimate protection of the Agency's mission** The Panel believes that if employees are aware of many recent cases, they would be more

C05836390

CONFIDENTIAL

**supportive of the process, which in turn would improve CI and security in the Agency.**

(Ø) The argument is frequently made that the polygraph process has a deterrent effect. Applicants who believe that the polygraph will elicit disqualifying information may be deterred from applying. Cleared personnel may be deterred from misconduct because they know they will be required to take a polygraph in the future

(Ø) Agencies that use the ⬚ polygraph to screen applicants point to use of the process as an efficient and effective cost-containment tool. Disqualifying admissions made during the polygraph process obviate the need to conduct a time-consuming, resource intense and expensive background investigation.

(Ø) Further investigation and consideration— should be pursued. Such a process assures that qualified applicants are not rejected out of hand and that the Agency truly applies the "whole person" concept.

**Over-Reliance and The "Whole Person" Concept**
(Ø) CIA advocates the "whole person" concept, which calls on the adjudicator to look at the data in an applicant's or employee's BI, Financial Disclosure Form (FDF), credit report (CR), results of personal interview (PI) and any other relevant sources to assist in making the clearance decision,

**(C) However noble the intent of the "whole person" concept, the Panel remains concerned that over-reliance on the polygraph as an all-purpose vetting tool continues to exist.**

The Panel is concerned that over-reliance on the polygraph may have a detrimental effect

C05836390

**Over-Reliance—In the Applicant Process**
(C) After the DCI's Recruitment Center makes a conditional offer of staff employment to a promising candidate, the candidate completes the Standard Form SF86.

[          ] Concurrently, the Recruitment Center schedules the candidate for a full-scope polygraph examination.

(C)

[          ] For the applicant the polygraph experience constitutes the first security interview and, aside from general instructions and a candor statement, is often the first real contact with CIA beyond initial discussions with a recruiter. As such, it must be one that creates confidence and a sense of professionalism.

(C)

[          ] A candidate who is disapproved on the basis of security processing has a formal right to appeal that decision.

(C) All adjudicative decisions are based on strict adherence to DCID 6/4 (formerly DCID 1/14). This Directive stipulates adjudicative guidelines for approving security clearances.

[          ] Additionally, psychologists from the Office of Medical Services (OMS), attorneys from OGC and computer experts from [     ] re available to provide guidance to adjudicators.

(C) Management involvement [          ] provides a vehicle by which the interested component can be more directly involved in accepting responsibility for CI and security concerns [          ]

C05836390

We support and encourage the [          ] role to involve management constructively at such an early stage of the process.

### Over-Reliance—In the Reinvestigations Process

(Ø) [          ] has embarked on several initiatives, fully described below, that have had a positive impact on the number of employees whose reinvestigation processing remains unresolved. The Panel also makes recommendations specifically pertaining to polygraph, which we believe may produce additional substantive improvements. We strongly urge that these options be fully explored.

(Ø) The over-reliance factor manifests itself in the reinvestigations arena just as it does in the applicant process.

(Ø) When problems arise there is considerable disparity in the approach taken by Agency managers, who may become aware of difficulties formally—[          ]—or informally by the employee.

**(Ø) The Panel believes that Agency managers should be better prepared to deal with the concerns expressed by employees who have difficulty in the reinvestigation process. Courses for managers should be developed to ensure they understand the Agency's polygraph process and do not speak only from personal experience or bias. Managers should be taught how to help counsel employees and should know where to turn for additional assistance.**

(Ø)

[          ] Managers therefore have an important responsibility to support and counsel the employee without undermining the organizational processes established to resolve the area(s) of concern.

**(Ø) Regardless of the process, the panel strongly believes that management must be more directly involved in accepting responsibility for CI and security concerns for all employees.** [          ] **management must become accountable**

C05836390

(C) The Panel notes that applicants are told they must be totally candid. A similar statement, issued by the Agency's most senior management team, might also send the appropriate signal to all employees

(C) The Panel believes that                                        he polygraph is a tool, and it must be accompanied by other investigative methods.

**(C) We recommend expanded use of specialized interviews, financial investigations, operational reviews, and in some cases OMS intervention, to address problem cases.**

C05836390

(C) In sum, the over-reliance problem is deep-seated in the Agency

**(C) The Agency must articulate the primary goals of the polygraph program and support those goals by word and practice.** ☐ **in turn, must strive for absolute professionalism in the examiner cadre and strictly adhere to Agency polygraph policy. Finally, the system needs to identify, recruit and retain the necessary investigative resources to bring cases to resolution through alternate means.**

(C) We recognize that this requires ☐ resource commitment, but failure to apply adequate resources will result in a greater and more painful price in the long run.

**(C) The Panel recommends that** ☐ **develop a more espionage-focused polygraph examination, to be used with a comprehensive security interview conducted by the adjudicator.** ☐

☐ **The polygraph examination would then focus only on the issues most important to the Agency.** ☐

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

17

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

## POLYGRAPH EXAMINERS

**Prerequisites, Selection, Basic Training**

(ᴓ) The Panel believes that one of the most critical, if not the most critical element to ensure a professional, well-respected polygraph program is to identify and select the best possible candidates as polygraphers. Polygraphy is a behavioral science; managing the dynamics of human interaction in a stressful interview situation is the foundation of its success.

**(ᴓ) The Panel recommends that** [                    ]**identify critical examiner attributes/qualities** [                    ] [                    ]**and coordinate with the Office of Medical Services to identify selection tools for the examiner hiring process.**

(ᴓ) Furthermore, in addition to meeting all other requirements for Agency employment, examiner applicants should be at least 25 years of age and hold an earned baccalaureate degree from an accredited four-year college.

(ᴓ) The Panel strongly believes that basic interview, communication and elicitation skills—[                    ]can best be developed through experience as an investigator. The more experience and opportunity to hone these skills, the greater the likelihood of developing an accomplished interviewer. We heard compelling testimony—[                    ]that prior investigative experience should be a prerequisite for entering the polygraph profession.

**(ᴓ) After hearing from senior Agency officials** [                    ] **the Panel believes that the Agency's polygraph program must take steps to ensure that those entering the profession have proven investigative skills and appropriate level of investigative experience.** [                    ]

C05836390

CONFIDENTIAL

(C) The Panel believes that executive-level Agency managers should reinforce through the assignments, education and promotion processes that security/CI professionals are equal partners with DO, DI, and DS&T counterparts. Within_____ the training, career development, education, and reward systems should be reviewed.

(C) _____ CIA examiners must have highly developed information elicitation and interpersonal skills. _____

(C) The very nature of the process suggests that there will always be differences of perception regarding the tone and manner in which interviews are conducted. Nevertheless, it is critical to ensure that Agency examiners have the best training possible.

(C) In the Panel's opinion, the continuing education of examiners must include an array of courses that focus on techniques _____ Then, through a variety of courses, examiners should participate in skills-building courses, _____

(C) Once polygraphers have completed their basic training, the Panel believes _____ in concert with other appropriate Agency components, should develop familiarization programs for examiners _____

(C) _____ should formalize a system to identify those examiners who represent the best the _____ has to offer and develop a meaningful incentive/retention package.

(C) Security/CI officers with demonstrated talent should be considered _____ for senior positions across Directorate lines.

C05836390



CONFIDENTIAL

*Ames, the FBI, and Process Changes*
(C) *The arrest of Aldrich Ames on 21 February 1994 had a profound impact on counterintelligence in the Agency and throughout the IC.* _____
_____ two
*significant changes directly attributable to the Ames betrayal. On 1 May 1998,* _____
*began a number of initiatives to improve the process by which referrals to* ____ *are made.*
_____ *experienced examiners were matched with employees who had overseas experience, and the* _____ *MOU was amended to allow* ____ *to conduct more investigation* _____
_____ *also began planning a risk-managed reinvestigation program, based on an individual's access rather than on employment status,* _____
_____ *This program also provides for random BIs and polygraphs* _____
_____ *Security and CI professionals believe, and the Panel concurs, that the risk-managed reinvestigation program enhances the Agency's security/CI posture.* _____

(C) *We believe that these data reflect positively on the* ____ *plan to address unresolved CI issues, while balancing mission requirements and concern for the work force.*

C05836390

## TEST TECHNIQUES AND
## PROGRAMMATIC DIFFERENCES

(C) The importance of obtaining information from examinees ⬚
⬚ is fundamental to the Agency's program, and elicitation of information is the
hallmark of the program. ⬚

(C) An employee who has not engaged in wrongdoing ⬚
⬚ may still have legitimate concerns about ⬚ the
questions. These legitimate concerns are based on an individual's unique experience and
may be caused by knowing someone who has engaged in the behavior under question; or
the employee may have committed a lesser violation that does not meet the threshold of
the behavior of interest but nevertheless causes a reaction. Without further discussion, the
polygrapher has no way of determining whether the reaction is caused by these or similar
experiences that occurred in the Agency environment, or whether the person has engaged
in serious wrongdoing. Therefore, consistent with the doctrine that the Agency does not
use the polygraph as a "lie detector," the polygrapher is obligated to engage the employee
in discussion to gather information that may account for the polygraph reaction(s). ⬚



C05836390

(C) It should be noted, however, that throughout the sequence of events described above, the polygrapher believes that s/he is fulfilling an important responsibility to protect Agency and national security interests and is performing the mission for which s/he was trained.

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

Emphasis on a quality BI and review of financial information would also be standard.

(C) Finally, should specific information be developed that suggests a CI, security or suitability problem,____ still has the authority to conduct ____ Polygraphs or engage in other investigative activity as appropriate.

(C) Fundamental to this discussion remains the point that there is no tool available, including polygraph, that will categorically separate truth from deception. The polygraph process, especially in the screening world, relies heavily on the interpersonal and elicitation skills of the examiner. ____ Agency executives need to ____ articulate the direction of the polygraph program.

C05836390

We speculate that some percentage of the higher Agency numbers is attributable to the unique mission and responsibilities of Agency officers.

(C) We note that, as a post-Ames improvement to the CI posture of the Agency, [ ] and [ ] have codified procedures to review, on a regular basis, the [ ] Memorandum of Understanding that establishes the threshold for case referrals from [ ]

(C) The Panel applauds the many successful joint [ ] efforts conducted by the Agency [ ] However, much more must be done. [ ]

**The Need for Outreach—**
**Dispel the Myths and Educate**

C05836390

(C) The success of the Agency's polygraph program in protecting the integrity of the workforce, and by extension national security initiatives, should receive broader dissemination within the Agency. The Panel is mindful of privacy issues and the need to maintain an evenhanded system that does not suggest a "witch hunting" environment. Nevertheless, to the extent possible, the Agency population should be made aware of the continual stream of egregious, disqualifying behavior developed in the polygraph process; and understand that, had it not been for the polygraph, those individuals would likely have been hired.

(C) Panel members discussed at length alternatives to improve the perception of polygraph and instill greater confidence in the personnel security process by education and de-mystification of security vetting. While acknowledging the efforts currently made to explain procedures to applicants and employees alike, the Panel believes that more should be done in this area.

C05836390

CONFIDENTIAL

(C) Participants should understand the complaint and review process that provides responsible checks and balances

C05836390

(e) The Agency should support appropriate and periodic education of the workforce relative to the polygraph's role in protecting Agency and national security interests.

### Management Responsibility and Accountability

(C) The Panel found wide disparity among Agency managers' approach to polygraph issues—and in how they communicate their views to subordinates undergoing polygraph processing.

C05836390

CONFIDENTIAL

(C) We suggest that [                    ] develop a polygraph training module for managers. Such a module should be mandatory for new managers and included in their earliest training. The content should ensure that new managers understand the role of the polygraph within the Agency, and provide guidance about how to counsel employees who are experiencing difficulties in the polygraph process. A specialized course for senior managers should also be developed.

C05836390

CONFIDENTIAL

## The Need for Continued Research

(C) The Panel devoted considerable attention to improved technology in the business of deception detection. Development of a computerized algorithm to assist in scoring polygraph charts would be an improvement and would eliminate perceived subjectivity.

The IC overall, and the Agency specifically, has a continuing need to identify scientifically reliable and valid techniques to distinguish truth from deception. The Panel understands that an entity in the DS&T/OTS is conducting research in this area, but funding is very limited.

(C) **Accordingly, the Panel recommends that appropriate stakeholders, to include establish a dialogue to identify trends and advancements in neuroscience that are applicable to the overarching issue of deception detection. The most promising research should be identified, and specific funding recommendations should be presented. The Panel believes that this is a true IC issue and, provided the research demonstrates reasonable potential to achieve its goal, the project should be championed as a DCI initiative.**

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

C05836390

CONFIDENTIAL

CONFIDENTIAL

C05836390

CONFIDENTIAL

CONFIDENTIAL

# Katelyn Sack v. CIA et al

| | |
|---|---|
| **FOIA/PA Request No.:** | F-2011-01779 |
| **Document Number:** | 5 |
| **Date of Document:** | UNDATED |
| **Document Type:** | Presentation |
| **Classification:** | Unclassified |
| **From/To:** | N/A |
| **Subject:** | Personnel Security Briefing |
| **Document Pages:** | 21 |

**FOIA Exemptions:**
- ☐ (b) (1)
- ☐ (b) (2)
- ☒ (b) (3)
- ☐ (b) (4)
- ☐ (b) (5)
- ☐ (b) (6)
- ☐ (b) (7) (a)
- ☐ (b) (7) (c)
- ☐ (b) (7) (d)
- ☐ (b) (7) (e)
- ☐ (b) (7) (f)

**Privacy Act Exemptions:**
- ☐ (d) (5)
- ☐ (j) (1)
- ☐ (j) (2)
- ☐ (k) (1)
- ☐ (k) (2)
- ☐ (k) (5)

**Disposition:**
- ○ Denied in Full
- ● Partial Release
- ○ Released in Full
- ○ Referred to Third Agency

**Document Description:**
This is a 21-page undated powerpoint presentation about "Personnel Security Standards and Procedures Governing Eligibility for Access to Classified Information." It covers investigative requirements for future applicants to the CIA.  The CIA made one redaction related to internal Agency operations and functions as well as intelligence sources and methods related to applicant screening. This document is currently and properly marked UNCLASSIFIED.

This document is withheld in part on the basis of FOIA exemption (b)(3).

Exemption (b)(3): This document is withheld in part on the basis of FOIA exemption (b)(3).  This document contains CIA internal organizational data, functions, routing, and employee names that are specifically exempted from disclosure pursuant to the Central Intelligence Agency Act of 1949, and thus is protected from disclosure by exemption (b)(3). It also contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act of 1947, as amended.

*The CIA conducted a line-by-line review of this document and determined that no additional reasonably segregable, nonexempt portions of the document can be released.

**Case Number:** Civil Action 12-0244
**Judge's Initials:** EGS

# PERSONNEL SECURITY BRIEFING

APPROVED FOR RELEASE
DATE: 29-May-2012

C05836403

# OBJECTIVES

- Outline minimum Personnel Security Standards and Procedures Governing Eligibility for Access to Classified Information

  – EO 12968, DCID 6/4

- "Need-to-Know principle"

C05836403

# Personnel Security Standards

- US citizenship of Subject & Immediate Family

- Family members and/or others where bonds of affection or obligation is present must be free of physical, mental or other forms of duress by a foreign power, those involved in criminal activity, or advocating overthrow of the US Government.

- Unquestioned loyalty to US Gov't, stable, trustworthy, reliable, and of excellent character, judgment and discretion.

C05836403

# Executive Order 12968

- Presidential Order
  - President Clinton August 1995
- Establishes Requirements for Eligibility for Access to Classified Information
  - Initial Investigation
  - Aperiodic Reinvestigation
  - Appeals Rights

C05836403

# Investigative Requirements

- Agency Requirements
  - Application for Employment (paperwork)
  - Law Enforcement Checks and Credit Check
  - Background Investigation with Subject Interview
  - Polygraph (agencies with approved polygraph programs.)

C05836403

# Investigative Resources & Tools

- Personal History Statement
  - Biographical
    - Birth & Citizenship
    - Marital status, family members
    - Education, Employment, References
    - Personal declaration re drug and alcohol use, financial difficulties, arrests, etc.

- Law Enforcement Checks
  - Check with other government Agencies

C05836403

# Investigative Tools Continued

- Background Investigation
  - Subject interview with investigator
  - Coverage since age 18 or 7 years
  - Education, employment, neighborhoods
  - References – both listed and developed
- Polygraph – Polygraph is used to vet those issues contained in DCID 6/4
- Credit Bureau

# Personnel Security
## 'a life-cycle approach'

- Not a one-time, do it and forget it process
- Concerns and awareness from hiring to separation
  - Both Pre-employment Security and Counterintelligence Screening
- Initial
  - Upfront security and suitability screening
  - Conduct risk/gain assessment and employment decision
- Aperiodic Reinvestigation
  - May occur at different intervals during the career
  - Ongoing suitability and security assessment
  - Management, HR, Security and OMS input critical

C05836403

# Monitoring

Monitoring Tools

- Foreign national contact reporting

- Foreign travel reporting

- Outside activities reporting

- Financial Disclosure Form

  - Baselines assets and liabilities; identifies changes in following years. Disclose assets/income

    - Public records – land records, divorce, inheritances

    - Commercial Databases – information resellers

    - Government records – motor vehicles, boat & aircraft registration, US Treasure, Internal Revenue Service

    - Bank records (consistent with bank secrecy laws of the US and or Federal law enforcement access)

# Reinvestigations

## REINVESTIGATIONS

- Aperiodic
- Updated background investigation
- Polygraph

# Appeal Rights

- Provide individual with a written explanation of the basis of disapproval

- Allow representation by counsel or other representative

- Allow to reply in writing and to appear in person to present relevant material for their appeal

- Have request reviewed by senior officers who were not involved in the initial decision

# Decision Making Criteria

- Adjudicative Considerations
  - Nature/extent/circumstances
  - Frequency and recency
  - Subject's age & maturity at time of incident(s)
  - Presence of rehabilitation or behavioral changes
  - Motivation of the conduct
  - Potential for pressure, coercion, exploitation, or duress
  - Likelihood of continuation or recurrence

# Decision Making Criteria
# DCID 6/4 (Revised 12/29/05)

STATES CONCERNS, CONDITIONS THAT
RAISE CONCERNS, AND POSSIBLE
MITIGATION OF THOSE CONCERNS

- Allegiance to the United States
- Foreign Influence
- Foreign Preference
- Sexual Behavior
- Personal Conduct
- Financial Considerations

# DCID 6/4 Continued

- Alcohol Consumption
- Drug Involvement
- Psychological Conditions
- Criminal Conduct
- Handling Protected Information
- Outside Activities
- Use of Information Technology Systems

# DCID 6/4

# Concerns and Mitigators

- Allegiance to the US
  - Concerns: Involvement, Acts, and or Association with persons re: sabotage, espionage, treason, terrorism against US
  - Mitigators: Unwitting and or unaware of unlawful aims
    - severed ties and relationships upon becoming aware
- Foreign Influence
  - Concerns: Immediate family members or persons with whom there are close ties of affection or obligation – foreign country or government
  - Mitigators: Relationships determined to not present loyalty conflicts; contacts are casual and infrequent; prompt and proper reporting of FN contacts

# Concerns and Mitigators Continued

- Foreign Preference
  - Concerns: Dual citizenship, foreign passport, residence, military service
  - Mitigators: Activities prior to gaining US citizenship; willingness to renounce

- Sexual Behavior
  - Concerns: Criminal in nature; compulsive, addictive, high risk, coercion, etc.
  - Mitigators: Dated, adolescence; not exploitable, no current judgment/emot. Concerns

# Concerns and Mitigators Continued

- ## Personal Conduct
  - Concerns: Omission, concealment, falsification of information; pattern of dishonesty; rules violations
  - Mitigators: Isolated, dated, presently cooperative. Actions based on legal advice; improper guidance by authorized personnel; unsubstantiated

- ## Financial Considerations
  - Concerns: Unwillingness or inability to satisfy debts; deceptive or illegal practices; linked to gambling, drug use, etc.
  - Mitigators: Isolated, dated. Situational behond control; good faith efforts to repay/resolve debts

# Concerns and Mitigators
# Continued

- Alcohol Consumption
  - Concerns: Criminal incidents related to alcohol use; diagnosis of abuse/dependency; incidents affecting home/work
  - Mitigators: Isolated, dated, no evidence of a pattern; positive changes; successful treatment and rehab

- Drug Involvement
  - Concerns: Abuse; manufacture, sale, etc. Dependency, failed rehabilitation
  - Mitigators: Not recent; isolated; demonstrated intent not to use, successful rehab
  - Mitigators: Dated; isolated; not voluntary; acquittal; successful rehabilitation

# Concerns and Mitigators Continued

- Psychological Conditions
  - Concerns: High-risk, irresponsible, aggressive, unstable. Demonstrated judgment concerns; medical diagnosis
  - Mitigators: Recent medical opinion that disorder is controlled and indiv is complying with treatment plan, temporary, situational, no longer unstable

- Criminal Conduct
  - Concerns: Allegations or admissions of criminal conduct, whether formally charges, prosecuted or convicted. Single serious crime or multiple lesser offenses

# Concerns and Mitigators

## Continued

- Handling Protected Information

  - Concerns: Unauthorized disclosure of classified info; deliberate or multiple, negligence. Collecting or storing class info in an unauthorized location; efforts to obtain classified outside one's need-to-know

  - Mitigators: Inadvertent, isolated, improper training, positive attitude demonstrated

- Outside Activites

  - Concerns: Service, employment by/with a FN gov't FN national or other conflict, and failure to report activity

  - Mitigators: Willingness to terminate activities; no conflict evident re: Subj discharging security responsibilities

# Concerns and Mitigators Continued

- Use of Information Technology Systems

  — Concerns: Illegal or unauthorized entry, modification, destruction or manipulation into any information technology system; Unauthorized removal and or introduction or hardware, software or media into an information technology system

  — Mitigators: Misuse was not recent or significant, unintentional or inadvertent; isolated event; misuse followed by prompt, good faith effort to correct situation