DIA Decl.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATELYN SACK,

        Plaintiff,

    v.

CENTRAL INTELLIGENCE AGENCY,
*et al.*,

        Defendants.

Civil Action No. 12-cv-0244-EGS

## DECLARATION OF ALESIA Y. WILLIAMS

Pursuant to 28 U.S.C. § 1746, I, Alesia Y. Williams, do hereby declare the following to be true and correct:

    1.     I am the Chief of the Freedom of Information Act (FOIA) Services Section within the FOIA and Declassification Services Branch (FAC2A1) for the Defense Intelligence Agency ("DIA" or "Agency"), Department of Defense ("DOD").  I have served as the Chief, FOIA Services Section since January 2008.  Prior to that I was an administrative officer processing FOIA requests at DIA from November 2006 to December 2007, and I was a contractor assigned to DIA as a FOIA Senior Document Reviewer from January to November 2006.  Prior to coming to DIA, and throughout my career in the United States Air Force (USAF), one of my duties was to process FOIA requests.  I also spent over five years supervising two USAF FOIA offices.

    2.     As Chief of the FOIA Service Section, my duties include the management of day-to-day operations of DIA's FOIA program.  The FOIA Services Section receives, processes, and

responds to requests for DIA records under the FOIA and the Privacy Act, and I am the initial

denial authority for this Agency.  At my direction, DIA personnel search Agency records

systems under their control to identify documents and other information which may be

responsive to individual requests.  They forward any potentially responsive records located to my

office, which in turn determines whether responsive records should be withheld under any

applicable statutory FOIA or Privacy Act exemptions.  The activities of my staff are governed by

the Department of Defense, *DoD Freedom of Information Act Program Regulation*, found at 32

C.F.R. Part 286, as supplemented by the *Defense Intelligence Agency (DIA) Freedom of*

*Information Act Regulation,* found at 32 C.F.R. Part 292.

3.      I have been assigned classification validation and declassification authority for the

review of classified material in the records systems of the Agency.  As a matter of policy, I

exercise this authority after consultation with the subject matter experts or original classification

authorities who possess special knowledge concerning the national security sensitivity of this

classified information.  Through this process, I provide the Agency's declassification

determination to the requester.  The goal of the declassification process is to consult with the

subject matter experts to ensure that all records are properly considered for declassification.  If

the national security sensitivity has lapsed or expired, then the information will be declassified.

If the national security sensitivity has lessened, then the classification may be downgraded.  A

determination that a document should remain classified as marked is only reached after

consultations with the subject matter experts or original classification authorities.  All classified

material must go through this review process in response to a FOIA request.

4.      DIA is a component of DoD.  Its mission is to collect, analyze, and provide intelligence on the military capabilities of foreign military forces to the Secretary of Defense, the Joint Chiefs of Staff, and other DoD components.  DIA also manages the Defense Attaché System for DoD.  The DIA organization and mission are more fully set out at 32 C.F.R. Part 385, *Defense Intelligence Agency*.  Because of its mission to collect, analyze, and provide foreign intelligence, the vast majority of Agency records are classified in the interests of national security in accordance with Executive Order 13526, "Classified National Security Information."

5.      In the course of my official duties at DIA, I have become personally familiar with the six FOIA requests submitted by Kelly B. McClanahan on behalf of his client, Katelyn Sack, which are part of this lawsuit.  I am also familiar with a series of referrals sent to the FOIA Services Section by the Department of Defense Office of the Inspector General (DoD IG), arising from requests submitted to that DoD component by this requester.  These DoD IG requests are part of plaintiff's claims in this action.  Accordingly, I think it makes sense for me to address them in one declaration.  The statements made herein are based upon my personal knowledge, upon information made available to me in my official capacity, and upon determinations made by me in accordance therewith.

## PLAINTIFF'S FOIA REQUESTS SUBMITTED DIRECTLY TO DIA

6.      In her FOIA requests submitted directly to DIA, Ms. Sack requested a range of documents related to the DIA Credibility Assessment Program, which manages the use of credibility assessment technology – such as the polygraph examination – for the Department of Defense.  Ultimately, DIA processed seventy-two responsive documents (1,278 pages) for release to plaintiff.  Most of this information could be provided to plaintiff with no redactions.

However, DIA did redact certain information located in response to her requests directly to DIA pursuant to Exemptions 1, 3, 6, and 7(E) of the FOIA.  Through discussions between the parties in this litigation, the range of documents currently at issue has been narrowed somewhat.  With this declaration, I am attaching DIA's Vaughn Index that will explain the processing of thirty-six documents (482 pages).

7.     To locate the responsive records in this case, DIA conducted a search of every records system that was likely to have information responsive to this request.  The most likely repository for the academic articles related to the polygraph process was determined to be the National Center for Credibility Assessment ("NCCA), a DIA element located in Columbia, South Carolina.  The NCCA is the academic center for the development of credibility assessment technology and it bears responsibility for instructing federal government polygraph examiners in the current techniques and technologies available.  The DIA FOIA Services Section tasked NCCA to conduct a search, and the majority of the responsive pages were located within the records systems of the NCCA.  Because the requester mentioned investigative records in one portion of her request, additional search activity involved the DIA Office of the Inspector General in Washington, DC.  One page of responsive information was located within the records systems of the DIA Office of the Inspector General.  Additional information from the DIA FOIA Services Section administrative file was provided to plaintiff in response to the request.

8.     On November 21, 2010, Ms. Sack submitted four email requests pertaining to polygraph examinations to the DIA FOIA Services Section.  See Exhibits A-D, attached.  These requests were very similar to one of Ms. Sack's cases that had already been opened (0069-2010), so the FOIA Services Section originally filed these four email requests with that similar request,

number 0069-2010.  However, since 0069-2010 is not part of this litigation, three of those four e-mail requests were later pulled from case file 0069-2010 and processed as part of this civil action.  Plaintiff's first e-mail request, specifically asking for polygraph examiner demographics, is part of civil action number 12-1754 before this Court.  The other three e-mail requests are connected to this civil action. The subjects of these email requests were, as follows:

> **Email Number 2 -**  Request for a list of closed IG reports related to polygraph examinations;

> **Email Number 3 -**  Request for a report bibliography based on a list keywords the requester provided to assist in the search;  and

> **Email Number 4 -**  Request for reports authored by Dr. Gordon Barland.

9.      On July 3, 2011, the plaintiff's counsel emailed a request dated July 5, 2011, on behalf of his client, for the administrative records from FOIA requests numbers 0069-2010, 0135-2011, 0192-2011, 0193-2011, and 0194-2011.  (Please note the substantive records of these cases are not part of this civil action 12-CV-0244.  They are part of the other civil action, 12-1754, described above.  See Exhibit E, attached.  DIA assigned this request for administrative records case number 0404-2011.  On July 13, 2011, DIA sent correspondence to plaintiff's counsel acknowledging his client's request.  See Exhibit F, attached.

10.      On July 26, 2011, Plaintiff's counsel submitted a request, on behalf of his client, for course materials from the following courses:  PDD501 – Interview Techniques; LAW 501 – Legal and Ethical Aspects of PDD; RES 501 – Research Issues and Theories in PDD; Law Enforcement Quality Control Course (853); PDD Managers Course (860); and Advance Polygraph Studies Program (844).  See Exhibit G, attached.  DIA assigned this request case

number 0468-2011.  On September 9, 2011, DIA sent plaintiff's counsel correspondence acknowledging his request.  See Exhibit H, attached.

11.      On February 14, 2012, the requestor brought suit in United States District Court.

12.      On February 17, 2012, the FOIA Services Section completed its search for responsive records pertaining to request 0404-2011.  On May 10, 2012, the FOIA Services Section tasked the National Center for Credibility Assessment (NCCA) to search for responsive records pertaining to request number 0468-2011 and emails requests #3, and #4.  DIA also tasked the Office of Inspector General (IG) to search email request #2.

13.      The FOIA Services Section located 31 responsive documents (61 pages).  NCCA located 40 responsive documents (1,216 pages), plus one document that was potentially responsive but was corrupted and could not be opened.  IG located one responsive document (1 page).

14.      On April 24, 2012, DIA released 17 documents (554 pages) to the plaintiff in full.

15.      On October 11, 2012, DIA provided a second response to plaintiff.  DIA released 34 documents (454 pages) in part and 18 documents (198 pages) in full.

16.      On December 13, 2012, the FOIA Services Section provided plaintiff the third and final release records of related to the FOIA requests submitted directly to DIA.  During the first response, DIA was only able to locate an incomplete copy of document V-6.  NCCA searched again for the document and was able to find a complete copy of V-6 (16 pages) and released it in full in the third response.  DIA withheld in full two classified documents (43 pages).  DIA's search located seven documents that are already publically available.  DIA listed these documents in the response letter.  One of these documents (V-72, 20 pages) could be

difficult to locate; therefore, as a courtesy to the plaintiff, DIA included a copy of the document in the third response.

## PROCESSING OF FOIA REFERRALS FROM DOD IG

17.     On December 6, 2012, DoD OIG referred the document titled, "05-INTEL-18" (Bates stamped DoD OIG 000001 to 000180), for DIA review and response.  DIA reviewed document 05-INTEL-18 and DIA responded to DoD IG with a partial release recommendation on April 8, 2013.

18.     On January 30, 2013, DoD OIG referred seven documents (Bates stamped DoD OIG 000429 to 000468) for DIA review and response.  DIA reviewed the documents and provided DoD OIG with a release recommendation on April 5, 2013.

19.     On February 5, 2013, DoD OIG referred a document titled, "Defense Hotline case 102546" (Bates stamped DoD OIG 000881 to 000889), for DIA review and response.  DIA provided DoD OIG a response with a release recommendation on April 3, 2013.

20.     On February 28, 2013, DoD OIG referred one additional document (Bates stamped DoD OIG 000478 and 000479) for DIA to review.  DIA provided DoD OIG a response with a release recommendation on April 1, 2013.

## DIA'S EXEMPTION CLAIMS

21.     Having reviewed all material responsive to plaintiff's FOIA requests submitted directly to DIA and the referrals forwarded to DIA for review from the DoD IG, I have determined that it is necessary to assert the following exemptions to protect certain information contained within the responsive documents.

<u>Portions of Documents Withheld Under 5 U.S.C. § 552 (b)(1)</u>

22.     The current basis for classification of national security information is found in Executive Order 13526.  Section 1.1 of E.O. 13526, authorizes an Original Classification Authority (OCA) to classify information owned, produced, or controlled by the United States government if it falls within one of the following eight classification categories specified in Section 1.4 of E.O. 13526.

23.     Section 1.2 of E.O. 13526 provides that information covered by one or more of these classification categories may be classified at one of three classification levels - Top Secret, Secret, or Confidential - depending on the degree of harm that could reasonably be expected to result from the unauthorized disclosure of such information.  Information is classified at the Confidential level if unauthorized disclosure would reasonably be expected to cause damage to national security.  Information is classified at the Secret level if its release could reasonably be expected to cause serious damage to the national security.  Classification at the Top Secret level is maintained if its release could reasonably be expected to cause grave damage to national security.

24.     Certain information within these reviewed documents remains currently and properly classified under E.O. 13526 and it is appropriately withheld under FOIA Exemption 1. The documents contain information that relates to intelligence activities the release of which, I have determined, could reasonably be expected to cause serious and/or grave damage to national security.

<u>1.4(c) of Executive Order 13526 –</u>
<u>Protecting Intelligence Sources and Methods</u>

25.     DIA also withheld certain information under Exemption 1 because it relates to

intelligence sources and methods, and is properly classified under Section 1.4(c) of E.O. 13526.

Section 1.4(c) recognizes that the disclosure of intelligence sources can cause damage to national

security.  Intelligence sources can include individuals, foreign or American, foreign entities, and

the intelligence and security services of foreign governments.  Willing intelligence sources can

be expected to furnish information only when confident that they are protected from retribution

by the absolute secrecy surrounding their relationship to the United States government.  In some

rare instances, like times of conflict and war, interrogation is used with the intent of transitioning

a person hostile to the United States into a source.  In the instances where these efforts are

successful, it has been determined that they should be afforded the same amount of protection as

a willing source.  Sources that are compromised become extremely vulnerable to retaliation from

a variety of entities including their own governments or others having a stake in the

confidentiality of the information provided by the source.  In certain parts of the world, the

consequences of public disclosure of the identity of an individual that has served as a U.S. source

are often swift and far reaching, ranging from economic reprisals to possible harassment,

imprisonment, or even death.

26.     Section 1.4(c) of E.O. 13526 also recognizes that the release of intelligence

methods can cause damage to national security.  Intelligence methods are the means by which (or

the manner in which) an intelligence agency collects information to support military operations,

assist in national policymaking, assess military threats, or otherwise accomplish its mission.

Detailed knowledge of the methods and practices of an intelligence agency must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, avoid, or damage the intelligence operations of the United States.

27.     Disclosure of information the U.S. government obtains through intelligence sources or methods could reasonably be expected to enable persons and groups hostile to the United States to identify U.S. intelligence activities, methods or sources, and to design countermeasures to them.  This would damage the ability of the U.S. government to acquire information that is often critical to the formulation of strategic plans and missions designed to safeguard the United States against our enemies.  Based on the information provided to me in the course of my official duties, the documents identified in the Vaughn index as being withheld in part or in full under Section 1.4(c) of E.O. 13526 contain information concerning intelligence sources and methods.  Release of this information would reveal intelligence sources and methods and impair the intelligence collection mission of the intelligence community.  This information remains currently and properly classified under E.O. 13526 and it is appropriately withheld under FOIA Exemption 1.

<u>1.4(e) of Executive Order 13526 – Protection of</u>
<u>Data Related to Scientific, Technological, or Economic Matters</u>

28.     DIA also withheld certain information under Exemption 1 because it is related to scientific and technological matters relating to national security.  DIA asserted 1.4(e) of E.O. 13526 to protect scientific findings, detection algorithms, and other data that, if released, would expose countermeasures to polygraphs and compromise the effectiveness of polygraph screening

used within the intelligence community and law enforcement.

1.4(g) of Executive Order 13526 –
Protection of Information Related to Vulnerabilities

29.     DIA also withheld certain information under Exemption 1 because it relates to
vulnerabilities or capabilities of systems, and is properly classified under Section 1.4(g) of E.O.
13,526.  Section 1.4(g) recognizes that the disclosure of systems vulnerabilities can cause
damage to the national security.  In document 05-INTEL-18 DIA withheld information was
withheld that describes the weaknesses in DIA's cyber security program on the Top Secret
network.  If this information was released, it would allow individuals with hostile intent to
infiltrate the system and obtain access to information that would cause grave damage to national
security if the information was compromised.

30.     As noted above, a decision that a previous classification determination is still
valid today is only made by the FOIA Services Section after close consultation with the element
that originally classified the information.  That original classification determination is made
under the authority of the Director of this agency and his designated original classification
authorities.  In this instance, to verify the continued need to classify this information, the FOIA
Services Section tasked the subject matter expert with responsibility to review each classified
portion to determine whether disclosure would still cause national security harm.  The subject
matter expert confirmed the continued need for national security classification and the FOIA
Services Section asserted Exemption 1 to provide the appropriate protection.  Most of this
information is currently classified at the SECRET level.  Some of the information is classified at
the TOP SECRET level.

<u>Portions of the Documents Withheld Under 5 U.S.C. § 552(b)(3)</u>

31.     Exemption 3 of the FOIA permits the withholding of documents that are

"specifically exempted from disclosure by statute provided that such statute. . . requires that the

matters be withheld from the public in such a manner as to leave no discretion on the issue . . ."

Section 424 of title 10 of the United States Code is such a statute.  Section 424 provides: "(a)

Exemption from disclosure--Except as required by the President or as provided in subsection (c),

no provision of law shall be construed to require the disclosure of--(1) the organization or any

function of an organization of the Department of Defense named in subsection (b); or (2) the

number of persons employed by or assigned or detailed to any such organization or the name,

official title, occupational series, grade, or salary of any such person."  DIA is a covered

organization under section 424(b).

32.     Portions of documents have been withheld under Exemption 3 because they

specifically identify the names, office affiliations, contact information, and titles of DIA

personnel.  Release of this information would identify DIA employees, and would also reveal

part of the Agency's organizational structure.  Disclosure of this information is strictly prohibited

under Section 424.   Release of this information could ultimately result in the disclosure of the

names, official titles, occupational series, grades, or salaries of government employees working

in sensitive positions, which is also properly within the scope of Section 424.  Additionally, DIA

withheld information under Section 424 to protect sensitive intelligence functions of the Agency.

33.     A separate Exemption 3 statute, Section 403-1(i) of Title 50 of the United States

Code, provides that "[t]he Director of National Intelligence shall protect intelligence sources and

methods from unauthorized disclosure."  DIA carries out its intelligence mission under guidance

from the Director of National Intelligence.  Therefore, DIA is legally obligated to withhold any

intelligence sources or methods from release.  Portions of documents have been withheld under

Exemption 3 and 50 U.S.C. § 403-1(i), because they reveal classified intelligence sources and

methods.

<u>Portions of the DoD IG-Referred Documents Withheld Under 5 U.S.C. § 552(b)(5)</u>

34.     Portions of document 05-INTEL-18 have been withheld pursuant to Exemption 5,

which is intended to protect information relating to "Inter-agency or intra-agency memorandums

or letters which would not be available by law to a party other than an agency in litigation with

the agency."  The policy consideration behind this exemption is (1) to encourage open, frank

discussions on matters of policy between subordinates and superiors; (2) to protect against

premature disclosure of proposed policies before they are finally adopted; and (3) to protect

against public confusion that might result from disclosure of reasons and rationales that were not

in fact ultimately the grounds for an agency's action.  I have determined that portions of this

document are within the scope of subsections (1) and (2) enumerated and therefore the

information contained therein should be exempt from disclosure pursuant to 5 U.S.C. §552(b)(5).

The information withheld under Exemption 5 was to protect the deliberative process.  The

document contains internal communication providing assessments, advice and recommendations.

Release of this information would impair the deliberative process privilege.

<u>Portions of the Documents Withheld Under 5 U.S.C. § 552(b)(6)</u>

35.     Exemption 6 of the FOIA permits withholding of "personnel and medical files

and similar files the disclosure of which would constitute a clearly unwarranted invasion of

personal privacy."  Exemption 6 was used to withhold portions of documents to protect personal

information of DIA employees and employees of other government agencies.  This information, if released, would constitute an unwarranted invasion of their personal privacy.  Therefore, this information is protected under Exemption 6.

### Portions of Documents Withheld Under 5 U.S.C. § 552 (b)(7)(C)

36.     Exemption 7(C) of the Freedom of Information Act affords protection from disclosure for information that identifies law enforcement officials.  The names of several law enforcement officers were contained within these reports for administrative purposes, and DIA concluded that it was appropriate to assert Exemption 7(C) to protect their identities.  DIA determined that, in the balance, the privacy interest of these law enforcement officials outweighed any potential public interest in the disclosure.

### Portions of Documents Withheld Under 5 U.S.C. § 552 (b)(7)(E)

37.     Exemption 7(E) of the Freedom of Information Act affords protection to all law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  Exemption 7(E) was used to withhold portions of documents at Bates numbers 1824-1827. In this instance, Exemption 7(E) was asserted to protect the details concerning the use of polygraph technology to test the credibility of employees involved in specific incidents in the federal workplace.  DIA's credibility assessment officials believe that disclosure of this particular information could diminish the effectiveness of the polygraph examination as an investigative tool by allowing the general public to discern when DIA is likely to utilize this tool.

It is worth noting, as well, that the information withheld by DIA pursuant to Exemption 7(E) is

also protected by other FOIA exemptions because it relates entirely to a third party.

In this instance, Exemption 7(E) was asserted to protect the details concerning the use of

polygraph technology to test the credibility of employees.  DIA's credibility assessment officials

believe that disclosure of this particular information could diminish the effectiveness of the

polygraph examination as an investigative tool by allowing the general public to discern when

agencies are likely to utilize this tool.

     38.    It is worth noting here that the role of the NCCA in examining the polygraph

programs of other agencies was to identify the potential weaknesses or vulnerabilities that may

allow a person or a foreign intelligence service collectively to use countermeasures to

circumvent the polygraph system and conduct illegal or espionage activities without detection.

Accordingly, the NCCA report itself is intended to determine whether that agency's law

enforcement techniques and procedures are effective.  If this information was disclosed to the

general public, it is not hard to imagine how a determined individual could identify agencies with

weaker polygraph programs, seek employment, exploit the polygraph system, and obtain access

to sensitive information.  This would be a great risk to national security.

     39.    DIA also recommended withholding pursuant to Exemption 7(E) information

about investigative techniques that were used in an espionage investigation.  Release of these

techniques could result in circumvention of future investigations.

<u>Non-segregability</u>

     40.    I have carefully reviewed Attorney General Holder's memo dated 19 March 2009,

which encourages agencies to make discretionary disclosures and directs agencies to segregate

and release nonexempt information.  The documents were carefully reviewed for reasonably

segregable information.  I have determined that there is no reasonably segregable information

that can be released to the plaintiff.


     I certify under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

                    Executed this 15th day of April, 2013.


                          *Alesia Y. Williams*

                    Alesia Y. Williams
                    Chief, Freedom of Information Act
                    Services Section

# Exhibit A
# First Email
## November 22, 2010
## 10:33 am

*1st case*
*(0069. 2010)*

(b)(3):10 USC 424

**From:**      Katelyn Sack [katelyn.sack@gmail.com]
**Sent:**      Monday, November 22, 2010 10:33 AM
**To:**        FOIA
**Subject:**   Re: FOIA request

(b)(3):10 USC 424

Dear

My mailing address is: 111 David Terrace, Charlottesville, VA 22903.

Thank you for clarifying that this information was required. In sincerely appreciate your time and assistance.

Best,
Katelyn

On Mon, Nov 22, 2010 at 10:32 AM, FOIA <FOIA@dia.mil> wrote:

Ms. Sack,


Please provide a mailing address that we may use to send any records that may be found by our search.


(b)(3):10 USC 424

Defense Intelligence Agency

Washington, DC


**From:** katelyn.sack@gmail.com [mailto:katelyn.sack@gmail.com] **On Behalf Of** Katelyn Sack
**Sent:** Sunday, November 21, 2010 12:34 AM
**To:** FOIA
**Subject:** FOIA request


Nov. 21, 2010


Alesia Williams

Chief, FOIA Staff, DAN-1A

Defense Intelligence Agency

1

200 Macdill Blvd.

Washington, DC  20340-5100


Re: FOIA Request – Polygrapher Demographics


Dear Ms. Williams:


This is a request under the Freedom of Information Act, 5 U.S.C. § 552, et seq., for copies of all Defense Intelligence Agency ("DIA") records in the following category:


Department of Defense Polygraph Institute ("DoDPI"), Defense Academy of Credibility Assessment ("DACA"), and National Center for Credibility Assessment ("NCCA") records, research, or other documents pertaining in whole or in part to polygrapher demographic characteristics.


By polygrapher demographics, I mean the group-level population and subpopulation characteristics of individuals who are engaged in conducting and/or interpreting deception detection examinations, quality control of such examinations, and research and education regarding such examinations, especially but not limited to federally trained and military, federal, or state licensed polygraphers.  Hereafter I refer to this population as polygraphers.


By demographic characteristics, I mean responsive records or research including but not limited to information that addresses the following questions in aggregate terms for the polygrapher population specified above for as long a time period as there are responsive records.  I do not seek individual-level data.


1. How many federally trained polygraphers are employed full-time as polygraphers?  Of those whose full-time occupation is not polygrapher, in what capacity do they conduct and/or interpret polygraphs?


2. What type of polygraph test format(s) do polygraphers use?


3. What method(s) of scoring do polygraphers use (e.g. manual, computerized, other)?

4. What is the highest grade of school or year of college polygraphers have completed? What is their highest level of math education? If statistical training is relevant, of what does it consist?

5. How frequently do polygraphers administer polygraph exams?

6. What are polygraphers' religious affiliations characteristics, behaviors, activity levels, and views, and in what proportions?

7. What are polygraphers' political affiliations, characteristics, behaviors, activity levels, and views, and in what proportions?

8. What social class(es) best describes polygraphers, and in what proportions?

9. What racial or ethnic group(s) best describe polygraphers, and in what proportions?

10. If polygraphers are in part Hispanic, what categories best describe their Hispanic origin?

11. In what proportion are polygraphers male or female?

12. What sexual orientation(s) best describe polygraphers, and in what proportions?

13. What nationalities best describe polygraphers, and in what proportions?

14. What immigrant status best describes polygraphers, and in what proportions?

15. What distribution of ages characterizes polygraphers?

16.  What proportion of the polygrapher population is characterized by a physical or mental disability, and of what nature are these disabilities in the aggregate?

17.  What intelligence levels, quotients, or measures characterize polygraphers, and in what proportions?

18.  What personality and psychological characteristics are found in the polygrapher population, and in what proportions?

19.  In what proportion are polygraphers in the aggregate currently employed as:  active-duty military members, military reserves members, law enforcement officers, educators, government contractors, or other public sector employees in the criminal justice, law enforcement, or security fields?

20.  In what proportion have polygraphers in the aggregate been formerly employed as:  active-duty military members, military reserves members, law enforcement officers, educators, government contractors, or other public sector employees in the criminal justice, law enforcement, or security fields?

21.  What agencies employ how many members of the polygrapher population?

22.  What proportion of polygraphers have been or currently are retired, self-employed, unemployed, or employed in a field not related to criminal justice, law enforcement, or security?

23.  About how often do polygraphers see deception indicated in polygraph tests?

24.  About how often do polygraphers see inconclusive results?

25.  What is the mean, median, and modal income of the polygrapher population?

If you deny all or part of this request, please cite the specific exemptions you believe justify your refusal to release the information or permit the review and notify me of your appeal procedures available under the law. In excising material, please "black out" rather than "white out" or "cut out." Please release all reasonably segregable material.

4

(1) As an independent film-maker, I desire the requested information to include in my documentary on polygraphs. As art, investigative journalism, and translational science, this project qualifies the related FOIA request for fee exempt status. Since I have no distributor, the documentary is not a commercial activity any more than my putting music on Youtube or poetry on *The Science Creative Quarterly* is a commercial activity.

(2) As an independent writer, I desire the requested information for presenting this information in journalistic form. My publishing history demonstrates a solid basis for expecting publication through an organization which is organized and operated to public and broadcast news to the American public, to enhance the public understanding of the operations or activities of the U.S. Government. My recent writing and art has appeared or is forthcoming in *The Morning News,* the *South Carolina Review, The Christian Science Monitor,* the *New York Quarterly, Borderlands: Texas Poetry Review,* the *UK Guardian, Timothy McSweeney's Internet Tendency, The Science Creative Quarterly, Yankee Pot Roast, Demockeracy, Six Sentences, Thieves Jargon, Null Hypothesis, Word Riot, Divine Revolution Magazine, Opium Magazine, The Journal of Recreational Mathematics, Thema, Feathertale, Amalgam, Monkeybicycle, The Binnacle, The Georgetown Review,* and elsewhere.

(3) As a President's Fellow and PhD student in Politics at the University of Virginia, I am engaged in non-commercial educational and scientific research pertaining to polygraphs and polygraphers. I need the information I have requested in this capacity, as well as in the above capacities. The information requested will vitally inform my research, which will contribute to the advancement of public knowledge regarding federal polygraph programs.

In fact, not having access to this information is already impairing my ability to ideally design, implement, and analyze graduate experimental research on polygraphs, polygraphers, and related industries, programs, and topics. Thus in my capacity as an artist, journalist, student, and researcher, I reiterate my request for a fee waiver on the multiple grounds outlined above.

Please do not hesitate to contact me by phone (434-409-9670) or email (kls9t@virginia.edu) with any questions. Thank you for your time and consideration.

Sincerely,

Katelyn Sack

--
Katelyn Sack
434-409-9670
kls9t@virginia.edu

--
Katelyn Sack, Ph.D. student
Political Psychology and Theory
University of Virginia
434-409-9670
katelyn.sack@gmail.com

# Exhibit B
# Second Email
## November 21, 2010

## 3:00 pm

(b)(3):10 USC 424

| From: | katelyn.sack@gmail.com on behalf of Katelyn Sack [kls9t@virginia.edu] |
|---|---|
| Sent: | Sunday, November 21, 2010 3:00 PM |
| To: | FOIA |
| Subject: | ATTN: FOIA Requester Service Center (Ms. Alesia Williams) |

Nov. 21, 2010


Alesia Williams

Chief, FOIA Staff, DAN-1A

Defense Intelligence Agency

200 Macdill Blvd.

Washington, DC 20340-5100

foia@dia.mil


Re: FOIA Request – list of closed IG reports


Dear Ms. Williams:


This is a request under the Freedom of Information Act, 5 U.S.C. § 552, et seq., for copies of all Defense Intelligence Agency ("DIA") records in the following category:


DIA documents pertaining in whole or in part (all years, all classifications) to a list of closed Inspector General investigations and reports.


If you deny all or part of this request, please cite the specific exemptions you believe justify your refusal to release the information or permit the review and notify me of your appeal procedures available under the law. In excising material, please "black out" rather than "white out" or "cut out." Please release all reasonably segregable material.

1

I request a fee waiver on three grounds:

(1) As an independent film-maker, I desire the requested information to include in my documentary on polygraphs. As art, investigative journalism, and translational science, this project qualifies the related FOIA request for fee exempt status. Since I have no distributor, the documentary is not a commercial activity any more than my putting music on Youtube or poetry on *The Science Creative Quarterly* is a commercial activity.

(2) As an independent writer, I desire the requested information for presenting this information in journalistic form. My publishing history demonstrates a solid basis for expecting publication through an organization which is organized and operated to public and broadcast news to the American public, to enhance the public understanding of the operations or activities of the U.S. Government. My recent writing and art has appeared or is forthcoming in *The Morning News*, the *South Carolina Review*, *The Christian Science Monitor*, the *New York Quarterly*, *Borderlands: Texas Poetry Review*, the *UK Guardian*, *Timothy McSweeney's Internet Tendency*, *The Science Creative Quarterly*, *Yankee Pot Roast*, *Demockeracy*, *Six Sentences*, *Thieves Jargon*, *Null Hypothesis*, *Word Riot*, *Divine Revolution Magazine*, *Opium Magazine*, *The Journal of Recreational Mathematics*, *Thema*, *Feathertale*, *Amalgam*, *Monkeybicycle*, *The Binnacle*, *The Georgetown Review*, and elsewhere.

(3) As a President's Fellow and PhD student in Politics at the University of Virginia, I am engaged in non-commercial educational and scientific research pertaining to polygraphs, polygraphers, and related industries, programs, and topics. I need the information I have requested in this capacity, as well as in the above capacities. The information requested will vitally inform my research, which will contribute to the advancement of public knowledge regarding federal polygraph programs.

Thus in my capacity as an artist, journalist, graduate student, and researcher, I reiterate my request for a fee waiver on the multiple grounds outlined above.

Please do not hesitate to contact me by phone (434-409-9670) or email (kls9t@virginia.edu) with any questions. Thank you for your time and consideration.

Sincerely,

Katelyn Sack

--
Katelyn Sack
434-409-9670
katelyn.sack@gmail.com

www.katelynsack.com

# Exhibit C
# Third Email
## November 21, 2010
## 3:41 pm

(b)(3):10 USC 424

| From: | katelyn.sack@gmail.com on behalf of Katelyn Sack [kls9t@virginia.edu] |
| --- | --- |
| Sent: | Sunday, November 21, 2010 3:41 PM |
| To: | FOIA |
| Subject: | ATTN: FOIA Requester Service Center (Ms. Alesia Williams) |

ATTN: FOIA Requester Service Center (Ms. Alesia Williams)

Nov. 21, 2010

Alesia Williams
Chief, FOIA Staff, DAN-1A
Defense Intelligence Agency
200 Macdill Blvd.
Washington, DC  20340-5100
foia@dia.mil

Re: FOIA Request – Polygraph domestic and foreign use reports

Dear Ms. Williams:

This is a request under the Freedom of Information Act, 5 U.S.C. § 552, et seq., for copies of all Defense Intelligence Agency ("DIA") records in the following category:

Department of Defense Polygraph Institute ("DoDPI"), Defense Academy of Credibility Assessment ("DACA"), and National Center for Credibility Assessment ("NCCA") documents pertaining in whole or in part to:

A report bibliography (all years, all classifications) for the keywords

National OR domestic OR foreign OR international

AND

Use patterns OR capability OR industry OR export OR training OR accreditation

AND

Polygraphy OR Polygraph OR Lie detection OR Lie detector

If you deny all or part of this request, please cite the specific exemptions you believe justify your refusal to release the information or permit the review and notify me of your appeal procedures available under the law. In excising material, please "black out" rather than "white out" or "cut out." Please release all reasonably segregable material.

I request a fee waiver on three grounds:

(1) As an independent film-maker, I desire the requested information to include in my documentary on polygraphs. As art, investigative journalism, and translational science, this project qualifies the related FOIA

1

request for fee exempt status. Since I have no distributor, the documentary is not a commercial activity any more than my putting music on Youtube or poetry on The Science Creative Quarterly is a commercial activity.

(2) As an independent writer, I desire the requested information for presenting this information in journalistic form. My publishing history demonstrates a solid basis for expecting publication through an organization which is organized and operated to public and broadcast news to the American public, to enhance the public understanding of the operations or activities of the U.S. Government. My recent writing and art has appeared or is forthcoming in The Morning News, the South Carolina Review, The Christian Science Monitor, the New York Quarterly, Borderlands: Texas Poetry Review, the UK Guardian, Timothy McSweeney's Internet Tendency, The Science Creative Quarterly, Yankee Pot Roast, Demockeracy, Six Sentences, Thieves Jargon, Null Hypothesis, Word Riot, Divine Revolution Magazine, Opium Magazine, The Journal of Recreational Mathematics, Thema, Feathertale, Amalgam, Monkeybicycle, The Binnacle, The Georgetown Review, and elsewhere.

(3) As a President's Fellow and PhD student in Politics at the University of Virginia, I am engaged in non-commercial educational and scientific research pertaining to polygraphs, polygraphers, and related industries, programs, and topics. I need the information I have requested in this capacity, as well as in the above capacities. The information requested will vitally inform my research, which will contribute to the advancement of public knowledge regarding federal polygraph programs.

Thus in my capacity as an artist, journalist, student, and researcher, I reiterate my request for a fee waiver on the multiple grounds outlined above.

Please do not hesitate to contact me by phone (434-409-9670) or email (kls9t@virginia.edu) with any questions. Thank you for your time and consideration.

Sincerely,
Katelyn Sack

--
Katelyn Sack
434-409-9670
katelyn.sack@gmail.com
www.katelynsack.com

# Exhibit D
# Forth Email
## 3:56 pm

(b)(3):10 USC 424

| From: | katelyn.sack@gmail.com on behalf of Katelyn Sack [kls9t@virginia.edu] |
|---|---|
| Sent: | Sunday, November 21, 2010 3:56 PM |
| To: | FOIA |
| Subject: | ATTN: FOIA Requester Service Center (Ms. Alesia Williams) |

ATTN: FOIA Requester Service Center (Ms. Alesia Williams)

Nov. 21, 2010

Alesia Williams
Chief, FOIA Staff, DAN-1A
Defense Intelligence Agency
200 Macdill Blvd.
Washington, DC  20340-5100
foia@dia.mil

Re: FOIA Request – Barland reports

Dear Ms. Williams:

This is a request under the Freedom of Information Act, 5 U.S.C. § 552, et seq., for a printout of the list of reports at the Defense Intelligence Agency, or the Defense Academy of Credibility Assessment written by Gordon Barland.

I also request a copy of each of the reports located.

If you deny all or part of this request, please cite the specific exemptions you believe justify your refusal to release the information or permit the review and notify me of your appeal procedures available under the law. In excising material, please "black out" rather than "white out" or "cut out." Please release all reasonably segregable material.

This request falls into either the "all other requesters" or the "educational and scientific institutions" fee category.  However, I request a fee waiver on three grounds:

(1) As an independent film-maker, I desire the requested information to include in my documentary on polygraphs.  As art, investigative journalism, and translational science, this project qualifies the related FOIA request for fee exempt status.  Since I have no distributor, the documentary is not a commercial activity any more than my putting music on Youtube or poetry on The Science Creative Quarterly is a commercial activity.

(2) As an independent writer, I desire the requested information for presenting this information in journalistic form.  My publishing history demonstrates a solid basis for expecting publication through an organization which is organized and operated to public and broadcast news to the American public, to enhance the public understanding of the operations or activities of the U.S. Government.  My recent writing and art has appeared or is forthcoming in The Morning News, the South Carolina Review, The Christian Science Monitor, the New York Quarterly, Borderlands: Texas Poetry Review, the UK Guardian, Timothy McSweeney's Internet Tendency, The Science Creative Quarterly, Yankee Pot Roast, Demockeracy, Six Sentences, Thieves Jargon, Null Hypothesis, Word Riot, Divine Revolution Magazine, Opium Magazine, The Journal of Recreational

Mathematics, Thema, Feathertale, Amalgam, Monkeybicycle, The Binnacle, The Georgetown Review, and elsewhere.

(3) As a President's Fellow and PhD student in Politics at the University of Virginia, I am engaged in non-commercial educational and scientific research pertaining to polygraphs, polygraphers, and related industries, programs, and topics. I need the information I have requested in this capacity, as well as in the above capacities. The information requested will vitally inform my research, which will contribute to the advancement of public knowledge regarding federal polygraph programs.

Thus in my capacity as an artist, journalist, student, and researcher, I reiterate my request for a fee waiver on the multiple grounds outlined above.

Please do not hesitate to contact me by phone (434-409-9670) or email (kls9t@virginia.edu) with any questions. Thank you for your time and consideration.

Sincerely,
Katelyn Sack

--
Katelyn Sack
434-409-9670
katelyn.sack@gmail.com
www.katelynsack.com

# Exhibit E
# Plaintiff's request
## July 3, 2011



**FOIA**

| | |
|---|---|
| **From:** | Kel McClanahan, Esq. [kel@nationalsecuritylaw.org] |
| **Sent:** | Sunday, July 03, 2011 6:05 AM |
| **To:** | FOIA |
| **Subject:** | FOIA/PA request from Katelyn Sack |
| **Attachments:** | 01xx-2011 - 2011-07-05 - DIA - FOIA processing notes.pdf |

Please find attached a FOIA/PA request from my client Katelyn Sack.   Thank you.

# NATIONAL SECURITY COUNSELORS

1200 SOUTH COURTHOUSE ROAD
SUITE 124
ARLINGTON, VA 22204

TELEPHONE: (301) 728-5908
FACSIMILE: (240) 681-2189

KEL MCCLANAHAN, ESQ., EXECUTIVE DIRECTOR (admitted in NY, DC)
EMAIL: KEL@NATIONALSECURITYLAW.ORG
BRADLEY P. MOSS, ESQ., DEPUTY EXECUTIVE DIRECTOR (admitted in IL, DC)
EMAIL: BRAD@NATIONALSECURITYLAW.ORG

5 July 2011

Alesia Williams
Chief, FOIA Staff, DAN-1A
Defense Intelligence Agency
Building 6000
Washington, DC 20340-5100

Re:     FOIA/PA Request – FOIA Request Processing Notes

Dear Ms. Williams:

        This is a request on behalf of my client Katelyn Sack under the Freedom of Information
Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, and the Privacy Act, 5 U.S.C. § 552a, *et seq.*, for copies of
**all Defense Intelligence Agency ("DIA") records referencing FOIA requests submitted by
her, including, *but not limited to*, Req. Nos. 0069-2010, 0135-2011, 0192-2011, 0193-2011,
and 0194-2011, and the four requests submitted on 21 November 2010, that contain
remarks, comments, notes, explanations, etc. made by DIA personnel or contractors about
the processing of these requests (and appeals, if appropriate), the invocation of exemptions,
or related matters.** This is to include any analysts' notes made during the processing of the
requests, any standard worksheets completed by the analysts, any justifications for exemption
invocations or other supporting documentation provided to the Appeals Authority, and any
correspondence referencing the requests, including tasking orders, emails, and coordination
documentation. This request does *not* include any correspondence exchanged between the DIA
and Ms. Sack, unless that correspondence contains notes or comments that were not included in
the version sent to her. Nor does it include any records that were themselves responsive to any
of Ms. Sack's previous requests. Ms. Sack is to be considered the only requester for your
administrative purposes; National Security Counselors is *not* to be considered a requester. I have
attached a signed authorization form to this effect.

        When processing this request, please note that the DC Circuit has previously held that
agencies have a duty to construe the subject material of FOIA requests *liberally* to ensure
responsive records are not overlooked. *See Nation Magazine, Washington Bureau v. U.S.
Customs Service,* 71 F.3d 885, 890 (D.C. Cir. 1995). Accordingly, you are hereby instructed that
the term "record" includes, *but is not limited to*: 1) all email communications to or from any
individual within your agency; 2) memoranda; 3) inter-agency communications; 4) sound
recordings; 5) tape recordings; 6) video or film recordings; 7) photographs; 8) notes; 9)

notebooks; 10) indices; 11) jottings; 12) message slips; 13) letters or correspondence; 14) telexes; 15) telegrams; 16) facsimile transmissions; 17) statements; 18) policies; 19) manuals or binders; 20) books; 21) handbooks; 22) business records; 23) personnel records; 24) ledgers; 25) notices; 26) warnings; 27) affidavits; 28) declarations under penalty of perjury; 29) unsworn statements; 30) reports; 31) diaries; or 32) calendars, regardless of whether they are handwritten, printed, typed, mechanically or electronically recorded or reproduced on any medium capable of conveying an image, such as paper, CDs, DVDs, or diskettes. Furthermore, in line with the guidance issued by the Department of Justice on 9 September 2008 to all federal agencies with records subject to FOIA, agency records that are currently in the possession of a U.S. Government contractor for purposes of records management remain subject to FOIA. Please ensure that your search complies with this clarification on the effect of Section 9 of the OPEN Government Act of 2007 of the definition of a "record" for purposes of FOIA. In addition, DIA should not limit the search to DIA-originated records or exclude correspondence sent to outside third parties. Similarly, we request that all documents be reviewed in their entirety, and that no information be omitted on the grounds of "non-relevance."

If you deny all or part of this request, please cite the specific exemptions you believe justify your refusal to release the information or permit the review and notify us of your appeal procedures available under the law. In excising material, please "black out" rather than "white out" or "cut out." In addition, we draw your attention to President Obama's 21 January 2009 *Memorandum for the Heads of Executive Departments and Agencies*, directing federal agencies to adopt a presumption in favor of disclosure and stating that government information should not be kept confidential "merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears." To permit us to reach an intelligent and informed decision whether or not to file an administrative appeal of any denied material, please describe any withheld records (or portions thereof) and explain the basis for your exemption claims. This description should include a list of the withheld documents, pursuant to *Shermco Indus. v. Sec'y of the U.S. Air Force*, 452 F. Supp. 306, 317 n.7 (N.D. Tx. 1978) ("A person cannot effectively appeal a decision about the releasability of documents . . . if he is not informed of at least a list of the documents to which he was denied access . . . and why those decisions were made. Denial of this information would in all likelihood be a violation of due process as well as effectively gutting the reasons for applying the exhaustion doctrine in FOIA cases.").

Ms. Sack is a representative of an educational institution. She is a Ph.D. candidate and President's Fellow at the University of Virginia, Woodrow Wilson Department of Politics. She intends to utilize any responsive records in her research into polygraph bias and present her results in a publicly available form. Her Department has stipulated that she is to be treated as a representative of the university. I have attached a letter to that effect.

Because of the low number of responsive records Ms. Sack expects you to find in your search, she does not expect that a request for a public interest fee waiver is called for at this time. If you find that you will be releasing more than 100 pages of responsive records, please contact me and I will provide you with an appropriate fee waiver request at that time.

I also specifically state for the record Ms. Sack's unwillingness to pay any fees for this request. Please do not delay the processing of this request by needlessly requesting further confirmation of this unwillingness to pay fees or terminate the processing of this request for failure to provide you with such confirmation. This statement is a full and unequivocal refusal to pay *any* fees for this request.

Please ensure that, in accordance with the DC Circuit's ruling in *Chambers v. Dep't of the Interior*, 568 F.3d 998 (D.C. Cir. 2009), all records potentially responsive to this FOIA request are immediately preserved from destruction until the final resolution of this FOIA action. Destruction of potentially responsive records after the receipt of a FOIA request is considered "contumacious conduct" by the DC Circuit. *See id.* at 1004.

The DIA is required by law to respond to this request within 20 working days. Failure to timely comply may result in the filing of a civil action against your agency in a United States District Court.

Please provide any records produced in response to this request in electronic (soft-copy) form. Please provide soft-copy records by email or on a CD if email is not feasible. However, Ms. Sack does not agree to pay an additional fee to receive records on a CD, and in the instance that such a fee is required, she will accept a paper copy of responsive records.

Your cooperation in this matter would be appreciated. If you wish to discuss this request, please do not hesitate to contact me.

Sincerely,

Kel McClanahan

# ▥ UNIVERSITY*of*VIRGINIA

WOODROW WILSON DEPARTMENT OF POLITICS
P.O. Box 400787
Charlottesville, VA 22904-4787
☎434 924 3192 (*fax*: 434 924 3359)

JEFFERY A. JENKINS
*Associate Professor & Director of Graduate Studies*
*Office Location:* Gibson Hall S 261
*Email:* jaj7d@virginia.edu

June 30, 2011

    Re:  Fee category verification and fee waiver request support

To Whom It May Concern:

This letter verifies that Katelyn Sack's FOIA request to which it is attached falls into the "academic" fee category.  Ms. Sack is a Ph.D. student and President's Fellow in Politics at the University of Virginia.  She intends to review, evaluate, synthesize, and present the requested data, analyses, policies, protocols, and practices in a publically available, usable form.  This intention is consistent with U.Va.'s scholarly research goals.

The University of Virginia Politics Department is an institution of graduate higher education which operates programs of scholarly research.  Ms. Sack's request is on behalf of this institution, one of the primary aims of which is to explain contemporary political developments in a broad philosophical and historical context that sheds light on the long-term development of institutional structures that shape political behavior norms and public policies.  Ms. Sack is acting as a representative of the University of Virginia Department of Politics, and you may consider the Department to be the requester for purposes of fee calculations.

This letter also supports Ms. Sack's request for a fee waiver, on the grounds that disclosure of the requested information will significantly contribute to public understanding of government operations and activities.  Ms. Sack's graduate training qualifies her to extract, synthesize, and effectively convey the requested information to the public.  Her research is of interest to the public at large, because bias in polygraphs is an under-explored phenomenon that affects millions of Americans.

Sincerely,

Jeffery A. Jenkins

## AUTHORIZATION AND PRIVACY WAIVER

I, Katelyn Sack, hereby authorize the law firm National Security Counselors and any attorney associated with it (collectively "my attorneys") to file Freedom of Information Act ("FOIA") requests on my behalf with any agency of the United States government. I also authorize any agency of the United States government to discuss any FOIA requests filed by me or on my behalf (collectively "my requests") with my attorneys. A release to my attorneys shall be considered the legal equivalent of a release to me. A photocopy of this authorization shall have the same effect as the original.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Katelyn Sack
Katelyn Sack

05-18-2011
Date

# Exhibit F
# DIA
# Acknowledgement
## July 13, 2011



## DEFENSE INTELLIGENCE AGENCY

### WASHINGTON, D.C. 20340-5100



U-11-4,500/DAN-1A (FOIA)

JUL 1 3 2011

Mr. Kel McClanahan
1200 South Courthouse Road
Suite 124
Arlington, VA  22204

Dear Mr. McClanahan:

    This is an interim response to your July 5, 2011, Freedom of Information Act (FOIA) request for copies of all DIA records referencing FOIA requests submitted by Katelyn Sack.  We received your request on July 11, 2011, and assigned it case number 0404-2011.  Please use this number in all future correspondence with us about this matter.

    We will be unable to respond to your request within the FOIA's 20 day statutory time period due to unusual circumstances.  These unusual circumstances could be (a) the potential volume of records responsive to your request and (b) the need for consultation with one or more offices within DIA which have substantial interest in either the determination or the subject matter of the records.  For these reasons, your request has been placed in our queue and will be worked in the order the request was received.  Our current administrative workload is in excess of 2,085 requests.

    We regret that there is currently a substantial delay in processing requests and solicit your patience and understanding.  We assure you that we will process your request as soon as possible.  If you have any questions, please contact the DIA FOIA Requester Service Center at 301-394-5587.

                       Sincerely,

                       Alesia Y. Williams
                       Chief, Freedom of Information Act Staff

# Exhibit G
# Plaintiff's request
## July 26, 2011

FOIA

# NATIONAL SECURITY COUNSELORS

1200 SOUTH COURTHOUSE ROAD
SUITE 124
ARLINGTON, VA 22204

TELEPHONE: (301) 728-5908
FACSIMILE: (240) 681-2189



KEL MCCLANAHAN, ESQ., EXECUTIVE DIRECTOR (admitted in NY, DC)
  EMAIL: KEL@NATIONALSECURITYLAW.ORG
BRADLEY P. MOSS, ESQ., DEPUTY EXECUTIVE DIRECTOR (admitted in IL, DC)
  EMAIL: BRAD@NATIONALSECURITYLAW.ORG

26 July 2011

Alesia Williams
Chief, FOIA Staff, DAN-1A
Defense Intelligence Agency
Building 6000
Washington, DC  20340-5100

Re:   FOIA Request – NCCA course materials

Dear Ms. Williams:

This is a request on behalf of my client Katelyn Sack under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, for copies of **all course materials for the following National Center for Credibility Assessment courses:**

1.   **PDD Program:**
     a.   **PDD 501 – Interview Techniques**
     b.   **LAW 501 – Legal and Ethical Aspects of PDD**
     c.   **RES 501 – Research Issues and Theories in PDD**
2.   **FPCECP Program:**
     a.   **Law Enforcement Quality Control Course (853)**
     b.   **PDD Managers Course (860)**
     c.   **Advance Polygraph Studies Program (844)**

**This request covers *all* materials used for instructional purposes in these courses, including, but not limited to, Powerpoint presentations, handouts, and audio/video recordings.** You may limit this request to course materials from courses taught in 2010 and 2011, and may exclude examinations and testing materials. Ms. Sack is to be considered the only requester for your administrative purposes; National Security Counselors is *not* to be considered a requester. I have attached a signed authorization form to this effect.

When processing this request, please note that the DC Circuit has previously held that agencies have a duty to construe the subject material of FOIA requests *liberally* to ensure responsive records are not overlooked. *See Nation Magazine, Washington Bureau v. U.S. Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995). Furthermore, in line with the guidance issued by the Department of Justice on 9 September 2008 to all federal agencies with records

subject to FOIA, agency records that are currently in the possession of a U.S. Government
contractor for purposes of records management remain subject to FOIA. Please ensure that your
search complies with this clarification on the effect of Section 9 of the OPEN Government Act of
2007 of the definition of a "record" for purposes of FOIA. In addition, the DIA should not limit
the search to DIA-originated records or exclude correspondence sent to outside third parties.
Similarly, we request that all documents be reviewed in their entirety, and that no information be
omitted on the grounds of "non-relevance." Finally, please consider this letter an affirmative
rejection of any limitation of your search to records created prior to the date of this request. To
the contrary, we stipulate that this search should be restricted to records created prior to the date
of the first substantive review of this request by DIA FOIA personnel (as opposed to the date that
receipt of the request was acknowledged by the DIA).

        In conclusion, the DSS is hereby instructed to interpret the scope of this request in the
most liberal manner possible short of an interpretation that would lead to a conclusion that the
request does not reasonably describe the records sought. If, even given these restrictions, the
DIA still determines that this request does not reasonably describe the records sought, it is
instructed to contact me pursuant to 32 C.F.R. § 286.4(h)(1) to discuss reformulation of the
request before rejecting the request as overbroad, vague, or unduly burdensome.

        If you deny all or part of this request, please cite the specific exemptions you believe
justify your refusal to release the information or permit the review and notify us of your appeal
procedures available under the law. In excising material, please "black out" rather than "white
out" or "cut out." In addition, we draw your attention to President Obama's 21 January 2009
*Memorandum for the Heads of Executive Departments and Agencies*, directing federal agencies
to adopt a presumption in favor of disclosure and stating that government information should not
be kept confidential "merely because public officials might be embarrassed by disclosure,
because errors and failures might be revealed, or because of speculative or abstract fears." To
permit us to reach an intelligent and informed decision whether or not to file an administrative
appeal of any denied material, please describe any withheld records (or portions thereof) and
explain the basis for your exemption claims. This description should include a list of the
withheld documents, pursuant to *Shermco Indus. v. Sec'y of the U.S. Air Force*, 452 F. Supp.
306, 317 n.7 (N.D. Tx. 1978) ("A person cannot effectively appeal a decision about the
releasability of documents . . . if he is not informed of at least a list of the documents to which he
was denied access . . . and why those decisions were made. Denial of this information would in
all likelihood be a violation of due process as well as effectively gutting the reasons for applying
the exhaustion doctrine in FOIA cases.").

        Ms. Sack is a representative of an educational institution. She is a Ph.D. candidate and
President's Fellow at the University of Virginia, Woodrow Wilson Department of Politics. She
intends to utilize any responsive records in her research into polygraph bias and present her
results in a publicly available form. Her Department has stipulated that she is to be treated as a
representative of the university. I have attached a letter to that effect.

        Ms. Sack is also requesting a public interest fee waiver. There can be no question that
the information sought would contribute to the public's understanding of government operations
or activities and is in the public interest. Her research is of interest to the public at large, because

bias in polygraphs is an under-explored phenomenon that potentially affects millions of Americans. Experts estimate that close to 2.5 million polygraph exams are administered annually in the United States. In the FBI alone, the number of polygraph exams conducted solely in connection with pre-employment and employee security screenings rose nearly 750% from 2002 to 2005. By late 2009, 15% of U.S. Customs and Border Protection ("CBP") applicants were polygraphed, an increase of almost 10% from the previous year. CBP polygraph failure rate estimates range from 60% to 99.7%, or 340 of 341. The Anti-Border Corruption Act of 2010 mandated that by 2013, all CBP applicants be tested before hiring. There is also an expanding formal and informal global network of U.S. polygraph training and equipment recipients. Formally, the United States exports polygraph training and equipment as part of U.S.-sponsored anti-corruption programs such as Plan Colombia, the Mérida Initiative in Mexico, and others in the Bahamas, Bolivia, Guatemala, Honduras, and Iraq. Informally, the United States exports polygraph training and expertise to strategic allies, as in the cases of Singapore, South Korea, Japan, Australia, and Taiwan. Despite the prevalence of polygraphy inside and outside the federal government, little research is publicly available regarding bias, a vacuum which Ms. Sack intends to fill through her research. These courses have been specifically chosen because they purport to teach ethics, legal, and managerial subjects, which are the most likely to cover the topics of interest to this research. Her graduate training qualifies her to extract, synthesize, and effectively convey the requested information to the public in a form which would significantly contribute to the public's understanding of the government's use of polygraphy.

I also specifically state for the record Ms. Sack's unwillingness to pay any fees for this request. Please do not delay the processing of this request by needlessly requesting further confirmation of this unwillingness to pay fees or terminate the processing of this request for failure to provide you with such confirmation. This statement is a full and unequivocal refusal to pay *any* fees for this request.

Please ensure that, in accordance with the DC Circuit's ruling in *Chambers v. Dep't of the Interior*, 568 F.3d 998 (D.C. Cir. 2009), all records potentially responsive to this FOIA request are immediately preserved from destruction until the final resolution of this FOIA action. Destruction of potentially responsive records after the receipt of a FOIA request is considered "contumacious conduct" by the DC Circuit. *See id.* at 1004.

The DIA is required by law to respond to this request within 20 working days. Failure to timely comply may result in the filing of a civil action against your agency in a United States District Court.

Please provide any records produced in response to this request in electronic (soft-copy) form. Please provide soft-copy records by email or on a CD if email is not feasible. However, Ms. Sack does not agree to pay an additional fee to receive records on a CD, and in the instance that such a fee is required, she will accept a paper copy of responsive records. If a public interest fee waiver is granted, the previous statement is moot, as Ms. Sack expects that this will waive the charges for any CDs as well, thereby allowing the DIA to release the soft-copy records to her free of charge.

Your cooperation in this matter would be appreciated. If you wish to discuss this request, please do not hesitate to contact me.

Sincerely,

Kel McClanahan

# UNIVERSITY of VIRGINIA

WOODROW WILSON DEPARTMENT OF POLITICS
P.O. Box 400787
Charlottesville, VA 22904-4787
☎434 924 3192 (*fax*: 434 924 3359)

JEFFERY A. JENKINS
*Associate Professor & Director of Graduate Studies*
*Office Location:* Gibson Hall S 261
*Email:* jaj7d@virginia.edu

June 30, 2011

Re: Fee category verification and fee waiver request support

To Whom It May Concern:

This letter verifies that Katelyn Sack's FOIA request to which it is attached falls into the "academic" fee category. Ms. Sack is a Ph.D. student and President's Fellow in Politics at the University of Virginia. She intends to review, evaluate, synthesize, and present the requested data, analyses, policies, protocols, and practices in a publically available, usable form. This intention is consistent with U.Va.'s scholarly research goals.

The University of Virginia Politics Department is an institution of graduate higher education which operates programs of scholarly research. Ms. Sack's request is on behalf of this institution, one of the primary aims of which is to explain contemporary political developments in a broad philosophical and historical context that sheds light on the long-term development of institutional structures that shape political behavior norms and public policies. Ms. Sack is acting as a representative of the University of Virginia Department of Politics, and you may consider the Department to be the requester for purposes of fee calculations.

This letter also supports Ms. Sack's request for a fee waiver, on the grounds that disclosure of the requested information will significantly contribute to public understanding of government operations and activities. Ms. Sack's graduate training qualifies her to extract, synthesize, and effectively convey the requested information to the public. Her research is of interest to the public at large, because bias in polygraphs is an under-explored phenomenon that affects millions of Americans.

Sincerely,

Jeffery A. Jenkins

## AUTHORIZATION AND PRIVACY WAIVER

I, Katelyn Sack, hereby authorize the law firm National Security Counselors and any attorney associated with it (collectively "my attorneys") to file Freedom of Information Act ("FOIA") requests on my behalf with any agency of the United States government. I also authorize any agency of the United States government to discuss any FOIA requests filed by me or on my behalf (collectively "my requests") with my attorneys. A release to my attorneys shall be considered the legal equivalent of a release to me. A photocopy of this authorization shall have the same effect as the original.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Katelyn Sack
Katelyn Sack

05-18-2011
Date

# Exhibit H
# DIA
# Acknowledgement
## September 9, 2011



**DEFENSE INTELLIGENCE AGENCY**

WASHINGTON, D.C. 20340-5100



U-11-4,500/DAN-1A (FOIA)

Mr. Kel McClanahan                                                SEP 09 2011
c/o National Security Counselors
1200 South Courthouse Road
Suite 124
Arlington, VA  22204

Dear Mr. McClanahan:

   This is an interim response to your May 18, 2011, Freedom of Information Act (FOIA) request for information on 1. PDD Programs, a. PDD 501-Interview Techniques, b. Law 501-Legal and Ethical Aspects of PDD, c. RES 501-Research Issues and Theories in PDD & 2. FPCECP Programs, a. Law Enforcement Quality Control Course (853), b. PDD Managers Course (860), c. Advance Polygraph Studies Program (844).  We received your request on September 1, 2011 and assigned it case number 0468-2011.  Please use this number in all future correspondence with us about this matter.

   We will be unable to respond to your request within the FOIA's 20 day statutory time period due to unusual circumstances.  These unusual circumstances could be:  (a) the need to search for and collect records from a facility geographically separated from this office; (b) the potential volume of records responsive to your request; and (c) the need for consultation with one or more other agencies which have substantial interest in either the determination or the subject matter of the records.  For these reasons, your request has been placed in our queue and will be worked in the order the request was received.  Our current administrative workload is in excess of 1,985 requests.

   We regret that there is currently a substantial delay in processing requests and solicit your patience and understanding.  We assure you that we will process your request as soon as possible.  If you have any questions, please contact the DIA FOIA Requester Service Center at 301-394-5587.

                                        Sincerely,

                                        Alesia Y. Williams
                                        Chief, Freedom of Information Act Staff