UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
KATELYN SACK,                       )
                                    )
            Plaintiff,              )
                                    )
      v.                            ) Civil Action No. 12-244 (EGS)
                                    )
CENTRAL INTELLIGENCE AGENCY,        )
et al.,                             )
                                    )
            Defendants.             )
_____)

<u>**MEMORANDUM OPINION**</u>

Plaintiff Katelyn Sack requested information from the defendants, the Central Intelligence Agency ("CIA"), the Department of Defense ("DOD"), and the Department of Justice ("DOJ"), and their component agencies under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Dissatisfied with their responses, she filed this lawsuit. Pending before the Court are defendants' motion for summary judgment and plaintiff's motion to reinstate Count Fifteen of her Complaint. Upon consideration of the motions, the responses and replies thereto, the applicable law, and the entire record, the Court **GRANTS IN PART AND DENIES IN PART** defendants' motion for summary judgment and **DENIES** plaintiff's motion to reinstate.

## I. BACKGROUND

Katelyn Sack, a doctoral student, is writing a dissertation about polygraph examinations. *See* Compl. ¶ 4. In 2010 and 2011,

Ms. Sack submitted a number of FOIA requests to the defendants. Some, but not all, of these requests related to the agencies' use of polygraphs. Dissatisfied with the agencies' responses, Ms. Sack filed suit on February 14, 2012.

On April 25, 2013, the parties entered into a stipulation, dismissing Counts Two, Six, Eight, Ten, Eleven, Thirteen, and Fifteen of the Complaint. *See* Joint Stipulation, ECF No. 13 at 2. They also stipulated to the adequacy of the searches performed by each defendant. *See id.* at 1. The defendants moved for summary judgment on the remaining counts on May 3, 2013. *See* Mem. in Supp. of Defs.' Mot. for Summ. J. ("Mem."), ECF No. 14-1. Plaintiff responded on June 24, 2013. *See* Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Opp."), ECF No. 21. After multiple extensions, the defendants filed their reply brief on January 10, 2014. *See* Defs.' Reply in Supp. of Summ. J. ("Reply"), ECF No. 27.[1] The Court recites the facts relevant only to those Counts that remain in dispute.

1.   *The Central Intelligence Agency's Refusal to Search (Count One)*

On November 30, 2010, plaintiff submitted a request to the CIA (the "Count One Request") for "documents pertaining in whole or

_____

[1] On February 9, 2014, plaintiff moved to rescind the stipulated dismissal of Count Fifteen. *See* Mot. to Rescind, ECF No. 30. The defendants responded on February 26, 2014, Opp. to Mot. to Rescind, ECF No. 31, and plaintiff filed her reply on March 9, 2014. *See* Reply in Supp. of Mot. to Rescind, ECF No. 32.

in part (all years, all classifications) to a list of closed Inspector General investigations and reports." Defs.' Statement of Facts ("Defs.' SMF"), ECF No. 14-2 ¶ 1; *see* Ex. A to CIA Decl., ECF No. 14-5 at 2.

On February 7, 2011, the CIA responded to plaintiff's request and indicated that:

> We cannot accept your FOIA request in its current form because it would require the Agency to perform an unreasonably burdensome search. The FOIA requires requesters to "reasonably describe" the information they seek so that professional employees familiar with the subject matter can locate responsive information with a reasonable amount of effort. Because of the breadth of your request, and the way in which our records systems are configured, the Agency cannot conduct a reasonable search for information responsive to your request. We encourage you to refine the scope of your request (such as a more narrow time frame for the information you seek) to enable us to conduct a reasonable search for responsive information.

Ex. B to CIA Decl., ECF No. 14-5 at 5; *see* Defs.' SMF ¶ 2. Plaintiff did not contact the CIA to narrow or modify her request, and never filed an administrative appeal of the CIA's refusal to conduct a search. Defs.' SMF ¶ 3.[2]

> 2. *The Central Intelligence Agency's Withholdings (Counts Three and Four)*

On July 5, 2011, plaintiff submitted to the CIA two separate requests. The first request (the "Count Three Request") sought:

> (1) All records pertaining to changes made since 1994 in "the policies applicable to the training,

---

[2] The CIA disclaimed any argument related to plaintiff's failure to file an administrative appeal. *See* Reply at 5 n.1.

supervision, and performance appraisal of polygraph examiners to ensure that polygraph examinations are conducted in a professional manner and produce optimum results," in keeping with Recommendation No. 17 of the SSCI Report;[3] (2) All current "policies applicable to the training, supervision, and performance appraisal of polygraph examiners to ensure that polygraph examinations are conducted in a professional manner and produce optimum results," regardless of whether or not the records discuss actual or proposed policy changes; and (3) Any other records pertaining to Recommendation No. 17 of the SSCI Report.

Ex. F to CIA Decl., ECF No. 14-5 at 18; *see* Defs.' SMF ¶ 5. The

CIA responded to this request on July 26, 2012, and indicated

that it had "located nine documents, seven of which can be

released in segregable form with deletions made on the basis of

FOIA exemption (b)(1), (b)(3), and/or (b)(6)" and that the

remaining two documents were "denied in their entirety on the

basis of FOIA exemption (b)(3) and (b)(5)." Ex. G to CIA Decl.,

ECF No. 14-5 at 27.

Plaintiff's second request (the "Count Four Request") sought:

(1) All records pertaining to "[evaluations] of the polygraph as a part of CIA's security program" since 1994, in keeping with Recommendation No. 18 of the SSCI Report;[4] (2) All records pertaining to polygraph

---

[3] This refers to a report of the Senate Select Committee on Intelligence. *See* Staff of S. Select Comm. on Intelligence, 103d Cong., An Assessment of the Aldrich H. Ames Espionage Case and Its Implications for U.S. Intelligence (Comm. Print 1994), *available at* http://www.intelligence.senate.gov/pdfs103rd/10390.pdf. Recommendation 17 proposed that "[t]he Director of Central Intelligence should tighten polygraph procedures to make the polygraph more useful" and made suggestions. *Id.* at 68-69.

[4] Recommendation Number 18 suggested that "[t]he Director of Central Intelligence should institute a fundamental reevaluation

reliability and validity with respect to deception detection; (3) All records pertaining to the polygraph's relation to other aspects of the security process, such as background investigations, financial and supervisory reporting, and psychological testing; (4) All records pertaining to the use of inconclusive test results, especially (*but not limited to*) situations in which there are no damaging admissions; (5) All records pertaining to the use of deceptive polygraph results in the absence of damaging admissions; and (6) Any other records pertaining to Recommendation No. 18 of the SSCI Report.

Ex. H to CIA Decl., ECF No. 14-5 at 30; *see* Defs.' SMF ¶ 7. The CIA responded to this request on June 6, 2012, indicating that it "located five documents, four of which can be released in segregable form with deletions made on the basis of FOIA exemption (b)(1), (b)(3), and/or (b)(6)" and that the remaining document "must be denied in its entirety on the basis of FOIA exemption (b)(1) and (b)(3)." Ex. I to CIA Decl., ECF No. 14-5 at 37; *see* Defs.' SMF ¶ 8.

The parties agree that only certain CIA documents, and certain withholdings, remain at issue. *See* Defs.' SMF ¶¶ 6, 8; Opp. at 3-4. As to the Count Three Request, the parties dispute partial redactions made pursuant to Exemption 3 in Documents 3 and 5. *See* Defs.' SMF ¶ 6. As to the Count Four Request, the parties dispute the withholding in full of Document 1 pursuant to

---

of the polygraph as a part of CIA's security program." Staff of S. Select Comm. On Intelligence, 103d Cong., An Assessment of the Aldrich H. Ames Espionage Case and Its Implications for U.S. Intelligence 69 (Comm. Print 1994), *available at* http://www.intelligence.senate.gov/pdfs103rd/10390.pdf.

Exemptions 1 and 3, the partial withholding of Documents 2 and 4 pursuant to Exemptions 1 and 3, and the partial withholding of Document 3 pursuant to Exemption 3. *Id.* ¶ 8; Opp. at 3–4.

    *3.    The Defense Intelligence Agency's Withholdings (Counts Seven and Nine)*[5]

On November 21, 2010, plaintiff submitted a request to the Defense Intelligence Agency ("DIA") by email, seeking "a printout of the list of reports at the Defense Intelligence Agency, or the Defense Academy of Credibility Assessment written by Gordon Barland" and "a copy of each of the reports located." Ex. D to DIA Decl., ECF No. 14-9 at 32; *see* Defs.' SMF ¶ 10. In response, the DIA released multiple reports by Gordon Barland, but withheld in full two of his reports (called V-70 and V-71) pursuant to Exemptions 1, 3, and 7(E). Defs.' SMF ¶ 10. Plaintiff challenges only the Exemption 7(E) withholdings. *See* Opp. at 4-5 & n.4.

On July 26, 2011, plaintiff submitted another request to the DIA, seeking "copies of all course materials" for certain "National Center for Credibility Assessment courses." Ex. G to DIA Decl., ECF No. 14-9 at 44; *see* Defs.' SMF ¶ 11. The DIA

---

[5] Although the parties have not stipulated to the dismissal of Count Five, plaintiff appears to concede that Count. Count Five addressed the DIA's response to a November 21, 2010 request for "a list of closed Inspector General investigations and reports." Compl. ¶¶ 34-40. In response to that request, the DIA released one partially redacted document. *See* Defs.' SMF ¶ 9. Plaintiff did not list withholdings from that document among those she continues to challenge. *See* Opp. at 4-5.

released numerous records in response and the parties dispute only certain Exemption 3 and 6 withholdings from document V-21, Exemption 7(E) withholdings from documents V-27 and V-29, and Exemption 3 withholdings from document V-30. *See* Defs.' SMF ¶ 11; Opp. at 4–5.

> ### 4. *The Department of Defense's Withholdings (Count Twelve)*

On October 24, 2011, plaintiff submitted a request to the DOD's Office of the Inspector General ("DODIG") for "a copy of all Department of Defense Office of the Inspector General . . . records relating to the use of polygraphs by DOD components." Ex. A to DODIG Decl., ECF No. 14-11 at 20; *see* Defs.' SMF ¶ 12. DODIG conducted a series of document releases in response. *See* Defs.' SMF ¶ 13. At issue are four documents, IG-1, IG-2, IG-3, and IG-4. *See* Opp. at 5; DODIG Vaughn Index, ECF No. 14-12 at 2-3. Plaintiff challenges partial withholdings from IG-1 and IG-2, and the complete withholding of IG-3 and IG-4, all pursuant to Exemption 7(E). *See* Opp. at 5; DODIG Vaughn Index, ECF No. 14-12 at 2-3.

> ### 5. *The Federal Bureau of Investigation's Withholdings (Count Fourteen)*

On July 5, 2011, plaintiff submitted to the DOJ's Office of Information Policy a request for "records related to the processing of all FOIA appeals submitted by her, including, but not limited to, Appeal No. 2010-2171, by OIP." Ex. A to FBI

Decl., ECF No. 14-13 at 34 (emphasis omitted); *see* Defs.' SMF ¶ 14. The Office of Information Policy came upon four pages of Federal Bureau of Investigation ("FBI") records, which it "referred . . . to FBI for review and direct response." Defs.' SMF ¶ 15. On April 24, 2012, the FBI released one page in full and withheld portions of the other three pages pursuant to Exemptions 5, 6, and 7(E). *Id.* Plaintiff challenges only a single Exemption 5 withholding.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate. *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)). "FOIA cases typically and appropriately are decided on motions for summary

judgment." *Gold Anti-Trust Action Comm. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011) (quotation marks omitted).

In considering a motion for summary judgment under FOIA, the court must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). The court may award summary judgment solely on the basis of information provided by the agency in affidavits that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973). Agency affidavits must be "relatively detailed and non-conclusory." *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks omitted). Such affidavits are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id.* (quotation marks omitted). An agency may discharge its obligations under FOIA by producing a *Vaughn* index, which is an affidavit that indexes and specifically describes withheld or redacted records and explains

why each withheld record is exempt from disclosure. *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218–19 (D.C. Cir. 1987).

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.    The CIA's Refusal to Search (Count One).

The plaintiff's first argument is that the CIA erroneously refused to search for records responsive to the Count One Request. That request sought all "documents pertaining in whole or in part (all years, all classifications) to a list of closed Inspector General investigations and reports." Ex. A to CIA Decl., ECF No. 14-5 at 2. The CIA claims that the request was too broad to interpret and that responding would have been unduly burdensome.

FOIA requires agencies to produce documents "upon any request for records which . . . reasonably describes such records." 5 U.S.C. § 552(a)(3)(A). A FOIA request must "enable[] a professional employee of the agency who [is] familiar with the subject area of the request to locate the record with a reasonable amount of effort." H.R. Rep. No. 93-876, at 6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6271. "The linchpin inquiry is whether 'the agency is able to determine precisely what records are being requested.'" *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (quoting *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997)). By contrast, "[b]road, sweeping requests lacking specificity are not sufficient." *Id.* Relatedly, "[a]n

agency need not honor a request that requires an unreasonably
burdensome search," *Armstrong v. Bush*, 139 F.R.D. 547, 553
(D.D.C. 1991) (quotation marks omitted), or would require the
agency "to locate, review, redact, and arrange for inspection a
vast quantity of material." *Am. Fed. of Gov't Emps. v. U.S.
Dep't of Commerce*, 907 F.2d 203, 209 (D.C. Cir. 1990). This is
so because "FOIA was not intended to reduce government agencies
to full-time investigators on behalf of requesters."
*Assassination Archives & Research Ctr. v. CIA*, 720 F. Supp. 217,
219 (D.D.C. 1989).

The CIA claims that the Count One Request did not reasonably
describe the records it sought because the language "pertaining
in whole or in part" was undefined and caused the request to
cover any document that is arguably relevant to any list of
closed Inspector General investigations and reports, even if the
document did not reference such a list. *See* First Declaration of
Martha M. Lutz ("CIA Decl."), ECF No. 14-4 ¶ 22. The plaintiff
counters that the CIA is intentionally misinterpreting her
request, which was "limited to only those records which
referenced (1) a list (2) of closed (3) Inspector General
investigations and reports," and asserts that "there would be
very few places which would maintain records discussing lists of
OIG investigations." Opp. at 8 (emphasis omitted).

Plaintiff's request was broader than she claims. It did not seek "all lists of closed Inspector General investigations and reports" or even "all records that refer to a list of closed Inspector General investigations and reports." It sought all records that "pertain[] in whole or in part (all years, all classifications)" to such a list. Ex. A to CIA Decl., ECF No. 14-5 at 2. Nor did she describe how the CIA should determine whether a record "pertain[s] in whole or in part" to such a list. This phrase is difficult to define because a record may pertain to something without specifically mentioning it. *See* Black's Law Dictionary (9th ed. 2009), pertain ("[t]o relate to" or "to concern"); *Latham v. U.S. Dep't of Justice*, 658 F. Supp. 2d 155, 157, 161 (D.D.C. 2009) (request for "any records . . . that pertain in any form or sort to [plaintiff]" was "overly broad, and to require the [agency] to process it would be overly burdensome"); *James Madison Project v. CIA*, No. 8-cv-1323, 2009 WL 2777961, at *4 (E.D. Va. Aug. 31, 2009) (request for "all CIA documents pertaining to . . . [t]he indexing and organizational structure of all CIA Systems of Records subject to FOIA" was overbroad "because the term 'pertaining to' is synonymous to the term 'relating to'" and that "unfairly places the onus of non-production on the recipient of the request") (quotation marks omitted; alteration in original). Accordingly, although plaintiff's request clearly encompasses all lists of closed

Inspector General investigations and reports and any documents specifically referencing those lists, it would also cover documents that otherwise relate to those lists.

The problem for an agency responding to such a request is that the lack of clarity leaves the agency to guess at the plaintiff's intent. As the CIA explained, plaintiff's request could cover "any documents that relate to closed investigations and reports." Second Declaration of Martha M. Lutz ("CIA Suppl. Decl."), ECF No. 27-1 ¶ 13 (emphasis omitted). Indeed, any document related to a closed investigation may arguably pertain, at least "in part," to a subsequently generated list of investigations. Given this breadth, the CIA could not assume that responsive documents would be located only in those "very few places which would maintain records discussing lists of OIG investigations." Opp. at 8. That would be a starting point, but the CIA would also have needed to devise a method to search for records that do not mention a list of closed Inspector General investigations and reports, but still somehow pertain to such a list. This borders on the "all-encompassing fishing expedition" on which a FOIA requester cannot embark. *Dale*, 238 F. Supp. 2d at 104-05; *see Marks v. U.S. Dep't of Justice*, 578 F.2d 261, 262, 263 (9th Cir. 1978) (request for all records "under" a particular individual's name was a "broad, sweeping request[]" that did not reasonably describe the records it sought); *Hunt v.*

*CFTC*, 484 F. Supp. 47, 51 (D.D.C. 1979) (request for records

that "concerned" the requester was overbroad); *Fonda v. CIA*, 434

F. Supp. 498, 501 (D.D.C. 1977) (requester who sought "all

documents which . . . 'concern her' but do not mention her name"

made overbroad request by "offer[ing] no criterion by which

defendants can determine which documents 'concern her'").

This problem is especially acute because the CIA's record-

keeping systems do not permit it to "identify records that do

not necessarily reference a document, but which may bear some

relation to it." Mem. at 33 (citing CIA Decl. ¶ 22). Although

the D.C. Circuit has cautioned against "an 'undiscriminating

adoption'" of agency claims, *Armstrong*, 139 F.R.D. at 553

(quoting *Founding Church of Scientology, Inc. v. NSA*, 610 F.2d

824, 837 (D.C. Cir. 1979)), "an agency's affidavit detailing the

reasons that searches are unreasonably burdensome should be

accepted unless there is 'some reason to believe that the

documents could be located without an unreasonably burdensome

search.'" *Id.* (quoting *Goland v. CIA*, 607 F.2d 339 (D.C. Cir.

1978)). Here, "[t]he breadth of plaintiff's request[] is not

compatible with the CIA's document retrieval system, and

plaintiff must deal with that system as it is." *Assassination

Archives*, 720 F. Supp. at 220.

Moreover, plaintiff had ample opportunity to accept the CIA's

offer to reframe or narrow her request, but she failed to do so.

Now that this case has been litigated for years, plaintiff seeks to obtain only lists of closed Inspector General investigations and reports themselves, not any records "about these lists." Opp. at 10 n.7. This narrowing, however, did not come in time to permit the CIA to conduct a search responsive to a more reasonably framed request. Moreover, the parties have stipulated that the sole legal issue before the Court is "whether CIA was legally obligated to conduct [a] search" in response to plaintiff's request. Joint Stipulation, ECF No. 13 at 2. Faced with the task of guessing at plaintiff's intent regarding what might "pertain" to any list of closed Inspector General reports and investigations, the CIA followed a reasonable path: it sought additional guidance from the requester and, when none was provided, closed the file.[6]

**B.    The CIA's Withholdings (Counts Three and Four).**

---

[6] After this lawsuit was filed, the CIA searched for "a comprehensive list of closed OIG investigations" and "determined that no such listing exists." CIA Decl. ¶ 22. Plaintiff attached to her opposition what she claims are lists of OIG investigations, and argued that the CIA's declaration was therefore untrustworthy. *See* Opp. at 9-10. To begin, it is not clear that the documents are all what plaintiff claims; one is a "more comprehensive list, which includes open and closed investigations and other OIG matters, such as grievances." Suppl. CIA Decl. ¶ 13 n.5. The Court does not infer bad faith from the agency's failure to locate a single document in connection with a search where the parties have agreed that the sufficiency of any search is not a legal issue before this Court. *See* Joint Stipulation, ECF No. 13 at 2.

Plaintiff also challenges the CIA's Exemption 1 and 3 withholdings in response to the Count Three and Count Four Requests. She disputes partial redactions in five documents and the complete withholding of a sixth. Because the CIA indicated that "all of the information withheld pursuant to Exemption (b)(1) is also covered by [Exemption (b)(3)]," CIA Suppl. Decl. ¶ 4, the Court need not address the applicability of Exemption 1 if the Exemption 3 withholdings were proper. *See, e.g.*, *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 13 (D.C. Cir. 2014).

Exemption 3 protects records that are "specifically exempted from disclosure by statute . . . if that statute . . . requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). "In determining whether the government properly invoked this exemption, courts should 'not closely scrutinize' the withheld document's contents but rather determine (1) 'whether there is a relevant statute' and (2) 'whether the document falls within that statute.'" *Darnbrough v. U.S. Dep't of State*, 924 F. Supp. 2d 213, 217 (D.D.C. 2013) (quoting *Perry-Torres v. Dep't of State*, 404 F. Supp. 2d 140, 143 (D.D.C. 2005)).

The CIA relies on two statutes for its Exemption 3 withholdings: Section 102A(i)(1) of the National Security Act, 50 U.S.C. § 3024(i)(1); and Section 6 of the Central Intelligence Agency Act of 1949, 50 U.S.C. § 3507. These provisions "plainly are statutes contemplated by Exemption 3." *Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d 262, 273 (D.D.C. 2011). The question for the Court is whether the information that the CIA withheld falls within these statutes. *Darnbrough*, 924 F. Supp. 2d at 217.

1.   *Section 102A(i)(1) of the National Security Act*

Section 102A(i)(1) of the National Security Act provides that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). This provision grants the CIA "very broad authority to protect all sources of intelligence information from disclosure." *CIA v. Sims*, 471 U.S. 159, 168–69 (1985). According to the Supreme Court, "it is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." *Id.* at 180. Accordingly, "courts are required to give 'great deference' to the CIA's assertion that a particular disclosure could reveal intelligence

sources or methods." *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Sims*, 471 U.S. at 179); *see also Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009). In light of the Supreme Court's decision in *Sims*, the Act provides a "near-blanket FOIA exemption." *Berman*, 501 F.3d at 1140 (quotation marks omitted).[7]

Plaintiff focuses her argument on the CIA's invocation of the National Security Act in its *Vaughn* indices. *See* Opp. at 11. These assertions, plaintiff claims, fail to meet the agency's burden of demonstrating in a non-conclusory fashion that the withheld information relates to an intelligence source or method. *See id.* at 11-12. Plaintiff is correct that the *Vaughn* indices use generic language to invoke the National Security Act. *See, e.g.*, Count Three Vaughn Index, ECF No. 14-7 at 9 (stating that the document "is withheld in part on the basis of FOIA exemption (b)(3)" because it "contains information relating to intelligence sources and methods that is specifically exempted from disclosure pursuant to the National Security Act

---

[7] The Ninth Circuit has repeatedly warned that "*Sims* leaves courts 'only a short step from exempting all CIA records from FOIA.'" *Id.* (quoting *Hunt v. CIA*, 981 F.2d 1116, 1120 (9th Cir. 1992). It has further expressed "[c]oncern[] that this broad reading of CIA authority might be contrary to congressional intent" and has "invited Congress to 'take the necessary legislative action to rectify' that disparity." *Id.* (quoting *Hunt*, 981 F.2d at 1120); *see also Minier v. CIA*, 88 F.3d 796, 804 (9th Cir. 1996).

of 1947"); *see also id.* at 115; Count Four Vaughn Index, ECF No. 14-8 at 1, 4, 24, 55. That is not all the CIA provided, however.

First, the CIA explained that the information it withheld under the National Security Act related to "covert employees and facilities as well as the limitations, capabilities, successes, weaknesses or other issues pertaining to polygraph examinations." CIA Decl. ¶ 43. Release of this information, the agency asserts, "would expose sources and methods of the agency, not simply in the personnel screening settings, but also the capabilities and limitations of the polygraph in all applications." *Id.* In brief, disclosure of the withheld information "would reveal critical details about the polygraph program that would compromise the effectiveness of this method." Suppl. CIA Decl. ¶ 8; *see also id.* ¶¶ 9–11.

The Agency also specified how the particular documents and withholdings relate to that program. Each document is identified and described in ways that clarify its relation to the CIA's concerns. *See* Count Three Vaughn Index, ECF No. 14-7 at 9 ("Polygraph Procedures Manual," which "discusses authorities, code of ethics, examiner standards, and other topics with regard to polygraph examinations"; the withheld information "relates to the polygraph techniques, internal procedures and analysis"); *id.* at 115 (regulation related to the "Administration of Polygraph Examinations" which is described as "establish[ing]

19

the policy for the administration of polygraph examinations");

Count Four Vaughn Index, ECF No. 14-8 at 1 (report regarding
"[u]se of polygraph in security screening"); *id.* at 4 (report
entitled "The Value of the Polygraph in CIA's Personnel Security
Program," from which CIA redacted "information that would reveal
intelligence sources and methods as they are relate[d] to
polygraph screening procedures"); *id.* at 24 (index for a report
entitled "Validity and Reliability of the Polygraph as a Tool
for Identifying Deception and Nondeception," which was written
"to measure the validity and technical reliability of polygraph
examinations"); *id.* at 55 (report on "CIA's Use of Polygraphy in
Personnel Screening," which "goes into specific detail about
reliance on polygraph examinations, the polygraph process,
reinvestigation, training, and recommendations").

Moreover, the CIA's supplemental declaration provided
additional description of the particular information that was
redacted from individual documents. *See* Suppl. CIA Decl. ¶¶ 8-11
(material withheld from the documents included "internal agency
security regulations, details about polygraph examinations
including sample questions, analysis of testing data, and the
contents of examination reports"; "specifics on the accuracy of
certain areas tested during the exam"; "specific details about
the CIA's polygraph program, including in depth analysis of the
Agency's security processes and assessments of test techniques";

"statistics and anecdotal and empirical evidence . . . detailing the utility of and benefits derived from the program"; and "the organization and functions of the polygraph program and . . . the utility of this method in different settings").

The CIA also explained why its polygraph program is itself an intelligence source and method. Polygraphs are "a key intelligence method used in the Agency's security processes." They are "a tool for obtaining information and assessing deception in the course of applicant and personnel screening evaluations and counterintelligence investigations," form part of the agency's method for "determining an employee's eligibility for initial or continued access to classified information," and help "reduce the Agency's vulnerability to counterintelligence risks." *Id.* ¶ 4. Giving "substantial weight to the CIA's affidavits," *Larson*, 565 F.3d at 865, as the Court must, this is sufficient to establish that the withheld information relates to the detailed workings, efficacy, and weaknesses of a CIA intelligence source and method.[8] Accordingly,

---

[8] Courts have held that similar topics relate to intelligence sources and methods under the National Security Act. *See Blazy v. Tenet*, 979 F. Supp. 10, 23-24 (D.D.C. 1997) (upholding the Exemption 3 withholding of polygraph records based in part on agency's explanation "that plaintiff's polygraphs constitute intelligence methods and therefore cannot be released").

the CIA's withholdings under Section 102A(1)(i) of the National

Security Act were justified.[9]

   2.   *Section 6 of the Central Intelligence Act of 1949*

   The remaining Exemption 3 withholdings were done pursuant to

Section 6 of the Central Intelligence Act, which provides:

> [I]n order further to implement section 3024(i) of
> this title that the Director of National Intelligence
> shall be responsible for protecting intelligence
> sources and methods from unauthorized disclosure, the
> Agency shall be exempted from . . . the provisions of
> any other law which require[s] the publication or
> disclosure of the organization, functions, names,
> official titles, salaries, or numbers of personnel
> employed by the Agency.

50 U.S.C. § 3507. Plaintiff agrees that Section 6 protects

information about CIA employees, such as their names and

_____

[9] Plaintiff cites *Berman*, 501 F.3d 1136 for the proposition that
the CIA cannot invoke the Act solely "because it uses polygraphs
as part of its work." Opp. at 12. That case is entirely
distinguishable. In *Berman*, the CIA relied on the National
Security Act to prevent disclosure of the President's Daily
Briefs because they were "part of the process by which the CIA
advises the President . . . and therefore intelligence decisions
are directly affected by [them]." 501 F.3d at 1146 (quotation
marks omitted). The Ninth Circuit rejected this argument because
the Briefs "are nothing more than simple memoranda the CIA uses
to communicate with the President." *Id.* The Ninth Circuit's
statement that "[i]f we were to accept the CIA's logic, then
every written CIA communication . . . would be a protected
'intelligence method'" because it is a method that CIA uses in
doing its work," *id.*, is not applicable here, where the CIA is
seeking to protect information related to its polygraph program,
a method by which the agency obtains "information and assess[es]
deception in the course of applicant and personnel screening
evaluations and counterintelligence investigations." Suppl. CIA
Decl. ¶ 4.

specific job functions. *See* Opp. at 14, 20 n.12.[10] Although it is
possible that all of the information withheld by the CIA under
the CIA Act relates directly to agency personnel in this manner,
the Court cannot conclude as much on the current record and
therefore addresses the parties' competing interpretations of
Section 6.

The dispute boils down to a simple question: does the phrase
"of personnel employed by the Agency" modify each item in the
list of information that Section 6 exempts from disclosure or
only the final item? The plaintiff argues that it modifies each
item, meaning that Section 6 exempts from disclosure "the
organization of personnel employed by the CIA; the functions of
personnel employed by the CIA; the names of personnel employed
by the CIA; the official titles of personnel employed by the
CIA; the salaries of personnel employed by the CIA; and the
numbers of personnel employed by the CIA." Opp. at 14–15
(emphases omitted). The defendants read the phrase to modify
only the final item in the list. *See* Reply at 12.

_____

[10] Although she does not challenge the withholding of employee
names, plaintiff argues that the Agency's declaration is "a
textbook example of 'general sloppiness'" because it mentions
that CIA employee names are present in forty-nine documents, but
the CIA claimed FOIA Exemption 6's protection for such
information in only two instances. *See* Opp. at 14. The CIA
clarified that it "does not typically assert Exemption 6 to
protect the identities of its own employees, and instead relies
on the CIA Act to do so." CIA Suppl. Decl. ¶ 7 n.4. The two
Exemption 6 withholdings involved the names of non-employees.
*See* Defs.' Reply at 11.

The text of Section 6 does not readily bear the defendants' interpretation. If the phrase "of personnel employed by the Agency" modifies only the final term in the list, the provision becomes difficult to understand because it would exempt from disclosure: "the organization," "the functions," "the names," "the official titles," "the salaries," and "the numbers of personnel employed by the agency." The CIA appears to believe that the other terms should be read as modified by the phrase "of the agency," but that phrase does not appear in Section 6. Under that reading of Section 6, moreover, many items in the list would be rendered absurd (e.g. "the salaries [of the Agency]," "the names [of the Agency]," and "the official titles [of the Agency]"). Nor can the fact that Section 6 is entitled "Protection of nature of Agency's functions," 50 U.S.C. § 3507, overcome the provision's plain language. "[A] statute's title may not undo that which the statute itself makes plain." *United States v. Waters*, 158 F.3d 933, 938 (6th Cir. 1998).[11]

---

[11] Because reading Section 6 as defendant suggests renders the provision unclear, the last antecedent rule—that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows," *Barnhart v. Thomas,* 540 U.S. 20, 26 (2003)—does not apply. As the D.C. Circuit recently reiterated, that rule may "be overcome by other indicia of meaning." *Emory v. United Air Lines*, 720 F.3d 915, 926 (D.C. Cir. 2013). Similarly, the CIA's suggestion that it is entitled to deference, Reply at 15–16, is unavailing because its interpretation is at odds with the plain language of Section 6.

The Court does not write on a blank slate, moreover. Two
Judges of this Court recently rejected identical arguments made
by the CIA. *See Whitaker v. CIA*, No. 12-316, 2014 WL 914603, at
*5-7 (D.D.C. Mar. 10, 2014); *Nat'l Sec. Counselors v. CIA*, 960
F. Supp. 2d 101, 174-85 (D.D.C. 2013). There is also a long
history of decisions from the D.C. Circuit limiting the scope of
Section 6. *See Nat'l Sec. Counselors*, 960 F. Supp. 2d at 175-76.
First, as "an outer limit," *id.* at 175, the Circuit has held
that Section 6 "does not 'allow[] the [CIA] to refuse to provide
any information at all about anything it does.'" *Id.* (quoting
*Phillippi v. CIA*, 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976))
(alterations in original). The provision thus stands in contrast
to Section 6 of the National Security Agency Act, 50 U.S.C. §
3605(a), which protects from disclosure "the organization or any
function of the National Security Agency, or any information
with respect to the activities thereof, or of the names, titles,
salaries, or number of the persons employed by such agency." *See
Hayden v. NSA*, 608 F.2d 1381, 1389-90 (D.C. Cir. 1979) (noting
that the National Security Agency Act is "broader" than Section
6 because it protects "'any information with respect to the
activities' of the NSA").

The D.C. Circuit has also made clear that Section 6 "applies
only to 'information about [the CIA's] internal structure.'"
*Nat'l Sec. Counselors*, 960 F. Supp. 2d at 175 (quoting

*Phillippi*, 546 F.2d at 1015 n.14) (alteration in original). The
CIA repeatedly seizes on the use of the phrase "internal
structure" as support for interpreting the term to cover
anything related to the organization or function of the CIA. *See*
Reply at 10–12. The D.C. Circuit, however, has made clear that
information related to the Agency's structure is protected only
to the extent it relates to "information concerning the Agency's
personnel." *Linder v. Dep't of Defense*, 133 F.3d 17, 25 (D.C.
Cir. 1998). Thus, as Judge Howell found in *National Security
Counselors*, Section 6, "standing alone, only protects
information on the CIA's personnel and internal structure, such
as the names of personnel, the titles and salaries of personnel,
or how personnel are organized within the CIA." 960 F. Supp. 2d
at 175 (quotation marks and citation omitted).

The Agency argues that even if Section 6's protections apply
only to personnel information, information about the functions
and organization of the CIA necessarily relates to the function
and organization of its employees. Reply at 12–13. Were there no
distinction between the function and organization of agency
personnel and the function and organization of the Agency,
however, Section 6 would "encompass any kind of activity
appropriately carried out by the CIA." *Nat'l Sec. Counselors*,
960 F. Supp. 2d at 176 (holding that the CIA's argument would
"strip[] the word personnel of any real meaning") (quotation

marks omitted). Thus, although information related to the
function and organization of the Agency *may* relate directly to
the function or organization of agency personnel, it does not
necessarily do so. This comports with "the plain text of the
statute[, which] limits protection from disclosure only to the
functions and organization pertaining to or about personnel,"
*id.*, and the D.C. Circuit's view that Section 6 does not exempt
from disclosure "any information at all about anything [the CIA]
does.'" *Phillippi*, 546 F.2d at 1015 n.14.[12] Accordingly, Section
6's protection applies only when the withheld information
relates to "the CIA's personnel and internal structure, such as
the names of personnel, the titles and salaries of personnel, or
how personnel are organized within the CIA." *Nat'l Sec.*

---

[12] Illustrative of why "the functions and organization of
personnel" has a narrower meaning than "the functions and
organization of the agency" is the Supreme Court's
interpretation of the adjective "personnel" as used in FOIA's
Exemption 2. *See Milner v. Dep't of Navy*, 131 S. Ct. 1259
(2011). Exemption 2 protects from disclosure information
"related solely to the internal personnel rules and practices of
an agency." 5 U.S.C. § 552(b)(2). In *Milner*, the Court held that
the term "personnel" limits the types of "rules and practices"
that are covered by Exemption 2 to those that relate to human-
resources functions, rather than a broader set of agency rules
and practices. *Id.* at 1264. Reading the term "personnel" in
Section 6 to effectively mean "agency" would similarly do
violence to the word's ordinary meaning.

*Counselors*, 960 F. Supp. 2d at 175 (quotations marks and citations omitted); *see also Whitaker*, 2014 WL 914603, at *5.[13]

Under this interpretation of Section 6, the Court cannot currently say whether the CIA's withholdings were proper. The CIA's initial declaration described the information withheld under the CIA Act as including: (1) "the names of CIA employees," their "official titles," and "information disclosing their organizational functions"; (2) "contact information for CIA personnel"; (3) "internal CIA organizational data, including file paths"; (5) "internal taskings which would reveal internal document processing methods, as well as the organization of and capabilities related to the CIA's decentralized information management systems"; and (6) "internal CIA organizational and functional information." CIA Decl. ¶ 41. In its supplemental declaration, the CIA asserted that "the sole instances in which the CIA has relied exclusively upon the CIA Act concern internal office and distribution information," including "the internal

---

[13] The Court is not persuaded by earlier decisions that arguably condoned the CIA's interpretation. Those decisions analyzed the interpretive question very briefly and some appeared to rely simultaneously on the broad protections provided by the National Security Act. *See Inst. For Pol'y Studies v. CIA*, 885 F. Supp. 2d 120, 146–47 (D.D.C. 2012); *Schoenman v. FBI*, 841 F. Supp. 2d 69, 83–84 (D.D.C. 2012); *ACLU v. Dep't of Justice*, 808 F. Supp. 2d 280, 288–89 (D.D.C. 2011), *rev'd on other grounds*, 710 F.3d 422 (D.C. Cir. 2013); *McGehee v. U.S. Dep't of Justice*, 800 F. Supp. 2d 220, 231–32 (D.D.C. 2011); *James Madison Project v. CIA*, 607 F. Supp. 2d 109, 125–27 (D.D.C. 2009); *Riquelme v. CIA*, 453 F. Supp. 2d 103, 111 (D.D.C. 2006).

divisions within the Agency, internal telephone numbers, and classification dissemination controls" as well as other markings "involving internal office and distribution information." CIA Suppl. Decl. ¶ 6. The CIA also claims that "the National Security Act applies to the vast majority of information for which the CIA Act is claimed." *Id.* These declarations nonetheless imply that the withheld information may have related not only to personnel, but also to the organization of the CIA itself. To obtain summary judgment, the CIA must provide a clearer description of the withheld information. Moreover, to the extent that withheld information relates to "internal CIA organizational data, including file paths," "internal document processing methods," and "the organization of and capabilities related to the CIA's decentralized information management systems," CIA Decl. ¶ 41, the Agency must provide a more detailed description to justify withholding that information as related to the organization and functions of agency personnel. *See Nat'l Sec. Counselors*, 960 F. Supp. 2d at 179 ("Shorn of the gratuitous addition of the words 'internal' and 'organizational,' it appears that the information . . . is information about how the CIA manages, stores, and retrieves information.").[14]

---

[14] It is not clear whether the information that was withheld pursuant to the CIA Act alone was also subject to an Exemption

**C.    The DIA's Withholdings (Counts Seven and Nine).**

Plaintiff challenges certain of the DIA's withholdings with
respect to six documents. She challenges withholdings of
polygraph information under Exemption 3 from documents V-21 and
V-30; thermal images from document V-21 pursuant to Exemptions 3
and 6; and Exemption 7(E) withholdings from documents V-21, V-
27, V-29, V-70, and V-71.

>    1.    *Exemption 3 Withholdings Pursuant to the National*
>          *Security Act.*

The DIA's Exemption 3 withholdings from V-21 and V-30 were all
done pursuant to Section 102A(i)(1) of the National Security
Act. As discussed in Part III.B.1, *supra*, that provision exempts
from disclosure information related to "intelligence sources and
methods," 50 U.S.C. § 3024(i)(1), and grants "very broad
authority to protect all sources of intelligence information
from disclosure." *Sims*, 471 U.S. at 168–69. As long as the
agency provides "justifications for nondisclosure with
reasonably specific detail, demonstrate[s] that the information
withheld logically falls within the claimed exemptions, and
show[s] that the justifications are not controverted by contrary
evidence in the record or by evidence of [agency] bad faith,"

_____

One withholding. Accordingly, the parties' disputes regarding
Exemption One may be rendered moot by the Court's ruling
regarding the National Security Act and the Court declines to
address those arguments at this time.

*Berman*, 501 F.3d at 1140, the Court must "accord[] substantial weight to the [agency's] affidavits." *Larson*, 565 F.3d at 865.

The plaintiff claims that the DIA's *Vaughn* index and declarations are vague and conclusory. *See* Opp. at 22-23. In fact, the DIA provided sufficient information to show that it is entitled to summary judgment. The DIA's *Vaughn* Index states that V-21 is entitled "National Center for Credibility Assessment, Alternative Credibility Assessment" and that the National Security Act was relied upon "to protect intelligence sources and methods." DIA Vaughn Index, ECF No. 14-10 at 1. V-30 is entitled "National Center for Credibility Assessment, Continuing Education PDD," and the National Security Act was relied upon "to protect sensitive information on the population of federal polygraph examiners throughout government agencies; how polygraph examiners are trained and the locations where the training occurs." *Id.* at 4.

The DIA's supplemental declaration provided additional detail. It explained that the National Center for Credibility Assessment, the entity to which both V-21 and V-30 relate, "conducts developmental research and provides academic training to the polygraph programs within the United States Intelligence Community," which then "utilize[s] the . . . technology for both national security screening and investigative purposes." Second Declaration of Alesia Y. Williams ("Suppl. DIA Decl."), ECF No.

27-2 ¶ 2. The DIA further stated that the National Security Act "was specifically cited to protect intelligence sources and methods within the Intelligence Community that are related to the use of polygraph technology," which "is used by DIA and other agencies for their intelligence activities and to asses employees' and potential employees' suitability for access to classified materials." *Id.* ¶ 4. Finally, the DIA declared that "it is not possible to provide any additional information without compromising the sources and methods." *Id.*

This is sufficient to establish that the withheld information relates to research and training programs of the National Center for Credibility Assessment regarding polygraphs that are used by the intelligence community for security and counterintelligence purposes. In view of the deference owed an agency under the National Security Act, the Court cannot disagree that the DIA's polygraph program is an intelligence source and method and that the withheld information relates to that program.[15]

  2. *Exemption 3 and 6 Withholdings of Thermal Images.*

---

[15] Moreover, absent evidence of agency bad faith, the Court must also consider the agency's declaration that providing any further detail would disclose the very information it seeks to protect. *See Sims*, 471 U.S. at 179 (noting that "[i]t is conceivable that the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency").

Plaintiff also challenges the DIA's withholding of thermal images from Document V-21. The DIA explained that the images are "photographs of Department of Defense employees or contractor personnel taken for training purposes with a thermal camera . . . to demonstrate the potential use of these sorts of images in the credibility assessment process." DIA Suppl. Decl. ¶ 5. These images were withheld pursuant to Exemption 6, which protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).[16] Exemption 6 covers any "[g]overnment records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Wash. Post. Co.*, 456 U.S. 595, 602 (1982) (quotation marks omitted); *see also Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006) (Exemption 6 applies "to exempt not just files, but also bits of personal information . . . the release of which would create a palpable threat to privacy") (quotation marks and alterations omitted). The Court determines whether Exemption 6 applies by "weigh[ing] the privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the

---

[16] The images were also withheld under 10 U.S.C. § 424, which exempts from disclosure "the organization or any function of [the DIA]" and "the number of persons employed by or assigned or detailed to [the DIA] or the name, official title, occupational series, grade, or salary of any such person."

disclosure would work a clearly unwarranted invasion of personal privacy." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (quotation marks omitted).

"The only relevant public interest . . . is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Id.* (quotation marks and alterations omitted). Here, the public interest in disclosure of the thermal images is minimal because the "same type of image could be created with any thermal camera, including through widely-available smart phone 'apps' that generate images similar to those being withheld." Suppl. DIA Decl. ¶ 11. "[T]he public interest is not furthered 'by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct.'" *People for the Am. Way v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 304 (D.D.C. 2007) (quoting *U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 773 (1989)).

Privacy concerns outweigh this minimal public interest. "The privacy interest in nondisclosure encompasses an individual's control of personal information and is not limited to that of an embarrassing or intimate nature." *Id.* (citing *Wash. Post Co.*, 456 U.S. at 600). Images of an individual may implicate a

privacy interest under Exemption 6. *See, e.g.*, *Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 818 F. Supp. 2d 122, 129 (D.D.C. 2011). Indeed, plaintiff "concedes that photographs of employees may be legitimately withheld," but argues that thermal images are different because no employee may be identified from the images. *See* Opp. at 23-24. The DIA stated, however, that the images "could reasonably lead to the personal identification of these . . . employees or contractor personnel." DIA Suppl. Decl. ¶ 5.

Four of the images are such that "[a] viewer is easily able to identify the gender, age, facial shape, and facial hair of the subject" and "can easily make out more detailed facial features that make each person unique." *Id.* ¶ 7. "These four images provide the viewer with an image that is . . . similar to a regular photograph, but with a detailed color overlay that shows the measurement of the heat emanating from the subjects' skin." *Id.* Three other images, while of lesser quality "still allow a viewer to identify gender, basic facial features, facial hair, and the subject's general age." *Id.* ¶ 8. Ultimately, the DIA stated, "it would still be quite easy for a viewer to use the images' personally identifying information to discover the identity of each of these [individuals]." *Id.* ¶ 9.

Nor are the images being withheld solely to prevent unwanted disclosure of the individuals' photographs. As the DIA

explained, disclosure of the identities of those depicted in the images would "allow[] outside actors to identify employees of this Agency who may be working to further the mission of the Intelligence Community; and, the release could reasonably be expected to damage the individual privacy of the employees or contractors by disclosing their identities to the general public." *Id.* ¶ 6. At a minimum, this creates a moderate privacy interest and "something, even a modest privacy interest, outweighs nothing every time." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).[17]

> 3.  *Exemption 7(E) Withholdings.*

Plaintiff also challenges the DIA's withholding of polygraph-related information pursuant to Exemption 7(E) from V-27, V-29, V-70, and V-71. Exemption 7(E) protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). An agency does not bear "a highly

---

[17] The images were also properly withheld under 10 U.S.C. § 424, which is "a statute that falls within the scope of Exemption 3." *Physicians for Human Rights v. U.S. Dep't of Defense*, 778 F. Supp. 2d 28, 36 (D.D.C. 2011). Section 424 "clearly aims to protect the identity of DIA personnel" and is therefore a proper basis for withholding the images. *Larson v. Dep't of State*, No. 2-cv-1937, 2005 WL 3276303, at *15 (D.D.C. Aug. 10, 2005).

specific burden of showing how the law will be circumvented";
rather, "exemption 7(E) only requires that [the agency]
'demonstrate[] logically how the release . . . might create a
risk of circumvention of the law.'" *Mayer Brown LLP v. IRS*, 562
F.3d 1190, 1194 (D.C. Cir. 2009) (quoting *PHE, Inc. v. Dep't of
Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993)) (second alteration
in original).

The DIA maintains that the information withheld under
Exemption 7(E) consists of "details concerning the use of
polygraph technology to test the credibility of employees
involved in specific incidents in the federal workplace" the
release of which "could diminish the effectiveness of the
polygraph examination as an investigative tool by allowing the
general public to discern when DIA is likely to utilize this
tool." DIA Decl. ¶ 37. Moreover, at least some of the
information withheld relates to "investigative techniques that
were used in an espionage investigation." *Id.* ¶ 39.

More specifically, V-21, V-27, and V-29 are "training
materials, which are used to teach polygraph research,
standards, policies and procedures" and the withheld information
"could be used to circumvent the polygraph examination itself"
and potentially diminish "the effectiveness of the polygraph
examination as a critical law enforcement and national security
screening tool." DIA Suppl. Decl. ¶ 12. V-70 and V-71, reports

of Dr. Barland, both include "a significant amount of sensitive information concerning the use of polygraph countermeasures that is unknown to the public." *Id.* ¶ 13.

Plaintiff argues that this information is not subject to Exemption 7(E) because the information does not pertain to the use of polygraphs during a criminal investigation. *See* Opp. at 24. The Court finds that plaintiff's proposed distinction between criminal investigations and personnel-screening has no legal basis. Indeed, Judge Wilkins rejected an identical argument in *Sack v. U.S. Dep't of Defense*, No. 12-cv-1754, 2013 WL 6640776, at *8 (D.D.C. Dec. 13, 2013). There, the Court upheld Exemption 7(E) withholdings of polygraph-related information because disclosure of information regarding the DIA's involvement in reviewing and testing other agencies' polygraph programs would contribute to the circumvention of polygraphs. *Id.* The Court rejected plaintiff's distinction "between polygraph examinations conducted as part of a criminal investigation . . . and employment-related polygraph programs." *Id.* Similarly, in *Morley v. CIA*, the D.C. Circuit applied Exemption 7(E) to information "revealing security clearance procedures [that] could render those procedures vulnerable and weaken their effectiveness at uncovering background information on potential candidates." 508 F.3d 1108, 1129 (D.C. Cir. 2007). The Circuit found that "[b]ackground investigations conducted to

assess an applicant's qualification . . . inherently relate to law enforcement." *Id.* at 1128–29. There is therefore no basis to exclude information from coverage of Exemption 7(E) based solely on the fact that it is used in personnel-screening activities.

Plaintiff argues alternatively that the information cannot lead to circumvention of law enforcement techniques because it is outdated and there is "no reason to presume that those vulnerabilities [it identifies] have not been subsequently corrected. Opp. at 25–26. The DIA declared that the research discussed in the withholdings "remains an active part" of its "efforts to detect and prevent the use of polygraph countermeasures." DIA Suppl. Decl. ¶ 13. Even if some of the findings have been used to improve polygraph practices, "harm would be caused to the overall process were it to be disclosed precisely which . . . vulnerabilities have been suitably addressed and which remain a critical task." *Id.* ¶ 14. These statements are sufficient to meet the agency's burden of showing that release of the information could lead to circumvention of current law-enforcement techniques.

**D. The DODIG's Withholdings (Count Twelve).**

Plaintiff's sole challenge to the DODIG's withholdings asserts that it invoked Exemption 7(E) in a conclusory manner and should be "require[d] . . . to supply actual particularized evidence." Opp. at 27. The DODIG withheld portions of Documents IG-1 and

IG-2, and all of Documents IG-3 and IG-4. *See* DODIG Vaughn

Index, ECF No. 14-12 at 2-3. Three of the four documents—all but

IG-3—are identified as having been authored by the Defense

Criminal Investigative Service, *id.*, an arm of the DODIG that

utilizes polygraphs in its investigations. *See* Declaration of

Jeanne Miller ("DODIG Decl."), ECF No. 14-11 ¶¶ 4(a), 47. The

titles of all four documents shed further light on their

relation to DODIG's investigative functions. *See* DODIG Vaughn

Index, ECF No. 14-12 at 2-3 (IG-1 "Psychophysiological Detection

of Deception (PDD) Examinations"; IG-2 "Pyschophysiological

Detection of Deception Program (PDD) Operational Manual"; IG-3

"Utilization of Polygraph in Criminal Intelligence Operations";

IG-4 "DCIS Form PDD4-DCIS Polygraph Testing Techniques.").

   The *Vaughn* index also states that each withholding was done

because the information "would disclose investigative techniques

and procedures, specifically, polygraph techniques used by

DCIS." *Id.* Finally, in its declaration, the DODIG asserts that

"[i]nformation contained in [the withheld documents], which is

not generally known to the public, is designed solely to guide

DCIS personnel in the use of polygraphs in support of

investigations" and that "[t]he redacted material identifies

specific applications of techniques and procedures used in

polygraph matters and disclosure could enable circumvention of

[the] polygraph test by others." DODIG Decl. ¶ 47. Moreover,

DODIG states, "[p]ublic release of that information could possibly benefit those attempting to reduce the effectiveness of the polygraph or violate the law and avoid detection." *Id.* This description meets the agency's burden by showing that the withholdings protect information the release of which could lead to circumvention of the criminal-investigation activities of the Defense Criminal Investigative Service.

**E.    The FBI's Withholdings (Count Fourteen).**

Plaintiff's sole challenge to the FBI's withholdings relates to a single Exemption 5 withholding. The FBI released that information to plaintiff after learning that it "was actually released by FBI in response to another of Sack's requests." Opp. at 27 (emphasis omitted); *see* Second Declaration of David M. Hardy, ECF No. 27-3 ¶ 5. Because plaintiff does not challenge any other withholdings, this claim is moot.[18]

**F.    Segregability.**

---

[18] Plaintiff's request that the Court "issue a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding," Opp. at 28, is **DENIED**. For one, the Court has neither "order[ed] the production of any agency records" in connection with this dispute, nor "assesse[d] against the United States reasonable attorney fees and other litigation costs," 5 U.S.C. § 552(a)(4)(F)(i), both of which are necessary prerequisites to the relief plaintiff seeks. *See Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 184 n.8 (D.D.C. 2013). Moreover, plaintiff has not demonstrated that the FBI's withholding was arbitrary or capricious.

Before granting summary judgment, the Court must determine whether "[a]ny reasonably segregable portion of a record" can "be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "So important is this requirement that '[b]efore approving the application of a FOIA exemption, the district court *must* make specific findings of segregability regarding the documents to be withheld." *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 173 (D.D.C. 2011) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)) (emphasis in original). The Court, in fact, has "an affirmative duty to consider the segregability issue *sua sponte.*" *Juarez v. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008) (quotation marks omitted).

In this Circuit, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). The agency must "'describe what proportion of the information in the documents,' if any, 'is non-exempt and how that material is dispersed through the documents.'" *Elec. Frontier Found.*, 826 F. Supp. 2d at 174 (quoting *Mead Data*, 566 F.2d at 261) (alterations omitted). Once it does so, the agency is "entitled to a presumption that it complied with the obligation to disclose reasonably segregable

material." *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013)

(quotations marks and alterations omitted). This presumption

"must be overcome by some 'quantum of evidence' by the

requester." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, No.

12-1350, 2014 WL 794220, at *12 (D.D.C. Feb. 28, 2014) (quoting

*Sussman*, 494 F.3d at 1117). The Court therefore must analyze the

evidence of non-segregability presented by the DIA and DODIG.[19]

The DIA declaration asserts:

> I have carefully reviewed Attorney General Holder's
> memo . . . which encourages agencies to make
> discretionary disclosures and directs agencies to
> segregate and release nonexempt information. The
> documents were carefully reviewed for reasonably
> segregable information. I have determined that there
> is no reasonably segregable information that can be
> released to the plaintiff.

DIA Decl. ¶ 40. The declaration confirms that the agency

conducted a careful review. The partial withholdings from

documents V-21, V-27, V-29, and V-30 are described in sufficient

detail to indicate that the agency withheld information directly

related to the reason for invoking an exemption. *See* DIA Suppl.

Decl. ¶¶ 4-5, 7-8, 12.

The DIA's withholding in full of V-70 and V-71 was justified

by "affidavits that show with reasonable specificity why

documents withheld pursuant to a valid exemption cannot be

---

[19] Because the Court upholds only some of the CIA's withholdings
at this time, and it is not clear what information was withheld
solely pursuant to the CIA Act, the Court is currently unable to
conduct a segregability analysis as to the CIA's withholdings.

further segregated." *Juarez*, 518 F.3d at 61. The DIA determined that V-70 and V-71 "each contain[] a significant amount of sensitive information concerning the use of polygraph countermeasures that is unknown to the public" and "[t]he whole body of research discussed in documents V-70 and V-71 remains an active part of the [agency's] efforts to detect and prevent the use of polygraph countermeasures." DIA Suppl. Decl. ¶ 13. The DIA also concluded that, even if some of the vulnerabilities identified in the articles have been rectified, "harm would be caused to the overall process were it to be disclosed precisely which potential[] vulnerabilities have been suitably addressed and which remain a critical risk." *Id.* ¶ 14. For this reason, "it is . . . not possible to segregate certain information from either of these two articles for release to plaintiff." *Id.*

The DODIG declaration states:

> I have carefully reviewed Attorney General Holder's memo . . . which encourages agencies to make discretionary disclosures and directs agencies to segregate and release nonexempt information. The documents were carefully reviewed for reasonably segregable information. I have determined that there is no additional reasonably segregable information that can be released to the Plaintiff.

DODIG Decl. ¶ 48. This statement, combined with the DODIG declaration's description of the information redacted from the partially withheld documents, IG-1 and IG-2, is sufficient. *See id.* ¶ 47. The DODIG did not, however, describe "with reasonable

specificity" why IG-3 and IG-4 were withheld in full. It may be that those documents contain information withheld under Exemption 7(E)—or under other exemptions that plaintiff has elected not to challenge—that is dispersed such that the documents must be withheld in full, but DODIG must "show with reasonable specificity *why*" this is the case. *See Juarez*, 518 F.3d at 61 (emphasis added).

## IV.   **PLAINTIFF'S MOTION TO RESCIND**

Also before the Court is plaintiff's motion to rescind the stipulated dismissal of Count Fifteen of her Complaint. That Count challenged the DOJ Office of Legal Counsel's ("OLC") response to a FOIA request plaintiff submitted "for all records relating to polygraphs." Compl. ¶ 84. Plaintiff claims that she agreed to the stipulated dismissal of Count Fifteen because OLC assured her, through a draft *Vaughn* index, that it would withhold six documents on the basis of the attorney-client and deliberative-process privileges. *See* Mot. to Rescind, ECF No. 30 at 1. She claims that OLC represented that the documents were communications to other agencies and that it had consulted with each agency before withholding the document. *Id.* at 2.

Plaintiff asserts that her counsel found one of the documents, an OLC opinion from 1967, publicly available through the CIA Records Search Tool. *See id.* Plaintiff's counsel brought this to the attention of defendants' counsel, who confirmed with OLC

that it had consulted the appropriate agencies in determining what to withhold. *See id.* OLC, however, refused to provide plaintiff the level of detail about these consultations that she desired. *See id.* at 2-3. Accordingly, plaintiff moved to rescind the stipulated dismissal of Count Fifteen.

Plaintiff offers no legal basis for her request. Instead, she argues the merits of OLC's withholding, noting that the privileges claimed in the OLC's draft *Vaughn* index may be waived if published by OLC's client. *Id.* at 3. According to plaintiff, OLC's failure to learn of the CIA's publication of the 1967 memo demonstrates that OLC's consultations regarding the other five documents cannot be trusted. *Id.* at 4.

The Court reads plaintiff's motion as a request under Federal Rule of Civil Procedure 60(b), which provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

The D.C. Circuit has held that voluntary dismissals under Rule 41(a), like the parties' Joint Stipulation, may be subject to

Rule 60(b) motions. *See Randall v. Merrill Lynch*, 820 F.2d 1317, 1320 (D.C. Cir. 1987).

Plaintiff's failure to provide a legal basis for her request complicates matters, but the Court finds that her allegation of "a misrepresentation by OLC," Mot. to Rescind, ECF No. 30 at 1, could fall under Rule 60(b)(3), which provides relief for "fraud . . . misrepresentation, or misconduct by an opposing party."[20] To obtain relief under this provision, "the burden of proof of fraud is on the moving party and . . . fraud must be established by clear and convincing evidence." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2860 (3d ed. 2014); *see also Tembec, Inc. v. United States*, No. 5-2345, 2007 WL 1169346, at *4 (D.D.C. April 19, 2007) (movant "must establish fraud or misconduct, and resulting actual prejudice, by clear and convincing evidence").

---

[20] Plaintiff does not appear eligible for relief under any other subsection of Rule 60(b). Her voluntary entrance into the stipulation would preclude relief under Rule 60(b)(1). *See* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2858 (3d ed. 2014) ("Voluntary action also may prevent a party from seeking relief on the ground of mistake or excusable neglect. This includes . . . deliberately adopted stipulations, or voluntary dismissals, even when based on erroneous facts."). Subsections (b)(2), (b)(4), and (b)(5) cannot provide relief because they address defects in or changed circumstances regarding a prior Court judgment. Finally, Rule 60(b)(6) "should be only sparingly used and may not be employed simply to rescue a litigant from strategic choices that later turn out to be improvident." *Kramer v. Gates*, 481 F.3d 788, 792 (D.C. Cir. 2007) (quotation marks omitted).

Plaintiff cannot meet this bar. She establishes only that OLC failed to learn that the CIA had previously released the 1967 Opinion. There is no evidence—much less clear and convincing evidence—that this was anything but an oversight in connection with negotiations regarding a far-ranging FOIA request. A minor oversight, without evidence of affirmative misconduct, does not support a finding of fraud. *Compare Summers v. Howard Univ.*, 374 F.3d 1188, 1193 (D.C. Cir. 2004) (granting relief under Rule 60(b)(3) where "plaintiffs engaged in repeated, affirmative efforts to keep [the relevant information] a secret from [the defendant]" and "plaintiffs concede[d] that these acts were intentional"). "There must be an end to litigation someday" and plaintiff's strategic decision to stipulate to the dismissal of Count Fifteen was the kind of "free, calculated, deliberate choice[ that is] not to be relieved from." *Ackermann v. United States*, 340 U.S. 193, 198 (1950).

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** defendants' motion for summary judgment and **DENIES** plaintiff's motion to reinstate Count Fifteen. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:     **Emmet G. Sullivan**
            **United States District Judge**
            **July 10, 2014**

48